## No. 2014-1599

### IN THE
# *United States Court of Appeals*
### FOR THE FEDERAL CIRCUIT

---

SOFTVIEW LLC,

*Appellant,*

*v.*

KYOCERA CORPORATION and MOTOROLA MOBILITY LLC,

*Appellees.*

---

APPEAL FROM
THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD
IN NOS. IPR2013-00004 AND IPR2013-00257

---

## BRIEF OF APPELLANT SOFTVIEW LLC [CORRECTED]

---

MORGAN CHU
SAMUEL K. LU
ALAN J. HEINRICH

**IRELL & MANELLA LLP**

1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 277-1010
*Attorneys for Appellant*
SOFTVIEW LLC

September 8, 2014

# CERTIFICATE OF INTEREST

Counsel for Appellant SoftView LLC certifies the following:

1.   The full names of every party represented by me is:  SoftView LLC.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: N/A.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: Irell & Manella LLP, Morgan Chu, Samuel K. Lu, Alan Heinrich, Ben Yorks, and Babak Redjaian.

Dated:  September 8, 2014                Respectfully submitted,

                                         IRELL & MANELLA LLP

                                         By:  */s/ Samuel Lu*
                                         *Attorney for Appellant*
                                         SoftView LLC

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .......................................................... i

STATEMENT OF RELATED CASES ............................................. viii

JURISDICTIONAL STATEMENT ..................................................... 1

INTRODUCTION ............................................................................... 2

STATEMENT OF THE ISSUES......................................................... 5

STATEMENT OF THE CASE.............................................................. 6

    I.     PROCEDURAL BACKGROUND .................................. 6

    II.    THE SOFTVIEW PATENTS ....................................... 7

    III.   THE PRIOR ART ........................................................ 13

         A.    The Zaurus References ....................................... 14

         B.    The Pad++ References ....................................... 14

         C.    Hara ................................................................. 15

         D.    Tsutsumitake ..................................................... 16

SUMMARY OF THE ARGUMENT ................................................. 17

ARGUMENT ................................................................................... 20

    I.     STANDARD OF REVIEW .......................................... 20

    II.    THE BOARD ERRED IN CLAIM CONSTRUCTION .................. 20

         A.    The Parties' And The Board's Claim Constructions .............. 21

         B.    The Claim Language Supports SoftView's
             Construction ....................................................... 22

**Page**

    1.    Original Page Layout, Functionality, And Design Exist <u>Before</u> The Webpage Is Retrieved And Translated ........................................... 23

    2.    Petitioners' Construction Only Requires Preserving Page Layout, Functionality, And Design <u>After</u> They Have Been Rendered By The Device .................................................................. 24

    3.    The Board's Construction Rewrites The Claim Language To Require Preserving "Only A Portion" Of The Original Page Layout, Functionality, And Design ............................ 24

        a)    The Board's Construction Would Cover Browsers That Strip Away Almost All Original Page Layout, Functionality, And Design ................................ 25

        b)    The Board Rewrites The '353 Claim Language .......................................... 31

        c)    The Board Fails To Consider Other Intrinsic Evidence For Claim 52 of the '926 Patent ..................................... 32

        d)    The Language Of Claim 30 of the '926 Patent Is Different...................................... 33

C.    The Patent Specification Requires Preserving Original Page Layout, Functionality, And Design As They Would Appear On A Conventional Desktop Browser.................................................... 34

    1.    The Specification Discusses The Importance Of Look And Feel Of Desktop Webpages .................. 34

        a)    The Specification Emphasizes "Maintaining The Look And Feel Of

**Page**

                          Browsing . . . Webpages With A
                          Conventional Desktop Browser" ........................ 35

           b)    There Is No Language In The
                 Specification Supporting the Board's
                 Construction ....................................................... 37

    D.    The Prosecution History Supports SoftView's
        Construction ........................................................... 38

        1.    SoftView Disclaimed Browsers That Did
                 Not Preserve Original Page Layout,
                 Functionality, And Design As They Would
                 Appear On A Conventional Desktop
                 Browser ...................................................... 38

        2.    Petitioners And The Examiner Agreed That
                 SoftView Had Made A Prosecution
                 Disclaimer ................................................... 40

        3.    The Prosecution History Illustrates The
                 "Preserving" Limitation By Comparing A
                 Desktop Browser With A Mobile Browser ................. 41

        4.    The Passage Relied Upon By The Board For
                 Its Construction Was Taken Out Of Context .............. 47

III.    THE BOARD'S OBVIOUSNESS DETERMINATION
      WAS NOT SUPPORTED BY THE EVIDENCE ........................... 48

    A.    The "Preserving" Claims Are Not Obvious In
        View Of Zaurus And Pad++ .................................................. 49

        1.    Zaurus Does Not Disclose The "Preserving"
                 Limitation ................................................... 49

        2.    Pad++ Does Not Disclose The "Preserving"
                 Limitation ................................................... 51

3.    The Combination Of Zaurus And Pad++ Cannot Render The "Preserving" Claims Obvious ........................................................ 55

4.    There Was No Motivation To Combine Zaurus and Pad++ ........................................................ 55

     a)    Pad++ Required A Large, High-Resolution Display ............................................ 55

     b)    Zaurus Had A Small, Low-Resolution Display ................................................................ 58

     c)    The Conclusory Statements Identified By The Board Do Not Provide A Sufficient Basis To Combine Pad++ With Zaurus ........................................................ 58

     d)    The Testimony Of Third Parties Establish A Lack Of Motivation To Combine Pad++ With Zaurus ............................. 60

     e)    The Combination Would Have Been Inoperative ............................................................ 60

B.    The "Preserving" Claims Are Not Obvious In View Of Zaurus, Hara, And Tsutsumitake ............................. 62

1.    Hara Teaches Away From "Preserving" ...................... 62

2.    Tsutsumitake Does Not Disclose Zooming Or "Preserving" ............................................................ 65

3.    There Was No Motivation To Combine Zaurus, Hara, And Tsutsumitake .................................. 66

C.    The "Smart Zooming" Claims Are Not Obvious ................... 67

1.    Zaurus Does Not Disclose Smart Zooming ................. 68

2.    Pad++ Does Not Disclose Smart Zooming ................. 69

**Page**

3.     The Board's Construction Of The "Smart Zooming" Limitation Is Unreasonable ........................ 73

4.     There Was No Motivation To Combine Zaurus With Pad++ ........................................................ 74

5.     The "Smart Zooming" Claims Are Not Obvious In View Of Zaurus, Hara, And Tsutsumitake ................................................ 74

IV.    THE BOARD ERRED IN ITS TREATMENT OF OBJECTIVE INDICIA ................................................ 76

    A.    The Board's Post Hoc Analysis Of Objective Indicia Was Improper ........................................... 76

    B.    The Board Failed to Consider Praise by Others .................... 77

    C.    The Board Failed to Consider Uncontested Objective Indicia ................................................ 79

V.    THE BOARD VIOLATED SOFTVIEW'S DUE PROCESS RIGHTS ................................................ 81

    A.    Petitioners Withheld Prime Facie Arguments ....................... 81

    B.    The Belated Obviousness Arguments And Evidence Should Have Been Excluded ................................. 83

    C.    Petitioners Withheld Claim Construction Positions Until Their Reply .................................................. 84

    D.    The Belated Claim Construction Arguments And Opinions Should Have Been Excluded .................................. 85

CONCLUSION ................................................ 86

ADDENDUM ................................................ 88

CERTIFICATE OF SERVICE ................................................ 166

CERTIFICATE OF COMPLIANCE ................................................ 167

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apple Inc. v. Int'l Trade Comm'n*,
  725 F.3d 1356 (Fed. Cir. 2013) ............................................................ 79, 80

*In re Biedermann*,
  733 F.3d 329 (Fed. Cir. 2013) ....................................................................82

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ..................................................................34

*In re Packard*,
  751 F.3d 1307 (Fed. Cir. 2014) ..................................................................20

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) ..................................................................34

*In re Sullivan*,
  498 F.3d 1345 (Fed. Cir. 2007) ..................................................................79

*Leo Pharm. Prods., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) ..................................................................77

*McGinley v. Franklin Sports, Inc.*,
  262 F.3d 1339 (Fed. Cir. 2001) ..................................................................60

*Nat'l Ass'n of Home Builders v. Norton*,
  340 F.3d 835 (9th Cir. 2003) .......................................................................84

*Plantronics, Inc. v. Aliph*,
  724 F.3d 1343 (Fed. Cir. 2013) ......................................................... passim

*Rambus Inc. v. Rea*,
  731 F.3d 1248 (Fed. Cir. 2013) ..................................................................78

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) ..................................................................20

*SoftView LLC v. Apple, Inc., et al.*,
  No. 10-389-LPS (D. Del.) ......................................................................... viii

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) .......................................................38

*Toro Co. v. Deere & Co.*,
    355 F.3d 1313 (Fed. Cir. 2004) ....................................................73

*Young v. Dep't of Housing and Urban Dev.*,
    706 F.3d 1372 (Fed. Cir. 2013) ....................................................83

## Statutes

28 U.S.C. § 1295(a)(4)(A) ...................................................................1

35 U.S.C. § 329 ...................................................................................1

37 C.F.R. § 42.104(b) ........................................................................18

37 C.F.R. § 42.104(b)(3)....................................................................84

5 U.S.C. §§ 706(2)(A) - (D)...............................................................20

## Rules

Changes to Implement Inter Partes Review Proceedings,
    77 Fed. Reg. 48,680, 48,699 (August 14, 2012) ..........................84

Office Patent Trial Practice Guide,
    77 Fed. Reg. 48,756, 48,767 (August 14, 2012) ................... 18, 83

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding was previously before this or any other appellate court.

There is an appeal before this Court that will be directly affected by the Court's decision in the pending appeal: *SoftView LLC v. Kyocera Corp.*, No. 2014-1600 (the "Companion Appeal"). The Companion Appeal is from the *inter partes* review ("IPR") of U.S. Patent No. 7,461,353 (the "'353 patent"), a sibling to U.S. Patent No. 7,831,926 (the "'926 patent") at issue in this appeal (collectively, the "SoftView Patents"). The Companion Appeal involves substantially similar issues.

There is a patent litigation pending in the United States District Court for the District of Delaware filed by Patent Owner SoftView LLC ("SoftView") that will be directly affected by the Court's decision in the pending appeal: *SoftView LLC v. Apple, Inc., et al.*, No. 10-389-LPS (D. Del.) (Consolidated) (the "District Court Case"). The defendants in that case include: Petitioner Kyocera Corporation ("Kyocera"); Petitioner Motorola Mobility LLC ("Motorola"); and certain of their affiliates. Other defendants include: Apple Inc. ("Apple"); Dell, Inc.; HTC Corp.; Huawei Technologies Co. Ltd.; LG Electronics, Inc.; Samsung Electronics Co., Ltd.; AT&T Mobility LLC; and certain of their affiliates.

The District Court Case is currently stayed pending the outcome of this appeal and the Companion Appeal.

# JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C.

§ 329 as an appeal from a final written decision of the Patent Trial and Appeal

Board (the "Board") of the United States Patent Office (the "PTO") in an IPR (the

"Decision").

**INTRODUCTION**

Given the near-universal adoption of smartphones with Internet browsers by today's consumers, it is difficult to think back to the 2000 timeframe when mobile Internet browsing was in its infancy.  Device makers, software companies, and service providers were all focused on mobile browsers that delivered a "dumbed-down" version of webpages designed for desktop computers.  SoftView alone took a different path, developing and marketing a mobile browser that "maintain[s] the look and feel of browsing . . . [web]pages with a conventional desktop browser." A-00861 (2:54-56).  This technology resulted in the SoftView Patents at issue in this appeal and in the Companion Appeal.

Because SoftView took a different path than everyone else, Petitioners could not identify any allegedly anticipatory prior art.  Instead, Petitioners relied exclusively on obviousness in their IPR Petitions.  Even then, none of the identified prior art disclosed the two key limitations of the SoftView Patent claims: (a) "preserv[ing] the original page layout, functionality and design of the content defined by its original format" (the "preserving" limitation), as properly construed; and (b) recognizing and zooming on a particular type of webpage content (such as an image or column) in response to a simple user input, such as a tap on a touchscreen (the "smart zooming" limitation).  Although the prior art failed to

disclose these two key limitations, the Board nevertheless strained to find the SoftView Patents obvious, committing multiple errors in doing so.

For example, the Board formulated an unreasonable claim construction for the "preserving" limitation that directly contradicts the intrinsic record—a construction that rewrites the claim language, ignores clear statements in the specification, disregards disclaimers in prosecution, and contradicts the positions taken by *both sides* in the District Court Case.  The Board then relied upon its unreasonable construction to find the "preserving" limitation in prior art that explicitly teaches *changing* the original webpage content—the opposite of "preserving."

The Board's determination of obviousness for the "smart zooming" claims is similarly erroneous.  None of the prior art references discloses recognizing a particular type of content in a webpage, much less zooming on that content in response to a user input (such as a tap on an image or column).  The Board's findings to the contrary are unsupported by the evidence.

The Board also violated this Court's repeated directives that objective indicia of non-obviousness should be considered "prior to making the ultimate determination of whether an invention is obvious."  *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354-55 (Fed. Cir. 2013).  Moreover, the Board ignored SoftView's undisputed evidence regarding long felt need, failure by others, and teaching away.

Finally, the Board flagrantly disregarded its own procedural rules intended to maintain the fairness of IPR proceedings.  Over SoftView's objections, the Board permitted Petitioners to submit a reply brief and a ninety-page expert reply declaration that included new invalidity opinions and a new claim construction. After denying SoftView any opportunity to rebut this belated evidence, the Board then relied upon this evidence in its Decision.

The IPR process was intended by Congress to provide a fair and impartial proceeding for the review of issued patents, but the Board's handling of this proceeding—both substantively and procedurally—was anything but fair and impartial.  This Court should reverse the Board's decision.

## STATEMENT OF THE ISSUES

1.    Whether the Board erred in construing the "preserving" limitation to cover devices that significantly change the original page layout, functionality, and design of a webpage?

2.    Whether the Board erred in its obviousness determination when none of the prior art discloses the "preserving" and "smart zooming" limitations?

3.    Whether the Board erred in its obviousness determination when a person having ordinary skill in the art ("PHOSITA") would not have been motivated to combine the prior art for the purpose of browsing the web on a handheld device?

4.    Whether the Board erred by considering objective indicia only after already concluding that the challenged claims were obvious and by failing to consider numerous uncontested objective indicia advanced by SoftView?

5.    Whether the Board erred by denying SoftView's motion to exclude Petitioners' reply brief and reply expert declaration and in relying upon their contents in its Decision when, in violation of the Board's own rules, these materials raised new invalidity and claim construction arguments?

## STATEMENT OF THE CASE

## I.    PROCEDURAL BACKGROUND

On October 2, 2012, Petitioner Kyocera filed IPR petitions for SoftView's '353 and '926 Patents. A-000075; A-000088. The Board entered a Decision to Institute IPRs of these patents on March 29, 2013. A-000075; A-000088. On April 29, 2013, Petitioner Motorola filed IPR petitions for the same patents. A-000101; A-000105. The Board joined Kyocera's and Motorola's IPRs into a pair of related proceedings. A-009357; A-009438.

On July 19, 2013, SoftView filed its Oppositions. A-000076; A-000089. On September 23, 2013, Petitioners filed a Reply, including a ninety-page expert declaration that belatedly advanced prima facie arguments regarding obviousness as well as a new claim construction, both of which, under the Board's rules, were required to be included in the original Petition. *See* A-000076; A-000089; *see also generally* A-006648-741.

On September 30, 2013, SoftView filed a Notice of Objections to Evidence requesting that SoftView be allowed to file a motion to strike the improper reply materials, or be given the opportunity to file a surreply. A-000089. The Board denied both requests, but stated that it would decide whether the reply materials improperly raised new issues or evidence, and would not consider the reply materials if they did. A-000756. The Board then directed the parties to file a five-

page claim construction brief limited to the "preserving limitation."  A-000758.

On November 22, 2013, SoftView filed a motion to exclude Petitioners' belated

reply materials.  A-000089.

A hearing was held on January 7, 2014.  A-000077, A-000090.  In a pair of

final decisions dated March 27, 2014, the Board found all challenged claims

obvious and denied SoftView's motion to exclude.  A-000037; A-000073.

## II.    THE SOFTVIEW PATENTS

The '926 Patent, entitled "Scalable Display of Internet Content on Mobile

Devices," relates to the display of Web content on mobile devices.  A-008093

(Abstract).  The lead inventor is Gary Rohrabaugh, the principal owner of

SoftView.  *Id.*  The '926 and '353 Patents are siblings, with similar disclosures.

Web content is stored on servers, which browsers running on desktops or

mobile devices can access over the Internet.  A-008120 (7:26-60).  HTML is a

language that describes the page layout, functionality, and design of Web content.

*Id.*

The SoftView Patents disclose novel approaches for displaying Web content

on mobile devices, allowing the content to be zoomed and panned while preserving

an original page layout, functionality, and design of the Web content as they would

appear on a conventional desktop browser.  As the specification acknowledges,

"Much of the Internet content has been designed for display on <u>desktop computers</u>

with a single target resolution . . . This gives [Internet content providers] the ability to control the underline look and feel of their Web sites."  A-008117 (2:14-20).[1]  The '926 Patent goes on to explain that "[w]hile this fixed resolution approach is good for site branding and product differentiation it does present a daunting technical problem for display of Internet content (designed for desktop computers) on small screen, low resolution, or different aspect ratio devices, such as cell phones and handheld computers."  *Id.* (2:23-28).

To overcome this problem, the SoftView Patents disclose processes for translating the HTML code—including "elements such as tables, column definitions, graphic images, paragraphs" and the like—into a scalable representation for display on a mobile device.  A-008124 (15:43-52).  As an example, Figure 4B of the '926 Patent shows original HTML objects that are identified and translated:

---

[1] All emphasis in quotations is added unless indicated otherwise.



**FIG. 4B**

A-008103.

Figure 5 sets forth an exemplary translation process:



*FIG. 5*

A-008109.

A critical aspect of the SoftView Patents is that these translation processes preserve the original page layout, functionality, and design of the Web content as they would appear on a conventional desktop browser. Such preservation "enabl[es] users of . . . <u>handheld devices with small screens</u> . . . to view and interact with Web pages in a manner independent of the screen resolution of such device's built-in or associated display, <u>while maintaining the look and feel of browsing such pages with a conventional desktop browser</u>." A-000861 (2:49-55). This enables "users to easily navigate to selected content and features of familiar Web pages." *Id*. (2:33-34). This aspect of the invention is captured by the "preserving" claims, which are claims 30, 31, 43, 52, 55, 59, 72, and 75.

The SoftView Patents also disclose novel user interface functionalities, such as "smart zooming," which optimizes Internet browsing on mobile devices having small displays.  One such technique involves identifying the type of object being tapped on a webpage, and then, for certain objects, automatically zooming on the object.  Smart zooming by tapping on a column is depicted in Figures 7A and 7B and accompanying text:



*FIG. 7A*



*FIG. 7B*

A-008111-12 (red circles and accompanying text added, same image quality in original); A-008126 (20:56-67).

The SoftView Patents also teach smart zooming by tapping on an image:



*FIG. 8A*          *FIG. 8B*

A-008113-14 (red circles and accompanying text added, same image quality in original); A-008126 (20:56-67). This aspect of the invention is captured by the "smart zooming" claims, which are claims 40 and 41.

## III.    THE PRIOR ART

Petitioners do not assert, and the Board did not find, that any of the prior art anticipates any of the claims of the '926 patent. Moreover, none of the prior art discloses the "preserving" limitation, as properly construed, or the "smart zooming" limitation.

### A.    The Zaurus References

The Zaurus references are a collection of six publications describing the Zaurus personal digital assistant ("PDA").  *See* A-000529.  The Zaurus references were treated by the Board as a single prior art reference.  *See* A-000052.  Zaurus is a reference in each of the prior art combinations at issue:  (1) Zaurus, Pad++, and SVF and (2) Zaurus, Hara, Tsutsumitake, and SVG.[2]  A-000072.

When Zaurus was combined with a separately-sold cellular phone or PHS adapter, it was capable of very limited Web browsing.  A-001889-91.  But the Zaurus references discourage using Zaurus to access the Internet:  "However, due to its slow comm. rate, Internet connection is not practical."  A-001891.  Furthermore, Zaurus did not support many fundamental features of HTML.  *See infra* at 49-51.

### B.    The Pad++ References

The Pad++ references (also referred to as the "Bederson references") are a collection of seven publications describing a <u>desktop</u> user interface for displaying and navigating to various types of information.[3]  *See* A-000529-30.  The Board treated these seven publications as a single reference.  *See* A-000055.

---

[2] The Board relied upon the SVF and SVG references for claim elements that are not the subject of SoftView's arguments on appeal.

[3] Most of these articles were disclosed during the prosecution of the SoftView Patents.  *See, e.g.*, A-000984-86.

Central to the Pad++ desktop user interface was its use of a "large information surface" on a large, high resolution display.  A-002597.  "[U]sers are presented with a zooming view of a huge planar information space," which could be populated with many types of graphical objects that could be displayed, such objects including webpages.  *Id.*  Users could interactively zoom on the information surface via a frame-by-frame animation.  A-002600.  However, it is undisputed that Pad++ did not support fundamental features of HTML that define the layout, functionality, and design of webpages.  A-008784-87 (¶¶ 25-34) (Declaration of Glenn Reinman, Ph.D. ("Reinman")).

## C.    Hara

Japanese Unexamined Patent Application Publication H10-326169 ("Hara") discloses a device for resizing images.  A-002858.  Hara teaches that a webpage designed for a low-resolution display (e.g., 640x480) may contain image data.  When that image data was displayed on a high-resolution display (e.g., 1600x1200), the displayed image was often completely unrecognizable due to its small size.  A-002860-61 (¶¶ 1-3).

In Hara, when a webpage is retrieved, a respective magnification factor for resizing each image on the webpage to match the resolution of the display is determined.  A-002864 (¶¶ 46-47).  Resized images are then rendered to video

RAM (along with the other components of the webpage). The webpage with the resized images is then displayed. *Id.* (¶ 48).

Because the resizing operation is performed prior to the display of the webpage, there is no disclosure of zooming on an image in Hara. A-008803-04 (¶ 84) (Reinman). The image is displayed <u>only once and at a single size</u>. *Id.* Furthermore, when an image is resized, Hara explicitly teaches <u>changing</u>, rather than preserving, the original page layout and design of the webpage. *Id.*

### D.    Tsutsumitake

Japanese Laid Open Application H10-21224 ("Tsutsumitake") discloses an information processing device for displaying documents of various file types (e.g., doc, pdf, html). Tsutsumitake discloses converting these documents into documents a common "internal format" that is recognizable by the device, which uses the "internal format" to render the document. A-002460 (¶ 10).

Tsutsumitake does not teach zooming on a webpage or on a specific type of content in the webpage, much less zooming in response to user input. A-008806 (¶ 96) (Reinman). Tsutsumitake also does not disclose preserving, on a mobile browser, the original page layout, functionality, and design of webpage content as they would appear on a conventional desktop browser. *Id.*

## SUMMARY OF THE ARGUMENT

This Court should reverse the Board's decision that the challenged claims are obvious:

- The Board erred by construing the "preserving" limitation as "maintain[ing] the features of the web pages capabilities and appearances in a manner consistent with the translated portion of HTML code defining those capabilities and appearances."  The intrinsic evidence makes clear that what is "preserved" in the claimed invention is the original page layout, functionality, and design of the Web content as displayed on a conventional desktop browser.

- The Board erred in finding the "preserving" and "smart zooming" claims obvious.  None of the prior art, alone or in combination, discloses either (1) the "preserving" limitation, properly construed, or (2) recognizing and zooming on a specific type of content (such as an image or a column) in response to a user input (the "smart zooming" limitation).  Furthermore, there was no motivation to combine the references.

- The Board erred in its treatment of objective indicia.  Contrary to law, the Board conducted a post-hoc analysis of objective indicia only after concluding that the challenged claims were obvious.  Additionally, the

> Board failed to credit evidence of praise by others relating to the
> embodying products and failed to even address numerous uncontested
> objective indicia. The objective indicia, properly considered, render
> the claimed inventions non-obvious.

Thus, the Board's decision on obviousness should be reversed outright.

Additionally, Petitioners raised prima facie evidence regarding obviousness and a new claim construction for the first time in their reply materials. For example, Petitioners' ninety-page reply expert declaration is the first time they submitted <u>any</u> expert opinion regarding the Zaurus references (the base group of references for every obviousness combination) as well as motivations to combine Zaurus with other references.

The Board's rules are explicit—prima facie evidence regarding patentability and proposed claim constructions must be included with the Petition. 37 C.F.R. § 42.104(b). The Board's rules also clearly specify that "a reply that raises a new issue or belatedly presents evidence <u>will not be considered</u> . . ." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (August 14, 2012). But the Board disregarded these rules, and even relied upon Petitioner's new expert testimony in its Decisions. The Board compounded the error by not permitting SoftView to respond to Petitioners' belated evidence and arguments. The Board thus violated

SoftView's due process rights.  This Court should reverse the Board's denial of

SoftView's motion to exclude Petitioners' reply materials.

# ARGUMENT

## I.    STANDARD OF REVIEW

SoftView's appeal of the Board's claim construction ruling and due process challenge raise questions of law that are reviewed *de novo*.  *See* 5 U.S.C. §§ 706(2)(A) - (D); *In re Packard*, 751 F.3d 1307, 1311 (Fed. Cir. 2014). SoftView's challenge of the Board's conclusions on obviousness is reviewed *de novo* with respect to legal conclusions and for substantial evidence with respect to factual findings.  *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (inter partes reexamination).

## II.    THE BOARD ERRED IN CLAIM CONSTRUCTION

The Board construed the "preserving" limitation identically for both the '353 and '926 Patents.  A-000009.  Thus, SoftView addresses the construction of the "preserving" limitation for both patents together.

The purpose of the SoftView Patents is to enable "users of . . . handheld devices with small screens . . . to view and interact with Web pages in a manner independent of the screen resolution of such device's built-in or associated display, while maintaining the look and feel of browsing such pages with a conventional desktop browser."  A-000861 (2:49-55).  SoftView's technology "enabl[es] users to easily navigate to selected content and features of familiar Web pages," *id*. (2:33-34), instead of having to use "dumbed-down" webpages that are stripped of layout,

functionality, and design, either by servers (*e.g.*, Wireless Application Protocol

("WAP")) or by a browser upon initial rendering (*e.g.*, Pad++).  Thus, "[c]ell phone

users can see their favorite Internet Web sites in the same graphic layout they are

use[d] to from their desktop computers."  A-009051(1:45-47) (provisional

application incorporated by reference).

For independent claims 1, 36, 118, 149, and 252 of the '353 Patent and

claims 30 and 52 of the '926 Patent, "maintaining the look and feel of browsing

[web]pages with a conventional desktop browser" is captured by the "preserving"

limitation, properly construed.

## A.    The Parties' And The Board's Claim Constructions

Consistent with the claim language, the other intrinsic evidence, and the very

purpose of the invention, SoftView's construction for the "preserving" limitation is:

"preserving, at multiple zoom levels and panned views, the original page layout,

functionality, and design of the webpage as viewed on a conventional desktop

browser."  SoftView's construction explicitly tracks both the specification, *see* A-

000861 (2:54-56), and Petitioners' own position in the District Court Case that

"'original' must refer to layout as viewed on a conventional desktop browser, which

is how the HTML is defined at the time of request . . ."  A-004909.

Petitioners changed course in the IPR and, along with the Board, now

advance an unreasonable construction for the "preserving" limitation that

encompasses devices that radically change the layout, functionality, and design of "the original Web page," rendering webpages in a way that would appear nothing like how they appear on a conventional desktop browser. Petitioners' and the Board's claim constructions for the "preserving" limitation are:

| Petitioners | Board |
| --- | --- |
| At least preserving the layout as interpreted by the browser while at different zoom levels and panned views | Maintains the features of the web page's capabilities and appearances in a manner consistent with the translated portion of HTML code defining those capabilities and appearances. |

A-000344; A-000050.

It is undisputed that the prior art does not disclose or teach a mobile browser that preserved the original page layout, functionality, and design of the webpage as viewed on a conventional desktop browser. Thus, the meaning of the "preserving" limitation is a key dispute.

### B.    The Claim Language Supports SoftView's Construction

The relevant portions of exemplary claim 1 of the '353 Patent are:

. . . a user is enabled to <u>request access to an original Web page, the Web page comprising HTML-based Web content having an original format</u> **defining . . . an original page layout, functionality, and design of content on the Web page** . . .

translating at least a portion of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that **preserves the original page layout, functionality and design of the content defined by its original format** when scaled and rendered . . . .

A-000871.

### 1.  Original Page Layout, Functionality, And Design Exist <u>Before</u> The Webpage Is Retrieved And Translated

SoftView's construction, unlike the Board's and Petitioners' constructions, accurately describes <u>what</u> is preserved.  The "preserving" limitation requires preserving:  "[(a)] the <u>original page layout, functionality and design</u> [(b)] of the <u>content</u> [(c)] defined by its <u>original format</u> . . ."  *Id*.  This language finds its antecedent basis in the preceding "requesting access" limitation, where a user requests access to "an original Web page."  *Id*.  As recited in the "requesting access" limitation, the "original Web page" comprises "[(b)] HTML-based Web <u>content</u> having [(c)] an <u>original format</u> defining . . . [(a)] an <u>original page layout, functionality, and design</u> of content on the Web page."  *Id.*

Because a user must initially request access to an "original Web page" having an "original page layout, functionality, and design," such "original page layout, functionality, and design" must necessarily exist <u>before</u> the webpage is retrieved from the server.  A fortiori, such "original page layout, functionality, and design" must necessarily exist <u>before</u> the retrieved webpage is subsequently interpreted, translated, or rendered by the mobile device.  Indeed, the modifier "original" is what distinguishes the "original page layout, functionality, and design" from the interpreted or translated page layout, functionality, and design.

Petitioners' and the Board's constructions read out this all-important "original"

limitation.

In the District Court Case, Petitioners agreed with SoftView's construction,

arguing that "'original' <u>must</u> refer to layout <u>as viewed on a conventional desktop</u>

<u>browser, which is how the HTML is defined at the time of request</u> – *i.e.*, <u>before it</u>

<u>is interpreted</u> by the browser in question."  A-004909-10.

> **2.    Petitioners' Construction Only Requires Preserving Page Layout, Functionality, And Design <u>After</u> They Have Been Rendered By The Device**

Contrary to their District Court Case admissions, Petitioners argued to the

Board that the "preserving" limitation" requires only preserving the layout,

functionality and design of the Web content <u>after</u> the Web content has been

interpreted (or initially rendered) by the mobile device.  *See* A-000344.

However, Petitioners' construction would eviscerate the claim language.  It

covers devices that display "dumbed-down" webpages stripped of their <u>original</u>

page layout, functionality, and design.  It merely requires "preserving" the <u>non-</u>

<u>original</u>, "dumbed-down" webpages in subsequent zoom and pan operations.

> **3.    The Board's Construction Rewrites The Claim Language To Require Preserving "Only A Portion" Of The Original Page Layout, Functionality, And Design**

Although the Board did not adopt Petitioners' proposed construction, it

adopted a construction that leads to the same results.  As acknowledged in the

Decision, the Board's construction of the "preserving" limitation requires preserving the layout, functionality, and design of <u>only the portion of the HTML-based content that is translated</u> by the mobile device. A-000047-51. Under this construction, and in the Board's own words, "the web page rendered on the claimed device may or <u>may not appear</u> as it would on a conventional desktop, depending upon what portion of the HTML-based content is translated." A-000048.

> a) **The Board's Construction Would Cover Browsers That Strip Away Almost All Original Page Layout, Functionality, And Design**

The Board's construction leads to absurd results. For example, the following demonstrative images are of an illustrative handheld device that does <u>not</u> preserve core HTML features such as images, tables, forms, columns, and centering. The original page layout, functionality and design of the webpage as rendered on a desktop is on the left. The <u>translated</u> page layout, functionality, and design of the webpage as rendered on the illustrative handheld device is on the right.



Desktop

Handheld

Original page layout, functionality, and design such as images, tables, forms, columns, and centering that appear on the desktop are stripped away by the handheld device.  Yet the handheld device would still meet the "preserving" limitation under the Board's construction, provided that it maintains its own initial stripped-out rendering in subsequent pans and zooms, as depicted below:



Initial Rendering           Rendering After Zooming and Panning

Other illustrative examples of devices that would still meet the "preserving limitation" under the Board's construction include:

A handheld device that translates <u>only</u> images:





Desktop                                    Handheld

A handheld device that translates <u>only</u> centered text:



Desktop



Handheld

A handheld device that translates <u>only</u> forms:



Desktop                                    Handheld

Each of these exemplar devices translates only a small portion of the HTML code (images only, centered text only, or forms only), yet under the Board's unreasonable construction, they would nonetheless "maintain[] the features of the web page's capabilities and appearances in a manner <u>consistent with the translated portion of HTML code</u> defining those capabilities and appearances."  A-000050.

The fact that the "dumbed-down" webpages are completely unrecognizable (and in some instances unusable) is irrelevant under the Board's construction.

### b)    The Board Rewrites The '353 Claim Language

Furthermore, the Board's construction rewrites <u>all</u> of the independent claims of the '353 Patent to add the phrase "at least a portion of" to the "preserving" limitation.  This is improper.

When SoftView sought to claim preserving only "at least a portion of the content," SoftView did so explicitly.  For example, independent claim 30 of the '926 Patent expressly recites that only "a portion" of the HTML-based content needs to be preserved.  A-008129 (". . . preserves an original page layout, functionality, and design of <u>the at least a portion</u> of the HTML-based content . . .").  But SoftView did not use such language in the "preserving" limitations of the '353 Patent.

Recognizing that the "preserving" limitations of the '353 Patent do not include the "at least a portion of the content" language found in claim 30 of the '926 Patent, the Board instead relies upon the phrase "<u>translating</u> at least a portion of the HTML-based Web content" in the "translating" limitation of claim 1 and 118.  A-000011.  The Board thus conflates the separately claimed "translating" limitation with the "preserving" limitation.

However, these are two separate limitations serving two different purposes. The language in the "translating" limitation merely signifies that some, but not all of the content must be <u>translated</u>.  The language in the "preserving" limitation requires that the translated portion of the HTML content <u>preserve</u> "the <u>original page layout, functionality and design <u>of the content</u> defined by its original format."</u> A-000871.  The difference between these two limitations is intentional because the browser need not translate HTML code that does not affect the webpage's original page layout, functionality, and design, such as comment tags or keyword metatags.

Moreover, independent claims 36, 149, and 252 of the '353 Patent do not contain the word "portion" at all.  Instead, the Board concludes that, because these claims are purportedly silent as to what HTML-based content is processed, only a portion of the HTML-based content need be preserved.  A-000012-13.  But this construction is unsupported by the antecedent basis for what is preserved, "the <u>original</u> page layout, functionality, and design of the Web page content" to which the user requests access, before they have been interpreted or translated.

<div align="center">

**c)    The Board Fails To Consider Other Intrinsic Evidence For Claim 52 of the '926 Patent**

</div>

Claim 52 of the '926 patent contains the following language:  "preserving an original page layout, functionality, and design defined by the HTML-based Web content <u>as interpreted by a rendering engine</u>." A-008131.  The Board concludes from this language that only what is interpreted by a rendering engine need be

preserved, without considering the meaning of "rendering engine."  A-000049-51.

But a discussed below, the specification and prosecution history make clear that the rendering engine is one that must preserve "the original page layout, functionality and design" as they would appear on a conventional desktop browser. The Mozilla rendering engine disclosed as the preferred embodiment would accomplish this.  A-0008125 (17:31-41).  In addition to the Mozilla rendering engine, the prosecution history also identifies the WebKit (Safari) and Trident (Internet Explorer) rendering engines.  A-008190-91.

### d)    The Language Of Claim 30 of the '926 Patent Is Different

The Board relied heavily on claim 30 of the '926 patent for its claim construction for the "preserving" limitation.  A-000049-50.  Claim 30 specifies that the handheld browser "preserve[] an original page layout, functionality and design of the at least a portion of the HTML-based content [that is translated]."  A-008129.  The Board concluded from this language that the "preserving" limitation of claim 30 only needs to preserve the portion of the HTML-based content that is translated, rather than the HTML-based content as it would appear on a conventional desktop browser.  A-000049-50.

Even accepting the Board's reasoning, claim 30 is the only independent claim at issue that uses the phrase "at least a portion of the HTML content" in the

"preserving limitation." Thus, the Board's reasoning for claim 30 does not apply to any of the other independent claims of the SoftView Patents.

## C. The Patent Specification Requires Preserving Original Page Layout, Functionality, And Design As They Would Appear On A Conventional Desktop Browser

This Court has held that "[w]hile the Board must give the terms their broadest reasonable construction, the construction cannot be divorced from the specification and the record evidence." *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011); *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010) ("claims should always be read in light of the specification and teachings in the underlying patent"). Here, the specification confirms that it is the original page layout, functionality, and design of the HTML-based content as they would appear on a conventional desktop browser that is preserved. A-000861 (2:54-56).

### 1. The Specification Discusses The Importance Of Look And Feel Of Desktop Webpages

The specification first discusses the problem that the invention is intended to solve. "Much of the Internet content has been designed for display on <u>desktop computers</u> with a single target resolution." A-008117 (2:14-15). "This gives [Internet content providers] the ability to control the look and feel of their Web sites," which "is good for site branding and product differentiation." *Id*. (2:19-24). This ability to control look and feel is also important to users because they can more "easily navigate . . . familiar Web sites." A-000861 (2:33-34). But this

single target resolution approach "present[s] a daunting technical problem for display of Internet content (<u>designed for desktop computers</u>) on small screen, low resolution, or different aspect ratio devices, such as cell phones and hand held computers."  A-008117 (2:25-28).

> a) **The Specification Emphasizes "Maintaining The Look And Feel Of Browsing . . . Webpages With A Conventional Desktop Browser"**

The claimed inventions "employ software-based processing of original Web content, including HTML-based content . . . to generate scalable content."  A-008093 (Abstract).  "The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned" on the mobile device.  *Id.*

The specification proceeds to discuss <u>what</u> is rendered and preserved (or "maintained") on the mobile device and the reasons why preserving (or "maintaining") is important:

- "The methods and software enable users of various devices, from handheld devices with small screens . . . to view and interact with Web pages in a manner independent of the screen resolution of such device's built-in or associated display, <u>while maintaining the look and feel of browsing such pages with a conventional desktop browser</u>."  A-000861 (2:49-56) (Summary of the Invention).

- "In accordance with aspects of the invention, mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes are disclosed. . . . [T]he rendered displays provide <u>substantially the same or identical layout as the original Web page</u>, enabling users to easily navigate to selected content and features on familiar Web pages." *Id.* (2:22-34) (Summary of the Invention); A-000837 (Abstract) (substantially identical statement).

- "Cell phone users can see their favorite Internet Web sites in <u>the same graphic layout they are use[d] to from their desktop computers</u>." A-009051 (1:45-47) (provisional application incorporated by reference).

Thus, "original page layout, functionality, and design" must refer to the page layout, functionality, and design retrieved from the Web and intended to be viewed on a conventional desktop browser, <u>before</u> any interpreting, translating, or rendering by the mobile device.  A device that strips out page layout, functionality, and design in the translating process to display "dumbed-down" webpages (without images, forms, columns, and tables, for example) obviously does not "maintain[] the look and feel of browsing such pages with a conventional desktop browser," nor render "substantially the same or identical layout as the original Web page."

### b)    There Is No Language In The Specification Supporting the Board's Construction

The Board did not refer to any of the passages cited above in its claim construction analysis.  Nor did the Board (or Petitioners) identify any language from the specification that teaches stripping out portions of the original page layout, functionality, and design of the Web content as they would appear on a conventional desktop browser.  Instead, the Board relied on passages that do not even relate to the "preserving" limitation.  *See* A-000050-51 (citing in support of its construction:  (1) A-008120 (7:45-60) (a general description of HTML); (2) A-008117 (2:14-28) (a description of the problem to be addressed); and (3) *id.* (2:32-41) (a description of the disclosed zooming and panning functionality)).

The Board goes so far as to contend that "[t]he specification is silent on how closely the rendered content should match the web page as viewed on a conventional desktop."  A-000050-51.  But the specification is not silent.  The SoftView Patents teach that the webpage rendered on the handheld device should preserve or "maintain[] the look and feel of browsing such pages with a conventional desktop browser," "provide substantially the same or identical layout as the original Web page, enabling users to easily navigate to selected content and features on familiar Web pages," and "see their favorite Internet Web sites in the same graphic layout they are use[d] to from their desktop computers."

Indeed, the evidence in this regard is so compelling that Petitioners agreed in the District Court Case that "'original' <u>must</u> refer to layout <u>as viewed on a conventional desktop browser</u>, <u>which is how the HTML is defined at the time of request</u> – *i.e.*, <u>before it is interpreted</u> by the browser in question." A-004909-10. Petitioners later argued that there is "[n]o dispute that 'original' refers to how the Web page was defined to be shown on a desktop browser," even highlighting the language from the Summary of the Invention identified above about the importance of "maintaining the look and feel of browsing such pages with a conventional desktop browser." A-009076.

### D.    The Prosecution History Supports SoftView's Construction

In construing claims before the PTO, "the prosecution history . . . serves as intrinsic evidence for purposes of claim construction." *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) (inter partes reexamination relying upon prosecution history to construe claim language).

### 1.    SoftView Disclaimed Browsers That Did Not Preserve Original Page Layout, Functionality, And Design As They Would Appear On A Conventional Desktop Browser

SoftView unequivocally disclaimed browsers that did not preserve the original page layout, functionality, and design of HTML-based content as they would appear on a conventional desktop browser:

- "[U]sers of various devices, from handheld devices with small screens . . . are enabled to view and interact with Web pages . . . while <u>preserving the look and feel (i.e., functionality) of browsing such pages with a conventional desktop browser</u>.  As a result, users are enabled to access millions of Web pages on various devices having different screen resolutions while providing a full Web browsing experience <u>similar to that experienced when browsing the same Web pages using a desktop browser</u>.  **In order to clarify this result, Applicants have amended many of the claims to recite, in part, 'preserves the original page layout, functionality, and design of the [HTML-based Web page] content.**'"  A-001104  (citing claim 1 of the '353 patent).

Other passages from the prosecution history make similar statements:

- "A general purpose of the novel resolution-independent Web Page scaling, zooming, and panning techniques disclosed in the present application is to provide [users] with <u>a similar browsing experience</u> on substantially any device <u>as they experience using a desktop browser</u>.  <u>The location of content in the rendered page is substantially the same as the page appears when rendered by a desktop browser</u> . . . ."  A-001319.

- "[T]he foregoing operations enable[] . . . Web pages to be rendered on devices . . . in a manner that substantially retains the original page layout and attributes of the Web pages' content defined by the pages' HTML code.  Thus, familiar Web pages appear substantially the same on the devices as they do on desktop browsers . . ."  A-001372.

- "[C]learly neither [prior art] . . . translate[s] HTML-based Web content into scalable content that supports a scalable resolution-independent display of the Web page that substantially retains the original page layout and attributes of the content defined by its original format when rendered."  A-001382.

*See also, e.g.*, A-001092-93; A-001104; A-001352.

### 2. Petitioners And The Examiner Agreed That SoftView Had Made A Prosecution Disclaimer

In the District Court Case, Petitioners agreed that SoftView had made an unequivocal disclaimer in prosecution, arguing that "SoftView's prosecution statements also establish that 'original' refers to 'desktop browser.'"  A-009077.  The patent examiner also agreed that the invention relates to hand-held devices that allow users "to view and interact with Web pages . . . while maintaining the look and feel of browsing such pages with a conventional desktop browser."  A-001027.

### 3.    The Prosecution History Illustrates The "Preserving" Limitation By Comparing A Desktop Browser With A Mobile Browser

Furthermore, the prosecution history provides comparisons between a desktop browser and an emulation of the SoftView mobile browser product to illustrate the concept of "preserv[ing] the original page layout, functionality and design."  Figure 2a from the '926 Patent prosecution history is representative.  On the left is the www.nytimes.com webpage displayed on a desktop browser.  On the right is the www.nytimes.com webpage displayed on the SoftView mobile browser.  The mobile browser "preserves" the original page layout, functionality, and design <u>of the HTML content</u> as they would appear on a conventional desktop browser:





*Fig. 2a*

A-008171.

Figures 2b-2d make the same point.[4]  *See* A-008172-74.

Figures 4a, 6, and 8 provide examples of how zooming and panning on the mobile browser (bottom images) "preserves" the original page layout, functionality, and design <u>of the HTML content</u> in the desktop browser (top image):

---

[4] Certain ad content in these figures is not preserved.  However, the claims do not require preserving <u>non-HTML content</u> (such as ads using Flash or other plug-ins).  Moreover, a web server may provide different advertisement content to different browsers (based on a user's location, for example).  Finally, a browser with security features <u>enabled</u> (such as turning Active-X off) may render pages differently than even the same browser with security features <u>disabled</u>.  All of these differences are irrelevant to the "preserving limitation," which focuses solely on HTML-based content.



**Fig. 4a**



Fig. 6



**Fig. 8**

A-008184; A-008186; A-008188.

These examples and numerous others provide further support for SoftView's

construction. The Board ignored this compelling intrinsic evidence.

### 4.    The Passage Relied Upon By The Board For Its Construction Was Taken Out Of Context

In support of its construction, the Board cited the following passage from the prosecution history that discusses how the "preserving" limitation "refers to preserving the design as interpreted by the browser while at different zoom levels and panned views as opposed to rendering the content identically to how it is rendered by a particular desktop browser that may interpret the page design differently." A-000009. The Board's reliance on this passage was misplaced.

This portion of the prosecution history first discusses how different <u>desktop</u> browsers may render the same HTML-based content slightly differently. For example, Safari for Windows may not render a webpage exactly the same as Chrome for Windows which may not render that webpage exactly the same as Explorer for Windows. A-008167 ("As described above and in other remarks, browsers <u>often do not</u> render Web pages derived from the same HTML-based definition identically."); *see also* A-001119 (same).

In the passage cited by the Board, SoftView was clarifying that the "preserving" limitation does not require that a mobile rendering be "identical" to a specific desktop rendering. As discussed in the same section of the prosecution history, this is because even different desktop browsers will render the same webpage with slight variations between them:

> [O]ne of ordinary skill in the browser art would not expect Web pages rendered using an implementation in accordance with the teachings disclosed in the present application to render pages as *exact* scaled replicas of the same page rendered by a conventional desktop browser, such as Internet Explorer or Safari, for example . . . While conceivably an implementation might produce this exact (i.e., perfect magnification) result, <u>such results are not required by the scope of the terminology "preserving the overall layout . . . of the content.</u>"

A-008167 (italics in original, underlining added); *see also* A-001119-20 (similar).

Thus, the passage cited by the Board does not suggest that the claims encompass mobile browsers that strip webpages of their original page layout, functionality, and design, as the Board concluded. This passage simply emphasizes that "preserving" a webpage on a mobile browser does not require creating a "perfect," "identical," or "exact scaled replica" of the same webpage on a particular desktop browser.

## III.  THE BOARD'S OBVIOUSNESS DETERMINATION WAS NOT SUPPORTED BY THE EVIDENCE

For purposes of the obviousness analysis before this Court, SoftView's claims fall into two categories:  (1) the "preserving" claims (claims 30, 31, 43, 52, 55, 59, 72, and 75), which relate to preserving the original page layout, functionality, and design of the HTML-based content, and (2) the "smart zooming" claims (claims 40 and 41), which relate to recognizing and zooming on a specific type of content (such as an image or column) in response to a user input (such as a tap on a touchscreen).

The Board's obviousness determination is not supported by the evidence. None of the prior art discloses the "preserving" limitation or the "smart zooming" limitation, alone or in combination.

## A.    The "Preserving" Claims Are Not Obvious In View Of Zaurus And Pad++

Under the correct claim construction, neither Zaurus nor Pad++ discloses the "preserving" limitation.  The Board conceded as much when it stated that "neither Zaurus nor [Pad++] implements each and every feature of HTML . . ."  A-000059. Moreover, under <u>any</u> claim construction, there was no motivation to combine Zaurus with Pad++.

### 1.    Zaurus Does Not Disclose The "Preserving" Limitation

It is undisputed that Zaurus did not preserve the original page layout, functionality, and design of webpage content as they would appear on a conventional desktop browser.  As acknowledged in the Zaurus documentation:

- Zaurus could not handle many standard features of HTML webpages. A-002406  ("[d]isplay using the Internet browser installed in this product is partially different or limited" in a long list of ways as "compared to the WWW browser widely used in PCs.").

- Zaurus cannot display a single webpage with multiple frames.  A-001872 ("With a PC, multiple frames can be simultaneously displayed on one screen. . . .  *A Power Zaurus can only display one frame*.").

- Newer features of the Internet could not be used with Zaurus. A-001894.

At best, Zaurus discloses rendering a "dumbed-down" version of an HTML webpage on a handheld device, stripped of original page layout, functionality, and design. It does not teach or suggest a handheld device that preserves the original page layout, functionality and design of an original webpage.

Indeed, the Board conceded that Zaurus' browser was "dumbed-down": "Zaurus does not implement a desktop browser . . . Zaurus discloses that due to its implementation, its display is different from the home page as displayed using a PC . . . ." A-000055. Nevertheless, the Board ruled that Zaurus discloses the "preserving" limitation under its own (erroneous) construction, which requires preserving only that "portion" of the HTML content that is translated or processed – even if the rendered webpage looks nothing like how it would appear on a conventional desktop browser. A-000054.

The Board also argued that Zaurus "falls within the scope Patent Owner's stated understanding of its proposed claim construction" because "a person using a Zaurus PDA would understand that the same webpage as the one being used in connection with a desktop browser was being displayed." A-000055. This distorts SoftView's construction. A user may understand that a desktop browser and a handheld browser are both accessing the www.nytimes.com webpage by the

presence of the "New York Times" banner, but that alone does not suffice to meet the "preserving" limitation under SoftView's construction.  Instead, the mobile browser must preserve the original page layout, functionality, and design of the webpage as viewed on a conventional desktop browser.  Zaurus plainly cannot.  Moreover, the Board did not point to any evidence that a user would understand that a webpage displayed on the Zaurus was the same webpage displayed on a desktop.

### 2. Pad++ Does Not Disclose The "Preserving" Limitation

It is also undisputed that the Pad++ references do not disclose preserving the original page layout, functionality, and design of webpage content as they would appear on a conventional desktop browser.  Pad++ supported very few basic types of HTML content.

For example, Pad++ could not handle basic page layout, functionality, and design including forms (for inputting search requests, usernames, passwords, payment information, and addresses), columns (such as in online newspapers), tables (such as for sports scores), centering, italics, and bold, along with many other fundamental HTML features.  A-008783-87 (¶¶ 21-34) (Reinman).  The importance of such features cannot be overstated.  Imagine a Google webpage without a way to input search terms, an Amazon webpage without a way to input

an address or credit card number, and a Citibank or Hotmail webpage without a way to input a username or password.

SoftView also submitted undisputed expert testimony that the lack of support for such fundamental HTML features in Pad++ would result in changes to the original page layout, functionality, and design of the web content as they would appear on a conventional desktop browser.  *Id.*  SoftView further identified, from the Pad++ references themselves, an example of a Yahoo webpage rendered by Pad++ that illustrates the failure of Pad++ to teach the "preserving" limitation.  A-002643.



This "dumbed-down" Yahoo webpage rendered on Pad++ looks nothing like the actual Yahoo webpage, missing key aspects of the original page layout, functionality, and design. For example, the webpage rendered on Pad++ is missing forms, including an input box for Yahoo's most fundamental function, search. A-

002643; A-008786-87 (¶ 34) (Reinman).  In addition to the missing forms, the illustrated Yahoo page also fails to preserve basic formatting features, including centering, italics, and bold.  A-008786 (¶ 33) (Reinman).

In response to this evidence, the Board stated that "Patent Owner has not demonstrated that the original Yahoo page included such a search box . . . "  A-000058.  The Board has flipped the applicable standard of proof on its head.  It is Petitioners' burden to prove that the prior art discloses the "preserving" limitation—not SoftView's burden to disprove this.  Moreover, the Board ignored SoftView's uncontested expert evidence that, at the time of the Pad++ references (and today), the relevant Yahoo page was in fact a search engine that enabled users to search the Internet by entering search terms into a form.  A-008786-87 (¶ 34).  Indeed, Petitioners themselves admitted that "[t]here are things missing [from the Pad++ Yahoo page]."  A-000513 (Hearing Transcript).

The Board also states that "the '926 Patent provides no evidence that the Palm device screens illustrated in the '926 Patent preserve the layout, functionality, and design of a web page, as viewed on a conventional desktop." A-000058.  The Board's statement is incorrect.  Both the specification and the prosecution history demonstrate that the claimed inventions preserve the original page layout, functionality, and design of the web content as they would appear on a

conventional desktop browser. *See supra* at 34-48. There are no statements to the contrary in the intrinsic record.

### 3. The Combination Of Zaurus And Pad++ Cannot Render The "Preserving" Claims Obvious

Because neither Zaurus nor Pad++ teach the "preserving" limitation, as properly construed, their combination does not render the "preserving" claims obvious.

### 4. There Was No Motivation To Combine Zaurus and Pad++

The combination of Zaurus and Pad++ does not render SoftView's claims obvious for the separate and independent reason that a PHOSITA would not have been motivated to combine them for the purpose of browsing the web on a handheld device. This is true under either SoftView's or the Board's constructions.

#### a) Pad++ Required A Large, High-Resolution Display

A PHOSITA would not have combined Pad++ with a device having a small, low-resolution screen and limited graphics capabilities such as Zaurus. The Board ignored a number of key facts about Pad++, its intended purpose, and its technical requirements, all of which teach away from Pad++ being combined with a mobile device such as Zaurus.

Fundamentally, Pad++ teaches an alternative method for navigating the Web that requires a large information space and advanced graphics. *See* A-008779-80 (¶ 16) (Reinman). Pad++ disparaged conventional desktop browsers, which have a

single page visible at a time.  When a webpage was loaded on one of these browsers and a hyperlink was selected, a new webpage <u>replaced</u> the existing webpage.  The Pad++ authors considered this a significant problem because a user could not visualize how she had navigated to a particular webpage.  Pad++'s solution to this "problem" was graphically showing links between multiple webpages.  A-002568-69  ("[I]t is quite common to hear [Web] users complain of losing a sense of relationship between where they are and where they've been.  Pad++ attempts to address this problem by using a very high-resolution zoomable surface to graphically layout the links representing traversals.").

Specifically, Pad++ implemented a prototype "tree-browser" to "explore alternative mechanisms for navigating the [Web]."  A-002584.  Multiple webpages are displayed at once, where each connected box represents a webpage visited by the user:



A-002643.

This necessarily required using a "large information surface," as the Pad++

references repeatedly explain.  *See, e.g.*, A-002584 ("Instead of having a single

page visible at a time, multiple pages and the links between them are depicted on a

large zoomable information surface.").

The Pad++ references also emphasize the need for smooth, high-quality graphics: "Maintaining smooth real-time interaction is crucial. The entire metaphor is based on animation. If the system becomes slow and jerky, the metaphor dies." A-002600; *see also id.* ("The engine must support good fonts, high quality images, transparency, rotation, and other graphical effects, <u>matching or exceeding the capabilities already found in windowing systems</u>.").

### b)   Zaurus Had A Small, Low-Resolution Display

Zaurus' display was <u>the exact opposite</u> of a "large, high resolution display" with "high quality" graphics "matching or exceeding the capabilities already found in windowing systems." Zaurus had a small screen (4.3") with a low-resolution and minimal graphics processing capabilities. *See* A-008794-95 (¶ 55) (Reinman). A PHOSITA reading the Pad++ references emphasizing the importance of large, high-resolution displays would not have considered combining these references with Zaurus with its small, low-resolution display. A-008794-800 (¶¶ 55-72) (Reinman).

### c)   The Conclusory Statements Identified By The Board Do Not Provide A Sufficient Basis To Combine Pad++ With Zaurus

The Board identifies two general statements that refer to the possible use of Pad++ with PDAs. Those two statements, winnowed from the seven Pad++ publications totaling over 330 pages, are:

- "The system is being designed to operate on platforms ranging from high-end graphics workstations to PDAs (Personal Digital Assistants) and interactive set top boxes."  A-002635.

- "Pad++ could also be viewed as a way to implement an alternative windowing system based on zooming. Your whole desktop could be zoomable.  This seems especially attractive for systems which have small screens, such as handheld computers (i.e. PDA's)."  A-002821.

These isolated and conclusory statements are insufficient to constitute a motivation to combine.  There is no description or explanation in the Pad++ references of how to implement Pad++ on a PDA (especially in light of the far more numerous discussions regarding the importance of "a large, high resolution display" with "high quality" graphics that teach away from using Pad++ with PDA's).  Moreover, there is no description or explanation in the Pad++ references regarding the use of Pad++ for web browsing on a PDA.  A-008781(¶ 19) (Reinman).  And for good reason:  a small screen device would not be suitable for graphically displaying a tree-browser with multiple webpages and the links between them, which was a primary motivator for the Pad++ web browsing project.  A-008779-81(¶¶ 16-19) (Reinman).

### d) The Testimony Of Third Parties Establish A Lack Of Motivation To Combine Pad++ With Zaurus

The lack of motivation to combine Pad++ with Zaurus is further supported by the testimony of Scott Forstall, the Apple employee who was the co-developer of the iPhone's user interface. A-008872. Forstall testified in the District Court Case that there were challenges in designing a browser that could bring the entire Internet to a smartphone. A-008898-900; A-008937. These challenges included the small display of mobile devices, which would have to display content that was designed for a much larger desktop-size display; the slower processor performance of mobile devices; the lower available memory on mobile devices; and the lower data connection speeds on mobile devices. A-008898-900; A-008937. As a result of these challenges, Forstall testified that a developer would not look to a web browsing solution for a desktop and just port it to a smartphone. A-008900. For the same reasons, a PHOSITA would not have looked to port a desktop system such as Pad++ to the Zaurus.

### e) The Combination Would Have Been Inoperative

It is well settled that there would be no motivation to combine prior art if the combination would produce an inoperative result. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) ("If references taken in combination would produce a 'seemingly inoperative device,' we have held that such references

teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness.").

Implementing the teachings of the Pad++ references in the Zaurus device would not have led to an operative result. Bederson himself characterized Pad++ as being too slow and difficult to adapt to a different system. A-008825 (explaining technical reasons why Pad++ is "difficult to port to either different operating systems, or different graphics systems in a clean manner."). Bederson encountered these challenges running Pad++ on a 200 MHz Pentium Pro desktop system with a floating point unit. *See* A-008798-99 (¶¶ 65-67) (Reinman). In contrast, Zaurus ran a proprietary PDA operating system on a 60MHz processor without a floating point unit and with much smaller memory. A-008798-800 (¶¶ 66-70) (Reinman).

Given these differences in hardware capabilities, a PHOSITA would not have thought to port the Pad++ program onto a hardware-challenged device such as the Zaurus. Indeed, a PHOSITA would not have even been able to port the Pad++ program onto the Zaurus with a reasonable expectation of success, especially given the importance that the Pad++ references place on having smooth, real-time zooming and avoiding slow, jerky systems. A-008799-800 (¶¶ 70-71) (Reinman). Consequently, one skilled in the art would not be motivated to

combine Zaurus and Pad++ because any such combination would have been inoperative.

The Board does not address this evidence at all, stating only in a conclusory fashion that they "are not persuaded" by the evidence of inoperability. A-000055-56. But "[r]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Plantronics*, 724 F.3d at 1354 (citation omitted).

## B. The "Preserving" Claims Are Not Obvious In View Of Zaurus, Hara, And Tsutsumitake

Neither Zaurus, Hara, nor Tsutsumitake disclose the "preserving" limitation, correctly construed. In addition, Hara and Tsutsumitake do not even disclose zooming. Moreover, there was no motivation to combine Zaurus, Hara, and Tsutsumitake.

### 1. Hara Teaches Away From "Preserving"

Hara expressly teaches away from the "preserving" limitation. When resizing an image on a webpage having additional non-image content, Hara teaches that it is __necessary__ to change the original page layout and design of the webpage:

> Note that when the image data and the other data overlap due to the resolution conversion of the image data as set forth above, then it is __necessary__ to take action such as changing the display location of the other data so as to not overlap the image data

A-002866 (¶ 84); *see also* A-002864 (¶ 49); A-002865 (¶ 62).

Hara also does not disclose zooming on a webpage, much less zooming at various levels.  The Board ignored the following key facts about Hara:

- Hara discloses that a webpage may be designed for a low-resolution display (e.g., 640x480).  A-002860-61 (¶¶ 2-4)  When that webpage was displayed on a high-resolution display (e.g., 1600x1200), any image on that webpage would be displayed at its original resolution. *Id.*  But on the high-resolution display, the image (with a low original resolution appropriate for a low-resolution display) became unrecognizable due to its small size. *Id.*

- Hara purports to solve this problem by <u>resizing</u> images on a webpage to match the resolution of a display <u>before</u> the webpage (or the image) is ever displayed.  This is illustrated in Figure 12, which teaches first "[c]onvert[ing] resolution of the image data" (i.e., resizing), then "render[ing] the image data," and finally "displaying" the data.



(Figure 12)

A-002869.

> This is not zooming on an image because the image is displayed on the device only once and at a single size. A-008804 (¶¶ 86-87) (Reinman). Indeed, Hara's disclosure of displaying an image only once and at a single size teaches away from zooming.

- There is no discussion in Hara of "associated user inputs" initiating a resizing or zooming operation. *Id.*

- Finally, Hara does not disclose resizing a webpage or any element of a webpage aside from images.  A-002866 (*see* ¶ 84); A-008805 (¶ 89) (Reinman).

### 2.    Tsutsumitake Does Not Disclose Zooming Or "Preserving"

The Board also ignores key facts about Tsutsumitake's teachings:

- There is no zooming or scaling disclosed in Tsutsumitake.  A-008806 (¶ 96) (Reinman).  There is a one-to-one relationship between a document stored in the storage device and how the document is displayed on the screen.  Thus, Tsutsumitake does not disclose preserving the original page layout, functionality, and design of webpages while zooming or panning, as is required by all of the "preserving" claims.  *Id.*

- Tsutsumitake is directed towards displaying documents of <u>various</u> file types (e.g., doc, pdf, html), which is unrelated to the '353 patent.  While HTML is mentioned, it is only an exemplar file type that is capable of being converted into an "internal format" that is recognizable by the device and subsequently displayed with other non-HTML documents.  *See* A-002463 (¶ 25).

- Finally, there is no mention of retrieving web content over the Internet.  A-008806 (¶ 95) (Reinman).

Thus, the combination of Zaurus, Hara, and Tsutsumitake do not teach all of the elements of the SoftView claims.

### 3.    There Was No Motivation To Combine Zaurus, Hara, And Tsutsumitake

The only alleged evidence for motivation to combine Zaurus and Hara cited by the Board was from the Reply Declaration of Jack D. Grimes, Ph.D. ("Grimes Reply Declaration").  A-000064-65.  That declaration was not properly before the Board because it was new prima facie evidence raised in the Reply in violation of the Board's rules.  *See infra* at 81-85.

Moreover, the Grimes Reply Declaration is wrong, which SoftView would have established had the Board not denied SoftView an opportunity to be heard on this issue.  It is incorrect that Hara "teaches that the image data and screen size data are utilized to match the image zooming (in or out) with the display screen size" and "discloses the added functionality of zooming on specific elements within a page."  A-006712-14 (¶¶ 136-39) (Grimes Reply Declaration).  As discussed above at 62-65, Hara discloses (1) resizing an image <u>before</u> the webpage is rendered and displayed and (2) displaying the resized image on the device <u>only once and at a single size</u>.  This operation does not constitute "zooming (in or out)" or "zooming on specific elements within a page," as Dr. Grimes contends.  *Id.*  Thus, there would not have been any motivation to combine the two references.

The Board also asserts that combining Hara with Tsutsumitake is a "routine matter that produces predictable results," but fails to cite any supporting evidence or reasoning.  A-000065; *see Plantronics*, 724 F.3d at 1354 (mere conclusory statements are insufficient).

### C.    The "Smart Zooming" Claims Are Not Obvious

The Board ruled that the "smart zooming" claims (claims 40 and 41)[5] are obvious in view of (1) Zaurus, Pad++, and SVF and (2) Zaurus, Hara, and Tsutsumitake, and SVG.  *See* A-000063; A-000066-67.  The Board's ruling is wrong.  None of the prior art discloses the "smart zooming" limitation.

Dependent claim 40 of the '926 Patent recites as follows:

> 40.    The mobile phone of claim 30, wherein execution of the instructions performs further operations comprising <u>enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column via the touch sensitive display</u>, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is displayed to fit across the touch-sensitive display.

A-008130.

Dependent claim 41 contains similar limitations directed towards an image rather than a column.  *Id.*

---

[5] Claims 40 and 41 also contain the "preserving" limitation.  They are not obvious for the additional reasons explained above.

### 1.    Zaurus Does Not Disclose Smart Zooming

Zaurus does not disclose recognizing and zooming on a specific type of content in a webpage in response to a user input.  The Zaurus documentation notes that Zaurus included a reduce/magnify button on the menu bar.  A-002411-12.  This button presumably toggled the display between a reduced view and a magnified view.

But the Board conceded that Zaurus does not perform smart zooming, stating that "Zaurus describes magnifying or reducing the <u>entire</u> display . . . ."  A-000061.  The Board further conceded that a user would select the portion to be zoomed by "activating the horizontal scrolling keys and the vertical scrolling bar with the touch screen."  *Id.*  Zaurus thus does not disclose or suggest smart zooming.

Moreover, both claims 40 and 41 require zooming on a column or image so that it fits either across the display or across at least one of a width or height of the display.  Zaurus does not perform such an optimization.

## 2.    Pad++ Does Not Disclose Smart Zooming

The undisputed evidence also demonstrates that Pad++ was not capable of recognizing and zooming on a specific type of content in a webpage in response to a user input:

- Pad++ teaches converting an <u>entire</u> HTML webpage into a <u>single</u> graphical object for display on a large information surface.  *See* A-008801(¶ 75) (Reinman).  This conversion discarded most information regarding the individual components of the webpage.  *See* A-008785-86 (¶¶ 29-32) (Reinman).  Thus, Pad++ did not recognize individual images and columns (even if Pad++ had preserved columns, which it did not) within the single graphical object representing a webpage.  *See* A-008801-02 (¶ 76) (Reinman).

- Because Pad++ did not recognize individual images and columns, there was no way for Pad++ to zoom on just an image or just a column in response to "a corresponding user input" such as a tap.  *See* A-008802 (¶ 77) (Reinman).  The Board's statement that Pad++ could zoom on just an image or just a column cites no evidentiary support, A-000063, because there is none.  Moreover, such a conclusory statement is insufficient to support an obviousness finding.  *Plantronics*, 724 F.3d at 1354.

The Board also relies on the Pad++ "center" and "centerbbox" commands.

- To execute a Pad++ command, the user would first open a separate UNIX terminal or Tcl console (Windows) to enter the command.

- With the "center" command, a user could identify an object to be zoomed. To execute this command, the user would provide an identifier corresponding to the item to be zoomed (tagOrId); an $(x, y)$ coordinate for the location of the object's center when zoomed; and a value z for the specified amount of screen to be filled. A-002504.

- With the "centerbbox" command, a user could specify a bounding box around a portion of a graphical object to be zoomed. To execute this command, the user would provide a set of $(x1, y1)$ and $(x2, y2)$ coordinates for the portion of the object to be zoomed; an $(x, y)$ coordinate for the location of the bounding box's center when zoomed; and a value $z$ for the specified amount of screen to be filled. *Id.*

Note the number of mouse operations, keystrokes, and user-defined parameters that are required to perform these commands. Moreover, some of the user-defined parameters require inputting non-intuitive values. For example, what is the TagOrId of the object, or the pair of $(x, y)$ coordinates for the bounding box, or the $z$ value needed to fill the screen? Not surprisingly, there is no disclosure in

Pad++ of actually combining all of these operations and keystrokes to zoom on a column or image of a webpage.

Contrast this manual and cumbersome process cobbled together by the Board with SoftView's smart zooming, now known as "tap to zoom." When a user taps on an image, the device zooms on that image. When a user taps on a column, the device zooms on that column. This technique—now ubiquitous in mobile web browsing—is depicted in Figures 7A-7B and 8A-8B of the '926 Patent:



Text in column



Zoomed text in column

*FIG. 7A*                    *FIG. 7B*



Image



Zoomed image

**FIG. 8A**                    **FIG. 8B**

A-008111-14 (reds circles and accompanying text added, same image quality in

original).

Moreover, the simplicity of the smart zooming user interface is not the only

distinction between it and the Pad++ commands.

- The centerbbox command in Pad++ could zoom on only that portion

  of the webpage selected by the user. A-002504; *see also* A-008801-

  02 (¶ 76) (Reinman). It does not know and it does not care about what

  is zoomed. *Id.*

- The center command in Pad++ is not capable of zooming on an image or column.  As described above at 69, the <u>entire</u> webpage is treated as a <u>single</u> object.  Using the center command would only zoom on the webpage, not individual components of the webpage.

- Notably, Pad++ never actually discloses these commands being used to zoom on an image or column of a webpage.

Finally, there is an important reason why Pad++ does not recognize that a user would be interested in zooming on an image or column.  Pad++ was designed for a desktop with a large, high-resolution display.  *See* A-008779-80 (¶¶ 15-16) (Reinman); A-008794-95 (¶ 55) (Reinman).  A user would have no need to zoom an image or column to fit across the display for viewing—a webpage displayed at normal magnification would be sufficient.  The Board's reliance upon Pad++ for the "smart zooming" claims is pure hindsight.

### 3.    The Board's Construction Of The "Smart Zooming" Limitation Is Unreasonable

The Board purported to apply "the broadest reasonable construction" for the "smart zooming" claims, but the Board never sets forth what it considers to be the broadest reasonable construction.  *See* A-000061.  This is clear legal error.  *See Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1319 (Fed. Cir. 2004) ("The lack of claim construction leaves unclear the precise scope of limitation (c), and as result, it is impossible to know exactly what the [prior art] must disclose . . .").  Moreover,

to the extent that the Board's claim construction can be discerned, it is unreasonable.

Claims 40 and 41 require that the user perform smart zooming by "tapping on the column" or "image." These claims require, at a minimum, recognizing that an image or column is being "tapped" and zooming on the image or column so that it "is displayed to fit across the touch-sensitive display." The combination of the touchscreen of Zaurus with the manual and cumbersome commands of Pad++ did not teach these limitations. Neither Pad++ nor Zaurus was even capable of recognizing and zooming on a specific type of content. A-008794 (¶¶ 52-53); A-008801-03 (¶¶ 75-80) (Reinman). And the center and centerbbox commands in Pad++ certainly do not teach the operation of tapping on an image or column to zoom on that image or column. *Id.*

### 4.    There Was No Motivation To Combine Zaurus With Pad++

For the reasons described above at 55-62, there was no motivation to combine Zaurus with Pad++ for the "smart zooming" claims.

### 5.    The "Smart Zooming" Claims Are Not Obvious In View Of Zaurus, Hara, And Tsutsumitake

Neither Hara nor Tsutsumitake discloses recognizing and zooming on a specific type of content in response to a user input.

Hara does not teach zooming on webpage content at all. *See supra* at 63-65. Moreover, the user does not select a particular image to be resized in Hara; resizing

is done automatically for all images.  A-008805 (¶ 91) (Reinman).  Finally, there is no mention of resizing columns in Hara.  A-008806 (¶ 93) (Reinman).

Similarly, there is no zooming disclosed in Tsutsumitake.  *Id*. (¶ 96).  Nor is there any evidence that Tsutsumitake was capable of recognizing and zooming on a specific type of HTML content such as an image or column.  Tsutsumitake also makes no mention of tapping or of selecting an image or column for any purpose. *Id.*

The Board nevertheless strains to find SoftView's "smart zooming" claims obvious in the face of these fundamental deficiencies in the prior art.  The Board's reasoning is incomprehensible.  The Board asserts that "Tsutsumitake discloses grouping content in the same manner as it is grouped in a web page defined by HTML," but cites no evidence whatsoever for this statement.  A-000066-67.  The Board then finds that "Hara discloses resizing objects . . . identified by HTML tags . . . to match the width or height of the display screen or a user specified size." *Id.* The Board then states that "Zaurus discloses navigating a web page with a touch screen." *Id.*  From these statements, the Board "conclude[s] that the features recited [in the "smart zooming claims"] would have been obvious . . ."  A-000066-67.

The Board's analysis is not supported by substantial evidence on multiple levels.  First, the Board fails to cite evidence that Tsutsumitake discloses grouping

content.  Second, the Board's analysis is conclusory in nature, which is insufficient. *Plantronics*, 724 F.3d at 1354.  There is no explanation of how these disparate disclosures are tied together in any fashion.  A-000030-31.  Third, even if these disparate disclosures were combined, they still would not disclose recognizing and zooming on a specific type of content (e.g., an image or column) in response to a corresponding user input.

## IV.    THE BOARD ERRED IN ITS TREATMENT OF OBJECTIVE INDICIA

### A.    The Board's Post Hoc Analysis Of Objective Indicia Was Improper

<u>Prior to even mentioning objective indicia of non-obviousness</u>, the Board concluded that the challenged claims "would have been obvious." *See, e.g.*, A-000067.  Only <u>after</u> reaching these conclusions did the Board consider objective indicia, finding that "the objective indicia . . . do not overcome the case of obviousness . . ."  A-000069.

The Board's treatment of objective indicia as an afterthought flies in the face of settled law.  In *Plantronics*, this Court rejected the notion that a court could first decide obviousness, and then consider objective indicia.  724 F.3d at 1354-55 ("[W]e have required courts to consider evidence of the objective indicia of nonobviousness prior to making the ultimate determination of whether an invention is obvious.").

This principle applies fully to the Board. *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357-58 (Fed. Cir. 2013) ("Whether before the Board or a court, this court has emphasized that consideration of the objective indicia is *part of* the whole obviousness analysis, not just an afterthought.") (emphasis in original). The Board's post hoc analysis of objective considerations in this case is reversible error. *Id.* at 1359 (reversing Board's obviousness determination).

### B.    The Board Failed to Consider Praise by Others

The first category of objective indicia identified by SoftView was praise by others. A-000696. But in its Decision, the Board conflates praise by others with commercial success, stating that the patent owner "has the burden of showing that the <u>commercial success</u> derives from the feature, in this case the Internet browser in a handheld device." A-000068. The Board then finds that the commercial success of the iPhone could have been due to features other than the browser or due to Apple's distribution and marketing prowess, concluding that "Patent Owner . . . has not shown that the <u>sales</u> of the iPhone and Android devices are a result of the claimed invention." A-000068.

The Board's decision is not supported by substantial evidence for at least two reasons. First, the Board simply disregards the fact that SoftView is relying upon <u>praise by others</u>. A-000696-700. Second, the praise identified by SoftView was not of the accused products in general. Instead, the praise was directed at the

specific feature of the accused devices that is the subject of SoftView's claims, which the Board determined was an "Internet browser in a handheld device."  A-000068.

Such evidence includes praise by publications describing the iPhone browser as "game-changing," "bring[ing] you the 'real internet' . . . not dumbed-down pages simplified for mobile phones," "leav[ing iPhone] competitors in the dust," and allowing iPhone users to "see the same version of Web pages people see on their PC's."  *See* A-000697-99; *see also* A-008838; A-008846; A-008970.  This evidence also includes Steve Jobs' praise of the iPhone browser at its introduction as a "real web browser" that could browse websites as they are meant to be viewed on a desktop as well as iPhone user interface co-developer Scott Forstall's deposition testimony regarding the popularity of the iPhone browser.  A-000697-98.  This evidence further includes analyses of significantly increased Internet browsing by users of iPhones with "real web browsers" compared to users of other smartphones at the time, leading the Wall Street Journal to conclude that "IPhones Take Over the World."  A-000698-700.

This Court has held that "[o]bjective evidence of nonobviousness need only be 'reasonably commensurate with the scope of the claims' . . ."  *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013).  The specific nature of the cited praise (directed at the accused browsers rather than at the accused devices generally),

along with the charts provided by SoftView matching elements of the claims to the accused Internet browsers, is more than sufficient to meet the Court's standard. *See, e.g.*, *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013) (Apple's evidence of industry praise of iPhone's touchscreen by business publications deemed "compelling;" such praise would provide a nexus for commercial success). The Board's failure to consider this and other evidence of praise by others is reversible error. *In re Sullivan*, 498 F.3d 1345, 1351 (Fed. Cir. 2007).

### C.    The Board Failed to Consider Uncontested Objective Indicia

The Board did not address the remaining objective indicia, including SoftView's evidence of long-felt need for the invention, failure of others, and teaching away. A-000700-05. This legal error was not harmless. Objective indicia can establish that "an invention appearing to have been obvious in light of the prior art was not" and may be "the most probative and cogent evidence in the record." *Apple*, 725 F.3d at 1366 (citation omitted).

Here, the evidence of nonobviousness that the Board failed to consider was particularly critical because it was <u>undisputed</u>. This evidence included:

- The industry's single-minded pursuit of WAP, a stripped down mobile version of the real web, rather than mobile browsing technology (such as SoftView's) that would preserve the layout, functionality, and

design of a webpage as they would appear on a desktop browser. (Long-felt need, failure by others and teaching away.)  A-000700-05.

- A study of North American consumers finding that "48 percent of respondents said they wish they could look up things online when they're on the go, but 58 percent said the mobile web fails to meet their needs."  (Long-felt need, failure of others.)  A-000702.

- Deposition testimony of Apple's Scott Forstall, describing long-felt need, failure by others, and teaching away.  A-000701-05.

- A host of other evidence of long-felt need, failure by others, and teaching away.  A-000700-05.

Tellingly, Petitioners did not attempt to rebut this evidence—not even in the ninety-page Grimes Reply Declaration.

Today, in a world where browsing the Internet on mobile devices is ubiquitous, it would be very easy for a decision-maker to fall into the trap of hindsight when considering the state of mobile browser technology in the 2000 timeframe.  But careful consideration of objective indicia "guards against the use of hindsight because it helps 'turn back the clock and place the claims in the context that led to their invention.'"  *Apple*, 725 F.3d at 1366 (citation omitted). The fact that there was a long-felt need for a mobile browser that preserved the layout, functionality, and design of a webpage as they would appear on a

conventional desktop browser; the fact that the mobile industry's largest players were focused on delivering solutions that did not preserve layout, functionality, and design; and the fact that the industry thought that the solution to the mobile web problem was stripping away content, layout, functionality, and design are all compelling evidence of non-obviousness. This evidence is even more compelling given the fact that Petitioners had no response to it.

## V.    THE BOARD VIOLATED SOFTVIEW'S DUE PROCESS RIGHTS

Kyocera filed its Petition with two declarations, both by Dr. Grimes. A-004566-611. Those declarations withheld key arguments and evidence that were central to Petitioners' positions in the IPR's. Petitioners subsequently sprung these arguments and evidence on SoftView in a ninety-page Reply Declaration by Dr. Grimes. *See* A-006648-741.

Per the Board's rules, the Grimes Reply Declaration and the Reply should have been excluded. However, the Board denied SoftView's request to exclude, then relied upon these new arguments and evidence in its Decisions. The Board compounded its error and the resulting prejudice by refusing to permit SoftView to file a surreply to respond to these new arguments and evidence.

### A.    Petitioners Withheld Prime Facie Arguments

Zaurus was a key reference in the IPR proceedings. Indeed, it is the only reference relied upon for <u>each</u> determination of obviousness in the Decisions. But

the Grimes declarations submitted with the Petitions contained **no** opinions on Zaurus and **no** opinions regarding combining Zaurus with any other references. *See generally* A-004566-611.  The Grimes Reply Declaration provided these opinions for the first time.  *See* A-006677 (¶ 60); A-006695-714 (¶¶ 99-141); A-006731-35 (¶¶ 173-182).  Petitioners' Reply then relied upon this evidence.  *See, e.g.*, A-000717-17; A-000722; A-000724-27; A-000731.

In denying SoftView's request to exclude, the Board asserted that the Grimes Reply Declaration "was drawn to issues raised in Patent Owners Response that Petitioner could have not have addressed in the Petition."  A-000070.  The Board, however, could not and did not offer any explanation or support for this statement. And for good reason.  Petitioners' had relied upon Zaurus for <u>each</u> prior art combination in their Petition.  A-000552-90.  Petitioners argument that they could not have submitted an expert declaration on Zaurus with their Petition is simply not credible.  A-000401.

The Board compounded this error by refusing to permit SoftView an opportunity to file a surreply to respond to Petitioners' new evidence and arguments with its own evidence and arguments.  *See, e.g., In re Biedermann*, 733 F.3d 329, 339 (Fed. Cir. 2013) (vacating Board's finding of obviousness because it relied on a new reference, depriving the Patent Owner of notice and an opportunity to respond).

### B.    The Belated Obviousness Arguments And Evidence Should Have Been Excluded

The Board's rules confirm that the arguments and evidence raised in the reply materials were improper: "Examples of indications that a new issue has been raised in a reply include new evidence necessary to make out a prima facie case for the . . . unpatentability of an original . . . claim, and new evidence that could have been presented in a prior filing." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (August 14, 2012).

The Board's rules are explicit about what is supposed to happen under these circumstances: "a reply that raises a new issue or belatedly presents evidence <u>will not be considered</u> . . ." *Id*. Indeed, under the Rules, the <u>entire</u> Reply should have been excluded: "[t]he Board will not attempt to sort proper from improper portions of the reply." *Id*. The Board had told the parties that it would follow these ground rules. A-000756.

The Board however, rejected SoftView's Objections to Evidence; denied SoftView the opportunity to file a Motion to Strike; and denied SoftView's Motion to Exclude the Reply and the Reply Declaration. A-000755-56; A-000072. The Board's failure to follow its own rules constitutes a violation of SoftView's due process rights. *See Young v. Dep't of Housing and Urban Dev.*, 706 F.3d 1372, 1377-79 (Fed. Cir. 2013) (agency's consideration of new and material information in an ex parte communication against agency regulations violated due process and

"resulted in harmful procedural error requiring reversal"); *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003) ("Having chosen to promulgate the *DPS Policy*, the FWS must follow that policy.").

SoftView's fears that Petitioners' gamesmanship would be rewarded were confirmed.  The Board relied upon the new evidence and arguments, resulting in actual prejudice to SoftView.  For example, the Board relied exclusively on the Grimes Reply Declaration—and no other evidence—to support a finding of motivation to combine Zaurus and Hara.  A-000064-65.  The declaration evidence relied upon by the Board even referenced new prior art. A-006714-25 (¶¶ 142-165).

### C.     Petitioners Withheld Claim Construction Positions Until Their Reply

The Board's rules require a Petitioner to set forth its claim construction positions in the Petition.  37 C.F.R. § 42.104(b)(3).  One purpose of this requirement is to provide the Patent Owner with an opportunity to argue that the claims are not obvious under Petitioners' claim construction.  Changes to Implement Inter Partes Review Proceedings, 77 Fed. Reg. 48,680, 48,699 (August 14, 2012) ("[P]etitioner's claim construction will help to provide sufficient notice to the patent owner on the proposed grounds of unpatentability . . .").

Neither the Petition nor the accompanying Grimes declarations include any claim construction argument or evidence regarding the "preserving" limitation.

*See generally* A-0000526-92; A-004566-611.  Instead, Petitioners introduced a

new claim construction for the first time in the reply materials.  A-000295-99

(Reply); A-006662 (¶ 27) (Grimes Reply Declaration).

### D.    The Belated Claim Construction Arguments And Opinions Should Have Been Excluded

Petitioners' decision not to raise claim construction issues in their Petition is

a clear violation of the Board's rules and has been prejudicial to SoftView.  If

SoftView had been provided with Petitioners' claim constructions in the Petition,

SoftView could have done two things that it was not permitted to do as a result of

Petitioners' gamesmanship:  (1) amended some of the claims to explicitly recite

SoftView's claim construction and (2) submitted arguments and evidence for why

the original claims, under Petitioners' claim construction, would still not be

obvious.  With respect to (2), SoftView had requested a surreply, which was

denied.  A-000756.  Indeed, in ordering claim construction briefing, the Board

warned SoftView that "[t]he Board will not consider a brief which raises any other

issue."  A-000758.  The Board's decision to provide both sides with an additional

five pages of claim construction briefing thus did not remedy the prejudice

inflicted on SoftView.

## CONCLUSION

The Court should impose fairness and balance to the IPR process and reverse in full the Board's Decision, which is both substantively and procedurally flawed. There is no basis for the Board's obviousness determination. In particular, none of the prior art discloses the "preserving" and "smart zooming" limitations. Alternatively, the Court should reverse and remand for a new § 103 analysis under the correct claim construction and without the improper reply evidence.

Dated:  September 8, 2014

Respectfully submitted,

By:_____/s/ Samuel Lu_____

IRELL & MANELLA LLP

*ATTORNEYS FOR APPELLANT*
*SOFTVIEW LLC*

**ADDENDUM**

## CONTENTS OF ADDENDUM

Page

Final Written Decision in IPR2013-00004 & IPR2013-00257 ............................. 90

U.S. Patent No. 7,831,926 ....................................................................................... 126

Trials@uspto.gov
571-272-7822

Paper No. 53
Date Entered: March 27, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

KYOCERA CORPORATION
MOTOROLA MOBILITY LLC
Petitioner

v.

SOFTVIEW LLC
Patent Owner
_____

Case IPR2013-00004
Case IPR2013-00257
Patent 7,831,926 B2
_____

Before BRYAN F. MOORE, BRIAN J. McNAMARA, and
STACEY G. WHITE, Administrative Patent Judges

McNAMARA, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

BACKGROUND

On March 29, 2013, in Paper 12, the Board entered a Decision to Institute an *inter partes* review on the following challenges raised by Kyocera Corporation to the patentability of claims 30, 31, 40, 41, 43, 52, 55, 59, 72, and 75 (Challenged Claims) of U.S. Patent No. 7,831,926 B2 (the '926 Patent) owned by Softview LLC ("Patent Owner"):

Challenged Claims as obvious under 35 U.S.C. § 103 over the combination of Zaurus[1], Pad++[2], and SVF[3]; and

---

[1] Power Zaurus Personal Digital Assistant Documentation("Zaurus"), Ex. 1004
[2] Bederson, Benjamin B. and Hollan James D., Pad++: A Zoomable Graphical Interface System, CHI '95 Mosaic of Creativity, May 1995;  Bederson, Benjamin B. and Furnas, George W, Space-Scale Diagrams: Understanding Multiscale Interfaces, CHI '95 Proceedings, 1995; Bederson, Benjamin B., et al, A Zooming Web Browser, SPIE, Vol. 2667, 260-71, May 1996; Bederson, Ben and Meyer, Jon, Implementing a Zooming User Interface: Experience Building Pad ++, Software-Practice and Experience, Vol. 28(1), 1101-35, Aug. 1998; Bederson, Benjamin B., et al., Pad++: A Zoomable Graphical Sketchpad for Exploring Alternate Interface Physics, Journal of Visual Languages and Computing, Vol. 7, 3-31, 1996;  Pad++ Reference Manual Version 0.2.7, published July 9, 1996; Pad++ Programmer's Guide Version 0.2.7, published June 10, 1996 ( collectively, "Pad++"), Ex. 1006
[3] Specification for the Simple Vector Format v. 1.1, Jan. 16, 1995;  New CAD System Works With AutoCAD Drawings Without Translation," June 17, 1996, retrieved from:
http://web.archive.org/webI19961019052917/http://soft:source.cominet
PX 1009 news.html ; "Bring New CAD Viewing Power to the Internet," Mar. 4, 1996, retrieved
from:http://web.archive.org/webI19961019052917/http://softsource.cominet
news.html, (collectively, "SVF"), Ex. 1009

2

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

Challenged Claims as obvious under 35 U.S.C. § 103 over the combination
of Zarus, Hara[4], Tsutsumitake[5], and SVG[6].

IPR2013-00257, brought by Motorola Mobility LLC, raised the same
challenges and later was joined to this proceeding. IPR2013-00257, Paper 10.
Kyocera Corporation and Motorola Mobility are referred to collectively as
"Petitioner."

On July 19, 2013, Patent Owner filed a Patent Owner's Response. ("PO
Resp.," Paper 25). On September 23, 2013, Petitioner filed a Consolidated Reply
to Patent Owner's Response. ("Petitioner's Reply," Paper 28). On November 22,
2013, Patent Owner filed a Motion to Exclude. ("Mot. to Exclude," Paper 42). An
oral hearing was held on January 7, 2014, concurrent with the oral hearing in
related consolidated proceeding, IPR2013-00007/IPR2013-00256, between the
same parties..

In this Final Written Decision we determine, pursuant to 35 U.S.C. § 318(a)
and 37 C.F.R. § 42.73, that Petitioner has shown, by a preponderance of the
evidence, that claims 30, 31, 40, 41, 43, 52, 55, 59, 72, and 75 are unpatentable
under 35 U.S.C. § 103 over Zarus, Pad++, and SVF. Patent Owner's Motion to
Exclude is denied.

THE '926 PATENT (EXHIBIT 1001)

As indicated by its title, the '926 Patent is drawn to the scalable display of
Internet content, e.g., Hypertext Markup Language (HTML)-based content,

---

[4] Japanese Unexamined Patent Application Publication H10-326169 ("Hara"),
Ex. 1008
[5] Japanese Laid Open Patent Application H10-21224 ("Tsutsumitake"), Ex. 1005
[6] Ferraiolo, Jon, Scalable Vector Graphics Requirements: W3C Working Group
Draft, Oct. 29, 1998. ("SVG"), Ex. 1007

3

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

cascade style sheets (CSS), and Extensible Markup Language (XML) on mobile
devices, by enabling the content to be rendered, zoomed, and panned for better
viewing on small screens and standard monitors. Ex. 1001, col. 2, ll. 32-43, col. 5.
ll. 11-15. Patent Owner's expert describes the '926 Patent and related patent, U.S.
Patent No. 7,461,353 ("the '353 Patent"),[7] as "being directed toward a browser that
extends the web to mobile devices by supporting full-page browsing with zoom
and pan, using for, example, SVF (Simple Vector Format) to describe web content.
'926 Patent, col. 4:35-45." Declaration of Glenn Reinman (Reinman Decl.), Ex.
2003 ¶ 9. According to the '926 Patent, a client side viewer receiving Internet
content has an Internet browser and uses the simple vector format (SVF) originally
designed to handle common computer-aided design (CAD) file formats to describe
the current web content. Ex. 1001, col. 4, ll. 35-49. Translation of the content into
a scalable vector representation can be done by a third party proxy service (Fig.
1A), the content provider's web site (Fig. 1B), or at the client (Fig. 1C).

    The '926 Patent describes the logic used by the invention when translating
content into a scalable vector representation. *Id.* at col. 3, ll. 40-42, Fig. 5. Pre-
rendering parsing of a received HTML document identifies elements such as
tables, column definitions, graphic images, paragraphs, and line breaks and
determines where to place objects on a display. *Id.* at col. 15, ll. 45-52. When
using frames, the display page is divided into multiple frame areas, which enables
a single displayed page to include source code from several HTML documents. *Id.*
at col. 15, ll. 33-36. During pre-rendering, each frame is examined in the
sequential order it appears in the HTML document, and during further processing,
actual objects are rendered in their respective positions. *Id.* at col. 15, ll. 52-57.
The content is separated into objects based on logical groupings of content, and a

---

[7] The '353 patent is the subject of co-pending IPR2013-00007.

4

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

page layout is built using bounding boxes produced for each object. *Id.* at col. 16, ll. 19-38, col. 17, ll. 15-29. The '926 Patent acknowledges that the above steps commonly are performed by conventional browsers in the pre-rendering process, but indicates that the disclosed use of layout data generated in the pre-rendering process to generate a scalable vector representation of the original page content departs from the prior art. *Id.* at col. 17, ll. 30-45.

The '926 Patent discloses that generating a scalable vector representation begins by defining a page datum point as an X,Y value and a datum point as an X,Y value for each object's bounding box. *Id.* at col. 17, ll. 45-64, col. 18, ll. 1-5. A vector between the page datum point and the datum point for each bounding box then is generated and stored. *Id.* A frame datum can also be assigned and vectors drawn from the page datum to the frame datum to establish the frame's offset from the frame datum to each object in the frame. *Id.* at col. 18, ll. 5-16. The scalable vector representation is then completed by a reference that links each object's contents, attributes such as type (image, text), and bounding box parameters, such as height and width, to the object's vector. *Id.* at col. 18, ll. 18-26.

A display list of vectors for the vectorized HTML content is built, as is known from computer aided design (CAD) arts, and a user-selectable scale and offset are determined. *Id.* at col. 19, ll. 14-25. The bounding boxes are processed using the scale and offset, and a bounding box defining the limits of the display content is determined. *Id.* at col. 19, ll. 32-35. Scaling and offset can be accomplished by (i) mapping vectors to a virtual display area in memory with much more resolution than the actual display and reducing the scaling of the objects in the virtual display to how they will appear in the actual display or (ii) by using a fixed reference frame corresponding to the client's screen resolution and scaling and offsetting the vectors' bounding boxes relative to the fixed frame. *Id.*

5

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

at col. 19, ll. 39-57.  Using the latter approach, respective offsets in X and Y (-ΔX

and -ΔY) are applied to the starting point and the vectors are scaled by an amount

SF, producing a new datum (starting point) for each bounding box relative to the

rendered page datum, which remains fixed, but may or may not be displayed

depending on the offset and scaling. *Id.* at col. 19, l. 58 – col. 20, l. 17.  Once the

bounding boxes are offset and scaled, the content (e.g., image and text)

corresponding to objects having at least a part of their bounding boxes on the

screen is retrieved from the client device's display list and scaled. *Id.* at col. 20, ll.

18 – 44.  A display limit bounding box defines the portion of the display screen

that actually will be used to display content. *Id.* at col. 19, l. 58 - col. 20, l. 7.  The

portions of the scaled content falling within the display limit bounding box are

rendered on the client's display device. *Id.* at col. 20, ll. 45-47.

<center>ILLUSTRATIVE CLAIMS</center>

Independent claims 30 and 52, which are illustrative, are shown below:

30. A mobile phone, comprising:
a processor,
wireless communications means operatively coupled to the processor, to
    facilitate communication with a mobile service provider network via
    which Web content may be accessed;
a touch-sensitive display;
a memory, operatively coupled to the processor; and
storage means, operatively coupled to the processor, in which a plurality of
    instructions are stored that when executed by the processor enable the
    mobile phone to perform operations including,
    rendering a browser interface via which a user is enabled to request to
        access to a Web page having an original format comprising HTML-
        based content defining an original page layout, functionality, and
        design of content on the Web page;
    retrieving HTML-based content associated with the Web page;
    translating at least a portion of the HTML-based content from its original
        format to produce translated content including scalable vector-based

<center>6</center>

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

> content that supports a scalable resolution-independent representation
> of the HTML-based content that preserves an original page layout,
> functionality and design of the at least a portion of the HTML-based
> content when scaled and rendered; and
>
> employing the scalable vector-based content to render a view of at least a
> portion of the Web page on the display using a first scale factor,
>
> wherein preservation of the functionality defined by the HTML-based
> content includes preservation of hyperlink functionality.

52. A mobile device comprising:

a processor;

wireless communications means, to facilitate wireless communication with a
network via which Web content may be accessed;

a touch-sensitive display;

flash memory, operatively coupled to the processor, in which a plurality of
instructions are stored that when executed by the processor enable the
mobile device to perform operations including,

> rendering a browser interface via which a user is enabled to request
> access to a Web page comprising HTML based Web content defining
> an original page layout, functionality, and design of content on the
> Web page;
>
> retrieving and processing the HTML-based Web content to produce
> scalable content; and
>
> employing the scalable content and/or data derived therefrom to,
>> render a view of the Web page on the touch-sensitive display; and
>> re-render the Web page in response to associated user inputs to enable
>> the user to iteratively zoom in and out views of the Web page
>> while preserving an original page layout, functionality, and design
>> defined by the HTML-based Web content as interpreted by a
>> rendering engine,
>
> wherein preservation of the functionality defined by the HTML-based
> Web content includes preservation of hyperlink functionality.

## CLAIM CONSTRUCTION

As discussed in our Decision To Institute, we construed the claim terms as

the Petitioner represented they were construed by the district court in co-pending

litigation, *SoftView LLC v. Apple Inc.*, Case No. 10-389-LPS (D. Del.).  Dec. to

7

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

Institute (Paper 12), 19-20. A dispute concerning the meaning of another term, i.e.,
"preserve[s] an original page layout, functionality and design," emerged after the
Patent Owner Response argued that this claim feature recites a major distinction
over the art cited in Petitioner's challenges. PO Resp. (Paper 25) 2. In claim
construction briefing authorized by the Board, Patent Owner argues that the
original page layout, functionality, and design that must be preserved means "as
viewed on a conventional desktop browser." *See*, Patent Owner's Supplement
Claim Construction Brief. Paper 38. Petitioner argues that "what is being
preserved is the layout of the webpage after it has been processed by the browser."
See, Petitioner's Supplement Claim Construction Brief. Paper 37. Petitioner's
proposed construction is consistent with statements made by Patent Owner during
prosecution of the related '353 Patent, which is the subject of IPR2013-00007,
that:

> With respect to the scope of the terminology "preserving
> the [overall layout, functionality and] design" of the
> content, this refers to preserving the design as interpreted
> by the browser while at different zoom levels and panned
> views as opposed to rendering the content identically to
> how it is rendered by a particular desktop browser that
> may interpret the page design differently.

IPR2013-00007, Ex. 1002, 233. In a footnote, Patent Owner noted that differences
in page interpretation will be generally a function of the browser's rendering
engine (*a.k.a.* layout engine). *Id.*

    We do not adopt either Petitioner's or Patent Owner's proposed
constructions. Patent Owner's construction introduces uncertainty because the
claims do not refer to a conventional desktop browser, and the proposed
construction does not define a conventional desktop browser. Patent Owner agrees

<div align="center">8</div>

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

that, using the same HTML code, different browsers produce different displays, *see*, IPR2013-00007, Ex. 1002, 229-31,[8] but during the final hearing, argued that preserving the look and feel of the website as rendered on a desktop browser is sufficient. *See*, Tr. 51-61. At the oral hearing, Patent Owner argued that "you need to preserve the look and feel so that a person using a web page would understand that that was the same web page as the one that they were using in connection with a desktop computer." Tr. 60-61. Due to uncertainty regarding the scope of differences that would be permissible on the target device browser, while maintaining the look and feel as rendered by a conventional desktop browser, we determine that Patent Owner's proposed construction provides no more insight than the current "preserving" claim language.

Petitioner's construction requires that the zoomed version reproduce the layout of the page as initially displayed, but places no requirements on processing performed by the browser's initial rendering of the web page, and does not recognize a relationship between the web page as displayed and the HTML defining its format.

---

[8] The '353 and '926 Patents have the same specification. During prosecution of the '353 Patent, Patent Owner noted that,

> "Even when rendering the same Web page source content (i.e., the HTML code definition of the Web page), conventional Web browsers may not render the (non-scaled) Web page identically. Scaling Web pages may also result in alteration of the page layout. . . . However, the overall layout, functionality and appearance (design) of the scaled Web pages defined by the HTML code for the Web page are preserved . . . . Preserving functionality generally pertains to preserving the interoperability of various HTML-based Web page content, such as hyperlinks and UI [user interface] controls such as input forms defined via corresponding HTML based code.

IPR2013-00007, Ex. 1002, 231.

9

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

We begin our claim construction analysis with the language of the claims. The "preserving limitation" in claim 30 recites:

> a scalable resolution-independent representation of the HTML-based content that *preserves an original page layout, functionality and design of the at least a portion of the HTML-based content* when scaled and rendered (Emphasis added)

As an antecedent to the disputed "preserving limitation," claim 30 recites that the claimed mobile phone can render a browser interface that enables a user to request access to a "web page having an original format comprising HTML-based content defining an original page layout, functionality and design of content on the Web page." Ex. 1001, claim 30. Claim 30 next recites "translating at least a portion of the HTML-based content" from its original format into "translated content including scalable vector-based content that supports a scalable resolution-independent representation of the HTML-based content that preserves an original page layout, functionality and design of the at least a portion of the HTML-based content when scaled and rendered." *Id.* (emphasis added). Thus, claim 30 does not recite preserving the entire or layout, functionality, and design, but only original layout, functionality, and design that corresponds to the translated portion of the HTML-based content.

The "portion of the HTML-based content" in claim 30 corresponds to the disclosure relating to Figure 6, in which the HTML retrieved corresponds to objects whose bounding boxes at least partially fall within the display bounding box. However, claim 30 is not limited to the embodiment illustrated in the specification. Claim 30 recites only a representation that preserves an original page layout, functionality and design when scaled and rendered of the at least a

10

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

portion of the HTML-based content.  Claim 30 cannot be interpreted to preserve a

particular conventional desktop layout because claim 30 does not recite what

portion of the HTML-based content that defines the conventional desktop layout is

scaled and rendered.  Construing the claim broadly, but reasonably, a portion of the

HTML-based content could be scaled and rendered that would preserve only some

features of the original layout, function and design, as viewed on a conventional

desktop.[9]  While preserving the original layout, functionality, and design of the

translated portion of the HTML-based content, the web page rendered on the

claimed device may or may not appear as it would on a conventional desktop,

depending upon what portion of the HTML-based content is translated.

The "preserving limitation" in claim 52 recites:

> employing the scalable content…to render a view of the
> Web page on the touch sensitive display and re-render
> the Web page…to iteratively zoom in and out views of
> the Web page while preserving an original page layout,
> functionality, and design defined by the HTML based
> Web content as interpreted by a rendering engine.

Thus, claim 52 recites two renderings.  The first rendering of a view of the

Web page is not limited to one that preserves the original page layout, function,

and design.  The re-rendering or scaled view preserves the original layout,

function, and design defined by the HTML content as interpreted by a rendering

engine, such as one in the client device.  Ex. 1001, col. 5 -6.  Claim 52 does not

recite that the rendering engine renders a layout, function, and design that

conforms to one as viewed on a conventional desktop, or rendered by a

conventional desktop browser.

_____

[9] As discussed further herein, Patent Owner criticizes the prior art references as
primitive devices that implement only a portion of available HTML capabilities.

11

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

As previously discussed, the '926 Patent describes the relationships between a web page and HTML. Ex. 1001, col. 7.ll. 27-60. In HTML, tags define the layout and display information for a web page, including tables, paragraph boundaries, graphic image positions and bounding box sizes, type face styles, sizes, and colors, borders, and other presentation attributes. *Id.* at col. 7, ll. 47-52, col. 15, ll.19-32. A pre-rendering parsing of the HTML document is performed to determine where to place various objects on the display page. *Id.* at col. 15, ll. 48-50. Some objects, such as plain text, are rendered immediately, while other objects, such as graphic images must be retrieved before being fully rendered. *Id.* at col. 15, ll. 57-60. A web page may have all its information in a single frame, or may contain multiple frames as shown in Figure 4, which has adjacent frames 212 and 214. *Id.* at col. 7, ll. 33-37, col.12, ll. 21-22. When multiple frames are present, they are processed sequentially, and objects are rendered in their respective positions. *Id.* at col. 15, ll. 52-58. As the primary HTML is parsed, content that should logically appear together, for example within a substantially rectangular outline, is grouped into objects, while other content, such as headlines, user interface objects, and graphic layout objects are identified, so that a page layout is built by defining a bounding box for each object. *Id.* at col 8, ll. 19-39, col. 16. ll. 19-38. The page layout is generated in conjunction with defining the bounding boxes, so that the location of an object is based on the location of other related and non-related objects. *Id.* at col. 16, ll. 19 - col. 17, l. 4. -.

The '926 Patent describes all of the above functions as commonly performed by conventional browsers during a pre-rendering process, and at least in the case of the Mozilla browser, by the Mozilla rendering engine. *Id.* at col. 17, ll. 31-41.

Claim 30 recites preserving the original layout, function, and design of the at least a portion of the HTML-based content (which defines the original layout,

12

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

function, and design). Claim 52 recites preserving the original function, layout, and design defined by the HTML-based content in the re-rendering as interpreted by the browser's rendering engine. In both cases, the preservation of the original layout, function, and design turns on what elements of the HTML are translated to be interpreted by the browser, rather than the how that HTML is viewed on a desktop. Therefore, we construe the "preserving limitation" to mean *maintains the features of the web page's capabilities and appearances in a manner consistent with the translated portion of HTML code defining those capabilities and appearances.*

Our construction is consistent with the claims and the objectives of the invention, as described in the '926 Patent specification. Both claims 30 and 52 recite that an original layout, function, and design of a web page is defined by HTML-based content. There is no dispute with the statement in the '926 Patent that HTML is a standardized language that describes the layout of content on a web page and attributes of the content. Ex. 1001, col. 7, ll. 45-60. Our construction of preserving capabilities and appearances consistent with the translated portion of the HTML is consistent with the limitation in claim 30 that concerns "the at least a portion of the HTML-based content" and the limitation in claim 52 that recites, "as interpreted by the browser." The Background of the Invention notes that fixed resolution Web pages used for displaying Internet content designed for desktop computers present a technical problem for displaying Internet content on small screens in hand held devices. *Id.* at col. 2, ll. 14-28. The Summary of the Invention states that the claimed mobile devices employ novel processing of original Web content, including HTML-based content, to generate scalable content, which is then employed to enable the Web content to be rapidly rendered, zoomed, and panned. *Id.* at col 2, ll. 32-41. The specification is silent on

13

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

how closely the rendered content should match the web page as viewed on a
conventional desktop.

ANALYSIS OF PETITIONER'S PRIOR ART CHALLENGES

Obviousness over Zaurus, Pad++, and SVF

*Claims 30 and 52*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences
between the claimed subject matter and the prior art are such that the subject
matter, as a whole, would have been obvious at the time the invention was made to
a person having ordinary skill in the art to which said subject matter pertains. *KSR
Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is
resolved on the basis of underlying factual determinations including: (1) the scope
and content of the prior art; (2) any differences between the claimed subject matter
and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-
called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18
(1966).

We analyze the instituted grounds of unpatentability in accordance with the
above-stated principles. We also recognize that prior art references must be
"considered together with the knowledge of one of ordinary skill in the pertinent
art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (quoting *In re Samour,*
571 F.2d 559, 562 (CCPA 1978)). Moreover, "it is proper to take into account not
only specific teachings of the reference but also the inferences which one skilled in
the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d
825, 826 (CCPA 1968). That is because an obviousness analysis "need not seek
out precise teachings directed to the specific subject matter of the challenged
claim, for a court can take account of the inferences and creative steps that a

14

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *see also In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007).

As we discussed above under Claim Construction, the '926 Patent describes, as conventional, the use of HTML to specify the layout, design, and function of a web page. The '926 Patent also describes the zoom and pan capabilities of SVF (also referred to as "vectorized content") as known in the CAD art and under consideration by the World Wide Web Consortium for adoption as a standard for vector content on the web. Ex. 1001, col. 4, ll. 49-65. Patent Owner's expert states that the invention claimed in the '926 Patent is "directed toward a browser that extends the web to mobile devices by supporting full-page browsing with zoom and pan, using for, example, SVF (Simple Vector Format) to describe web content. '926 Patent, col. 4:35-45." Reinman Decl., Ex. 2003 ¶ 9. Although Patent Owner disputes whether the evidence supports a combination of Bederson's description of Pad++ with Zaurus, with or without SVF, there appears to be little dispute that Bederson discloses vectorized content. PO Resp. 34.

In view of Patent Owner's arguments our analysis of claims 30 and 52 turns on whether the Zaurus and Bederson references can be combined, and whether that combination of references renders the "preserving limitation" obvious, i.e., whether it is obvious to *maintain the features of the page's capabilities and appearances in a manner consistent with the translated portion of HTML code defining those capabilities and appearances.*

The Zaurus PDA

We begin our consideration of the scope and content of the prior art with Zaurus. Zaurus discloses extending the web to a mobile, handheld device with a small screen. Ex. 1004, 652 -54. As discussed in our Decision to Institute, Zaurus is a handheld PDA with a wireless communication means to access web content

15

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

(when used with a digital cellular phone adapter). Dec. to Institute, Paper 12, 22.
Zaurus includes a processor to render a browser (with limitations), provides
vertical and horizontal scrolling, and magnified and reduced views of web pages.
*Id.* Zaurus includes a touch sensitive screen and a browser that has the ability to
process HTML-based content up to HTML 3.2, but does not have the ability to
render multiple frames properly. Ex. 1004, 105, 127-8. The '926 Patent notes that
web pages may be provided as a single frame or multiple frames. Ex. 1001, col.15,
ll. 33-36. Zaurus does not ignore multiple frames in web pages. In Zaurus, pages
composed of multiple frames are viewed by displaying them frame by frame. Ex.
1004, 105, 638. The frame is selected using a touch screen, so that the selected
frame is displayed. Ex. 1004, 647.

Zaurus also discloses differences in the ways its browser processes certain
HTML content, for example using a smaller number of font sizes. Ex. 1004, 639.
Patent Owner recognized such browser font limitations during prosecution of the
related '353 Patent stating "the Web page's design is a matter of interpretation by
the particular browser . . . browsers may substitute fonts for fonts (as defined by
corresponding HTML code) that are not supported by the browser." IPR2013-
00007, Ex. 1002, 233. Zaurus's ability to default to a standard font size if the
HTML data does not specify a size further indicates that Zaurus incorporates a
browser that recognizes HTML-based information used to define web site design
features. Ex. 1004, 640. The inability of Zaurus to render properly web pages
using certain plug-ins and scripts, or to implement a full complement of HTML

16

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

features, does not mean Zaurus cannot be applicable as prior art that teaches implementing HTML on a handheld, mobile device, such as a phone.[10]

Zaurus discloses the ability to switch from a reduced view to a magnified view, as well as a left and right scrolling control and a vertical scrolling bar to view material not currently on the screen. Ex. 1004, 641, 644-45. Zaurus provides hyperlink functionality, Ex. 1004, 94, 608, but is silent on whether it maintains hyperlink functionality in a magnified display. Zaurus also discloses that by touching the screen one can display a list of web pages opened after connection to the Internet and switching to a selected page. *Id.* at 644. Zaurus further discloses compatibility with client side clickable maps, so that by clicking inside a displayed map, one can jump to the page that corresponds to that portion. *Id.* at 638. Thus, Zaurus discloses a system that maintains the primary features of the page's appearance in a manner consistent with the portion of HTML code that the Zaurus browser uses. To the extent that the browser in Zaurus provides a limited implementation of HTML, Zaurus preserves the layout and design of the web page defined by at least a portion of the HTML-based content (claim 30) and as rendered by its rendering engine (claim 52).

During the oral hearing, Patent Owner argued that under its proposed construction, which we do not adopt, the "preserving limitation" in the claims

---

[10] The '926 Patent defines an HTML document as any document that contains web page content other than <u>only</u> graphic content. Ex. 1001, col. 7, ll. 57-60. This would include documents with graphics and other content, as well as scripts and documents using extensible mark-up language (XML). During the oral hearing, however, Patent Owner argued that HTML is limited to anything that preserves the layout, functionality, and design and "excludes things like active scripting." Tr. 67. Patent Owner noted that a box where plug-in content might appear is rendered, but the content with the box is not rendered in the case of Microsoft Internet Explorer because that is a plug in, although another browser might render that content. Tr. 64-67.

17

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

requires preserving "the look and feel so that a person using a web page would understand that that was the same web page as the one they were using in connection with a desktop computer." Tr. 60-61. Zaurus does not implement a desktop browser, nor does the specification or claims require implementing a desktop browser in a mobile device. Zaurus discloses that due to its implementation, the display is different from instances where the home page is displayed by using a PC, for example, by not displaying background images of a home page. Ex. 1004, 639. Even with its limited implementation, however, a person using a Zaurus PDA would understand that the same web page as the one being used in connection with a desktop browser was being displayed. Thus, Zaurus falls within the scope of Patent Owner's stated understanding of its proposed claim construction. Tr. 59-61.

　　　Bederson and Pad++

　　　Zaurus discloses only a limited ability to magnify a screen display. Ex. 1004, 645. Bederson discloses a browser, referred to as Pad++ that "allows Web pages to remain visible at varying scales while they are not being specifically visited, so the viewer can examine many pages at once. In addition, Pad++ allows users to zoom in and out of pages, enabling explicit control of how much context is viewed at any time." Ex. 1006, 106. Bederson notes that Pad++ was being developed for use on platforms ranging from high-end graphics workstations to PDAs and interactive set-top boxes. *Id.* at 155. Bederson further discloses that using Pad++, one's whole desktop could be zoomable and that this feature "seems especially attractive for systems which have small screens, such as handheld computers (i.e., PDAs)." *Id.* at 341. We are not persuaded by Patent Owner's assertion that one would not be motivated to port Bederson's Pad++ browser to

18

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

Zaurus because of technical difficulties resulting from limited computing capacity and system incompatibilities. PO Resp. 29-33.

Bederson discloses zooming, primarily for navigation purposes, i.e., for allowing users to identify the web pages they have visited. Patent Owner notes that Pad++ was designed to provide users with a roadmap enabling them to trace their paths from one hyperlink to another, Tr. 70-71, or to show the hierarchy of relationships between web pages. Reinman Decl., Ex. 2003 ¶ 18. We agree. In Bederson's paradigm, users navigate a single large information surface on which documents can be placed at any position and scaled to any size with panning, zooming, and hyperlinks. Ex. 1006, 117. One aspect of Pad++ described by Bederson is the use of "dynamic objects" that restructure themselves in response to users' actions. When a user clicks on a link, Pad++ adds the new page to a tree visible to the user and places the new page at the center of the screen as "the current focus" at a size suitable for viewing. *Id.* at 106. A user can designate any page as the current focus by clicking on it. *Id.* In this context, the motivation for Pad++ to provide the ability to zoom in to a page in the roadmap is clear.

Patent Owner argues that Pad++ as described by Bederson supports only a small subset of HTML. PO Resp. 10, Reinman Decl., Ex. 2003 ¶¶ 29-34. Based on Pad++'s implementation of only a subset of HTML, Patent Owner argues that Pad++ does not disclose preserving the original layout, functionality, and design as claimed. Patent Owner's expert, Dr. Reinman, disagrees with the opinion of Petitioner's expert, Dr. Grimes, that Bederson preserves the original layout of a single web page when zoomed and panned. Dr. Reinman states that Section 3 of the Pad++ Brief Tour shows only how the web page looks after it has been rendered by Pad++, not the original page before being rendered by Pad ++, precluding a determination of whether the original page layout, functionality, and

19

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

design is preserved. Reinman Decl. Ex, 2003 ¶ 23. This is true in the '926 Patent
as well. The '926 Patent includes a listing (with some omissions for clarity) of the
HTML corresponding to web page 210, which is shown as a drawing in Figure 4A,
rather than as a display produced by a browser, as it would appear on a
conventional desktop computer. Ex. 1001, col. 12, ll. 44-49. Figures 7A, 7B, 8A,
8B and 9A and 9B are representations of nominal and zoomed views on a Palm
device. The '926 Patent does not illustrate how these nominal or zoomed views
would appear on a conventional desktop. Thus, in the '926 patent, one cannot tell
how well the display on the Palm device preserves the original layout, function,
and design of the HTML-based code, as viewed on a conventional desktop.

Patent Owner admits that the claimed "functionality" in the preserving
limitation includes clicking on a hyperlink. Tr. 48. In Pad++, an object includes
an HTML page composed of many characters, line segments, and images. Ex.
1006, 120. Pad++ discloses reading HTML and following links across the Internet.
*Id.* at 89, 105, 161-2, 183. Thus, Bederson discloses preserving HTML
functionality, i.e., hyperlinking, associated with a Web page. *Id.*

Patent Owner's argument appears to be that, in Pad++, Bederson does not
disclose preserving all the functionality of HTML. Patent Owner's expert, Dr.
Reinman, provides a list of HTML features that are not implemented in Pad++.
Ex. 2003 ¶ 29. For example, Patent Owner argues that Bederson does not disclose
the specific functionality of creating forms. Only two lines in the '926 Patent
mention forms as a feature of HTML. Ex. 1001, col. 15, ll. 29-30. Nevertheless,
according to Patent Owner, the ability to create forms is of particular importance to
e-commerce, and is not disclosed in Bederson. PO Resp. 24, Reinman Decl., Ex.
2003 ¶ 34. Referring to Figure 5 of on page 163 of Exhibit 1006, Patent Owner
states that the Pad++ reproduction of the Yahoo page does not include a search

20

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

term input box. PO Resp. 24-25. Patent Owner has not demonstrated that the
original Yahoo page included such a search box, but argues that the burden is on
the Petitioner to show the Yahoo page as it would have appeared on a desktop.
According to Patent Owner in the absence of such a showing, there is no evidence
of the original layout, functionality, and design of the Yahoo page in Bederson.
Tr. 72. As noted above, however, the '926 Patent provides no evidence that the
Palm device screens illustrated in the '926 Patent preserve the layout, functionality,
and design of a web page as viewed on a conventional desktop.

During prosecution of the related '353 Patent, Patent Owner argued that, in
the implementation of a browser, it may be desirable to change user interface
behavior based on a current use and/or context. IPR2013-00007, Ex. 1002, 232.
Patent Owner states it may be advantageous to implement a context-based, user
interface that may result in a different action for the same user inputs depending on
a current use or zoom context. *Id.* Patent Owner uses the example of a tapping on
a column, which may have the effect of zooming on the column, or activating a
hyperlink in the column, depending upon the browser implementation. Patent
Owner states that preserving content functionality only means that the functionality
defined by corresponding HTML code is supported, without limiting the particular
user interface for how that activation is facilitated. *Id.*

Bederson describes objects in the Pad++ hierarchy, which include user
inputs, such as checkboxes, and choice menus. Ex. 1006, 144-45. The standard
objects supported by Pad ++ include colored text, graphics, portal and HTML, with
standard input widgets (buttons, sliders, etc.) supplied as extensions. *Id.* at 156.
Bederson's disclosure of preserving hyperlinking capability demonstrates
preserving the functionality of HTML in a zoomed view. Bederson also notes that
tools for interacting with documents, such World Wide Web browsers like Mosaic

21

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

and Netscape; all predefine interactive widgets within the client and provide hooks
so that documents may access those widgets. *Id.* at 179. Thus, Bederson provides
user input functionality.

As discussed above, claim 30 requires preserving the original layout,
function, and design of the at least a portion of the HTML based content," i.e., the
translated portion. Claim 52 recites re-rendering a Web page while preserving an
original page layout functionality and design as defined by the HTML-based Web
content, as interpreted by a rendering engine. Although neither Zaurus nor
Bederson implements each and every feature of HTML, as discussed above, both
Zaurus and Bederson disclose preserving the layout, functionality, and design of
the part of the web page that is translated (claim 30) or interpreted by the rendering
engine (claim 52).

The underlying issue is not, as Patent Owner suggests, whether Zaurus
and/or Bederson disclose implementing all the features of HTML with zooming on
a device with a small screen. The issue is whether, in view of their disclosures, the
claims of the '926 Patent would have been obvious under 35 U.S.C. § 103.
Bederson discloses that Pad++ is a primitive browser, but suggests that a zooming
version of the Netscape and Mosaic browser could be implemented using the
techniques in Pad++. Ex. 1006, 286. Bederson then provides a screen shot of
Pad++ displaying Bederson's home page (an HTML document), Ex. 1006, 287,
and a zoomed view focusing on a portion of the document with "hotwords" that
provide hyperlinks. Ex. 1006, 289. The hyperlinks change color when scrolled
over (one of several possible ways a browser can display hyperlinks in an HTML
document) and can be followed to display the target of the link. *Id.* at 291. This
display shows the home page and the linked page side by side. The user can zoom
in on the linked page by clicking on it. *Id.* at 293. Bederson's implementation of

22

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

web page zooming appears to be a proof of concept, rather than a mere suggestion. The fact that Bederson did not implement all, or even many, of the known capabilities of HTML does not alter the fact that Pad++ demonstrates the concept, suggests it could be applied to the Netscape and Mosaic browsers, and states that it was being designed for use on devices with small screens, such as PDAs. Thus, we are persuaded that one of ordinary skill would be motivated to combine the teachings of these references.

Finally, there appears to be no dispute that, as discussed in our Decision to Institute, Bederson discloses vector scaling, in a manner similar to SVF. Patent Owner argues only that SVF does not cure the deficiencies of the combination of Zaurus and Pad++. PO Resp. 40.

In consideration of the above, we are persuaded that claims 30 and 52 would have been obvious over the combination of Zaurus, Bederson, and SVF.

   *Claims 31, 40, 41, 43, 55, 59, 72, and 75*

Admitting that zooming was known and is not part of the invention, Tr. 50, Patent Owner argues that the subject matter claimed is "smart zooming" – a way to tap or click on a column and zoom just to that column. The '926 Patent mentions this capability at column 20, lines 58-60. The '926 Patent also mentions selecting an image by tapping on it, Ex. 1001, col. 18, ll. 61-62, or zooming in on a paragraph, *Id.* at col. 18, ll. 62-63. In the context of selecting a paragraph, the '926 Patent states that the display may be reformatted to fit the characteristics of the display, rather than following the original format in the zoom out view. *Id.* at col. 18, ll. 64-67. These features are recited in, among others, dependent claims 31, 40, and 41.

Claim 31 recites the further limitation on claim 30 that execution of the instructions performs operations allowing the user to zoom on a user selectable

23

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

portion of a display using a touch sensitive display. Like claim 31, claim 55, which depends from claim 52, adds the further limitation that executing the instructions enables the user to zoom in on a user selectable portion of the display in response to a user input via the touch sensitive display. Patent Owner argues that, although it is a touch sensitive device, the reduce and magnify capabilities of Zaurus do not allow the user to select the portion of the display on which to zoom in. PO Resp. 42. Claims 31 and 55 do not require that the user select a portion of the display before the zooming operation, only that operations allow the user to zoom in on a user selectable portion of the display. Zaurus describes magnifying or reducing the entire display in response to the user activation of the magnify key. The portion of the screen on which a user zooms in or selects to view, however, is determined by the user activating the horizontal scrolling keys and the vertical scrolling bar with the touch screen. Thus, applying the broadest reasonable construction, Zaurus discloses executing instructions that perform operations that allow the user to select a portion of the display using a touch sensitive display. We conclude, based on a preponderance of the evidence that claims 31 and 55 would have been obvious to one of ordinary skill in the art based on the combination of Zaurus, Pad++ and SVF.

Claim 40 recites that execution of the operational instructions allows the user to view a column of web content at a higher resolution than the current resolution by tapping the column via the touch sensitive display, and re-rendering the display, such that the content corresponding to the selected column is displayed to fit across the touch sensitive display. We previously noted that Zaurus discloses selecting content with a touch sensitive display. Pad++ includes a renderer that performs all rendering to the screen, maintaining a stack of transformations, including separate stacks of view transformations and object transformations that

24

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

specify translations and scale. Ex. 1006, 144, 148. Pad++ discloses a bounding box (Ref Guide, 17, (Ex. 1006, 19)) and commands such as "center" and "centerbox" to center and scale items to fill a part of the screen (Ex. 1006, 24) as well as the ability to specify the width of an item (Ex. 1006, 4). *See,* Decision To Institute, Paper 12, 29-30. Pad++ also provides for manipulating text items that display a string of characters on the screen in one or more lines. Ex. 1006, 41-42, 77-79. SVF discloses that width can be specified with text and that the text will be scaled to fit the width. Ex. 1009, 6, 19.

Claim 41 recites that the web content contains at least one image and that execution of the instructions performs further operations enabling a user to view an image at higher resolution by tapping on the image, such that the display is re-rendered for the image to fit across at least one of a width and height of a display area of the touch sensitive display. As discussed above, Pad++ provides bounding boxes containing images and commands that allow the images in the bounding boxes to be expanded so the largest dimension fills the specified amount of the screen. Ex. 1006, 24.

Addressing claim 40[11] Patent Owner argues that these features of Pad++ are not zooming on a portion of a web page, such as a column or image, but pertain to moving objects as a whole, which in the case of an HTML item, would be an entire web page. PO Resp. 43; Reinman Decl. ¶¶ 75-76. Patent Owner also argues that Pad++ does not implement HTML tags for columns. *Id.* Patent Owner further argues that Pad++ lacks these features because Pad++ was designed for navigating across multiple pages, and not for viewing of elements within particular web pages. PO Resp. 43-44. As previously discussed, Bederson disclosed an example

---

[11] Patent Owner appears to apply the same arguments to claim 41, although claim 41 is not specifically argued.

- 114 -

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

of using Pad++ to zoom in on a portion of Bederson's home web page (an HTML document) selected by a user. Ex. 1006, 286, 289, 291, 293. Thus, Bederson discloses zooming on a portion of a web page. The '926 Patent discloses that it is conventional to represent a web page using frames and to render objects in their respective positions. Ex. 1001, col. 7, ll. 33-37, col. 15, ll. 52-58. The '926 Patent also discloses that it is conventional to generate the page layout in conjunction with bounding boxes. *Id.* at col. 16, ll. 21-41. As discussed above, Bederson also defines and scales objects using bounding boxes. *See* Decision to Institute, Paper 12, 8-12.

As previously discussed, even if Bederson did not implement all available HTML tags, the selection of which tags to implement is a matter that would be well within the knowledge and abilities of a person of ordinary skill in the art, and would be obvious under 35 U.S.C. § 103.

Finally, we are not persuaded by arguments that the references do not disclose tapping on a screen to designate material to be zoomed. Zaurus disclosed a touch screen to navigate HTML document, Bederson states that Pad++ could be designed for use on handheld devices with small screens and the expedient of tapping the screen corresponds to clicking with a mouse on a large screen device.

In view of the evidence, we are persuaded that, based on a preponderance of the evidence, dependent claims 40 and 41 would have been obvious over the combination of Zaurus, Pad++, and SVF. Neither Patent Owner nor Petitioner presents additional arguments concerning claims 43, 59, 72, and 75. We addressed these claims in our Decision To Institute. Paper 12, 31-41. Based on our review of the evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 43, 59, 72, and 75 also would have been obvious over the combination of Zaurus, Pad++ and SVF.

26

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

Obviousness Over Zaurus, Hara, Tsutsumitake and SVG

*Claims 30 and 52*

As previously discussed, Zaurus discloses a mobile touch screen device, with a limited HTML browser, on which a web page can be displayed, magnified and scrolled to view portions of the web page. *See* Zaurus PDA, *supra*. Hara discloses a client device receiving an HTML document from a server, analyzing the HTML to determine whether image tags indicate there is image data to be displayed and processing the images for display and magnification depending upon the resolution of the client device. Ex. 1008 ¶¶ 0011-14, ¶¶ 0058-62. In describing the display of WWW clickable data, *id.* at ¶0043, Hara discloses using (x,y) coordinates, vectors from an origin to the x-y coordinates, and tables for shifting the display based on the magnification. *Id.* at ¶¶ 0063-68.

Tsutsumitake discloses a device that receives and stores a document in an external format, such as HTML, and converts the document to an internal format suitable for display on a screen of the device, e.g., using information blocks, such that a tag, an X coordinate, and a Y coordinate indicate the type of information (e.g., text, image) and the display position of each block. Ex. 1005 ¶¶ 0010, 0025-27, Figs. 2-5. When a document is to be displayed, the current scroll position is determined, the document state information is retrieved, and the current scroll position is subtracted from the y coordinate value in the stored internal format, and the cursor is moved to display the document. *Id.* ¶¶ 0035-38, Fig. 6.

The parties agree that Hara discloses resizing images on a web page. PO Resp. 45, Pet. Reply 10. As we previously noted, during the oral hearing Patent Owner admitted that zooming was known in the art and is not part of the invention. Tr. 50. Thus, we agree with Petitioner's expert that Hara's disclosure of adapting

27

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

the display to the resolution of the target device motivates the combination of
Zaurus and Hara to provide zooming on the target device.  Ex. 1030 ¶¶ 136-43.

Patent Owner argues that Tsutsumitake is cumulative of Hara because it is
cited as a reference that discloses translating HTML to x-y coordinate information.
PO Resp. 47.  Patent Owner contends that Hara's disclosure of image resizing does
not disclose resizing text and that Hara discloses moving objects to avoid
overlapping them after conversion.  PO Resp. 45.  Therefore, Patent Owner argues
that Hara does not preserve the original layout, functionality, and design of the web
page.  However, as previously discussed, claims 30 and 52 recite that the original
layout, functionality and design is defined by the HTML content.  Ex. 1001, claims
30, 52.  *See also,* Claim Construction, *supra.*

Tsutsumitake discloses preserving the original layout, functionality, and
design of the document (web page), because it analyzes the syntax of the external
format, converts the external format (HTML) into an internal format, and uses tags,
X and Y coordinates, and scroll position, to generate the display. Ex. 1005
¶¶ 0025-29, Fig. 3.  We are persuaded that extending Hara's disclosure of resizing
an object tagged as an image to objects with other HTML tags is a routine matter
that produces predictable results.[12]  SVG also discloses that all objects and
attributes (including text and line widths) should grow/shrink uniformly with zoom
level.  Ex. 1007 ¶ 28.  Therefore, we conclude, based on a preponderance of the
evidence, that claims 30 and 52 would have been obvious to a person of ordinary
skill in the art over the combination of Zaurus, Hara, Tsutsumitake, and SVG.

---

[12] In our earlier discussion of claim 31, 40, 41, 43, 55, 59, 72, and 75, we noted
that, in the context of selecting a paragraph, the '926 Patent states that the display
may be reformatted to fit the characteristics of the device, rather than following the
original format in the zoom out view.  Ex. 1001, col. 18, ll. 64-67.

28

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

*Claims 31, 40, 41, 43, 55, 59, 72, and 75*

Patent Owner argues the subject matter of the invention is not zooming, but instead is "smart zooming" – a way to tap or click on a column and zoom just to that column. Tr.50-51. Dependent claims 31 and 55 recite zooming on a user selectable portion of the display, but do not require that the user select the portion of the display before the zooming operation. Thus, as previously discussed, these features are disclosed in Zaurus, which discloses magnifying an entire display and allowing the user to scroll to the desired subject matter.

Claims 40 and 41 recite executing instructions that allow a user to view a column (claim 40) or image (claim 41) at a higher resolution by tapping a touch sensitive display and re-rendering the display such that the content corresponding to the column or image is displayed across the display.

The '926 Patent discloses that it is conventional in HTML to group content that should appear together into logical groupings. Ex. 1001, col. 16, ll. 19-38. Tsutsumitake discloses converting a document from an external format into an internal coordinate format to produce X-Y coordinates that define a vector. Tsutsumitake specifically identifies HTML as one such external format. Ex. 1005 ¶ 0026. Thus, Tsutsumitake discloses grouping content in the same manner as it is grouped in a web page defined by HTML, whether such tags indicate the presence of an image, a column, or some other display characteristic. As discussed above, Hara discloses resizing objects, specifically images, identified by HTML tags. In Hara, the images can be resized to match the width or height of the display screen or a user specified size. Ex. 1008 ¶¶ 0047-48. As previously discussed, Zaurus discloses navigating a web page with a touch screen. Thus, we conclude the features recited in claims 40 and 41 would have been obvious to one of ordinary

29

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

skill in the art. Patent Owner presents no arguments concerning any of the other claims challenged on this ground.

In view of the above, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 31, 40, 41, 43, 55, 59, 72, and 75 would have been obvious to one of ordinary skill in the art over the combination of Zaurus, Hara, Tsutsumitake, and SVG.

Objective Indicia of Non-obviousness

Objective criteria constitute independent evidence of non-obviousness. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2013). However, as discussed below, the objective indicia argued in the Patent Owner Response, PO Resp. 51-59, do not establish a nexus with the claimed subject matter.

Citing *Power-One v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) and *Gambro Lunda AB v.Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) Patent Owner argues that praise by others, particularly a competitor, is evidence of non-obviousness. PO Resp. 51. However, the CIO Magazine 2001 Venture OnStage recognition award cited by Patent Owner, *Id.* at 52, is not praise by a competitor and states that it was based on the CEO's presentation of the company's technology and vision. Ex. 2010. Patent Owner has not demonstrated a specific nexus between that award and the claimed subject matter.

Similarly, Patent Owner's arguments concerning the success of the Apple devices, such as the iPhone, do not establish the requisite nexus. Petitioner contends that Patent Owner has not shown it ever sold a commercially successful product. Pet. Reply 11. Patent Owner's objective indicia arguments are predicated on the assumption that the iPhone and Android products implement the features of the subject claims. Patent Owner contends that high praise and commercial

30

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

success of iPhone and Android products can be mapped to the functionality of
claim 30 of the '926 Patent. PO Resp. 51; Ex. 2034.

Where the patent is said to cover a feature or component of a product, the
patent owner has the burden of showing that the commercial success derives from
the feature, in this case the Internet browser in a handheld device. *Tokai Corp., v.
Easton Enters.,* 632 F. 3d 1358, 1369 (Fed. Cir. 2011). Where that feature is found
in the product of another, there must be proof that the feature falls within the
claims. *E.g., Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387,
1392 (infringer's counsel stated at trial that the patent had been copied); *Hughes
Tool Co. v. Dresser Indus., Inc.,* 816 F.2d 1549, 1552 (Fed. Cir. 1987) (patented O-
ring seal copied by defendant). In order to establish a proper nexus, the patent
owner must offer proof that the sales were a direct result of the unique
characteristics of the claimed invention – as opposed to other economic and
commercial factors unrelated to the quality of the patented subject matter.
*Microsoft v. Proxyconn, Inc.,* IPR2012-00026, slip op. at 4 (PTAB Mar. 8, 2013)
(Paper 32). We have considered Patent Owner's Exhibit 2034, which purports to
show that the iPhone and Android devices include the features of claim 30.
However, Patent Owner has not shown that the sales of the iPhone and Android
devices are a result of the claimed invention.

Although Patent Owner cites comments lauding the Internet browsing
capabilities of the iPhone and Android devices, including a statement made in the
Wall Street Journal that the iPhone's game changing feature is its Safari browser,
Ex. 2022, the iPhone's implementation of the Safari browser was just one of its
many features. Patent Owner does not address the numerous other features cited as
important to the iPhone device, including its use as a phone, Apple's representation
that the iPhone is "the best iPod [media player] we ever made," and its e-mail

31

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

capability. Ex. 2011. Patent Owner also has not established that the subject matter of the '926 claims, rather than Apple's extensive distribution network and marketing presence are the reason the iPhone and similar devices have been a success. The same is true of Android based devices. In contrast to the declaration of Dr. Reinman, a computer science expert with knowledge of computer technologies, Petitioner's expert Dr. Lutz, an expert on marketing and consumer behavior, states that the success of such devices can be attributed to numerous factors, including product, promotion, price, and place, and that the web browser in the iPhone was just one of the several important features contributing to its success. Ex. 1049 ¶¶ 11-12, 41-55. Thus, the objective indicia cited by Patent Owner do not overcome the case of obviousness established by Petitioner by a preponderance of the evidence.

<div align="center">MOTION TO EXCLUDE</div>

A motion to exclude is required to preserve an objection to the admissibility of evidence. 37 C.F.R. § 42.64(c). Patent Owner has moved to exclude the following: (i) Grimes Declaration (Ex. 1030) on the basis that it improperly addresses new prior art references, advances claim construction positions, and belatedly comments further on Zaurus, Mot. to Exclude 2-9; (ii) Bederson Deposition Transcript (Ex. 1032) on the basis that it is not prior art or expert testimony, *id.* at 9; (iii) new prior art references (Exs. 1037-1041) on the basis that they were submitted belatedly and constitute new challenges to patentability, *id.* at 9-11; (iv) new invalidity claim charts which (Ex. 1043 -1044) as an attempt to belatedly inject new invalidity arguments into the proceeding, *id.* at 11-12; (v) the entirety of Petitioner's Reply on the basis that it relies on improper evidence, *id.* at 12-13; (vi) transcripts of experts Gary Rohrbach and Robert Alan Burnett (Ex. 1047-1048) as irrelevant to any issue in the proceeding, *id.* at 13; (vii) Grimes

<div align="center">32</div>

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

Supplemental Declaration (Ex. 1052) as not correcting evidence, but advancing new invalidity theories and belated opinions of Zaurus, obviousness, and claim construction, *id.* at 14-15; and (viii) Lutz Declaration (Ex. 1053) as supplemental evidence rather than a correction in the form of supplemental evidence, *id.* at 15.

A motion to exclude is neither a substantive sur-reply, nor a proper vehicle for arguing whether a reply or supporting evidence is of appropriate scope. *Zynga Inc. v. Personalized Media Commc'ns, LLC*, IPR2013-00162, slip op. at 3 (PTAB Aug. 28, 2013) (Paper 16), *Berk-Tek LLC v. Belden Tech., Inc.*, IPR2013-00057, slip op. at 3 (PTAB Oct. 31, 2013) (Paper 39). In this case, the Patent Owner Response raised several substantive issues that were not raised in the Petition. These included the proper construction of the preserving limitation and non-obviousness based on objective criteria of commercial success, both of which we have discussed extensively.

A petitioner reply to a patent owner response may address only issues raised in the corresponding opposition. Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012). Petitioner was entitled to rebut Patent Owner's arguments concerning the construction of the preserving limitation and the objective criteria of non-obviousness. We agree with Petitioner that Dr. Grimes' declaration (Ex. 1030) was drawn to issues raised in Patent Owner Response that Petitioner could not have addressed in the Petition. Petitioner's Opposition to Motion to Exclude, Paper 43, (Opp. To Motion to Exclude), 3. In addition, the Board provided the parties an opportunity for additional claim construction briefing. Thus, the parties were afforded another opportunity to respond to each other concerning the construction of the preserving limitation.

Dr. Grimes Declaration (Ex. 1030) and Petitioner's Reply cite additional exhibits that, as noted above, are the subject of Patent Owner's Motion To

<div align="center">33</div>

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

Exclude. Dr. Grimes' citation to the Bederson deposition transcript specifically addresses Patent Owner's contentions concerning zooming and a touchscreen, and is consistent with Ex. 1006 in the Petition. Ex. 1030 ¶¶ 128, 131, Ex. 1032, 77-79. The additional references noted by Dr. Grimes (Exs. 1037 – 1041) were not presented as new challenges to the claims, but to support that tapping a touch screen was well known in the art. Ex. 1030 ¶ 129. We recognize the possibility that, in some circumstances, expert testimony concerning references other than those cited in the Petition can operate effectively as new challenges to the claims. In this case, however, the references are not applied specifically to the claims, and the grounds on which the Board instituted review did not change.

Exhibit 1044[13] is a modified version of Patent Owner's Exhibit 2034, which attempts to map claim 30 to Android devices. Patent Owner's expert, Dr. Reiman, cited Exhibit 2034, which resembles an infringement chart, as evidence of the praise for and commercial success of Android devices incorporating the claims of the '926 Patent. Ex. 2003 ¶ 100. Petitioner was entitled to respond to the assertions made in conjunction with Patent Owner's Exhibit 2034. Petitioner responded by adding a third column to the charts to show that the success of the Android devices was not the result of the claimed subject matter, because the claimed subject matter was disclosed in the prior art. Petitioner's response did not propose new challenges to the claims, but was merely responsive to the chart submitted by Patent Owner. We also find no basis for excluding Exhibits 1047 and 1048, which are citations from transcripts of testimony in the co-pending litigation

---

[13] Patent Owner also objects to Ex. 1043, which concerns IPR2013-00007/IPR2013-000256, and similarly relates the challenged claims of '353 Patent to Apple and Android products and to prior art.

34

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

establishing that Patent Owner began investigating possible infringement by Apple at the time Steve Jobs announced the iPhone.

Petitioner submitted Exhibits 1052 and 1053 in response to objections from Patent Owner. Much of Dr. Grimes' declaration in Exhibit 1052 refers to his earlier declaration and attempts to address issues raised by Patent Owner. We are not persuaded that Exhibit 1052 proposes new invalidity theories, as Patent Owner contends. Exhibit 1053 by Dr. Lutz is responsive to Patent Owner's objections that Dr. Lutz's previous declaration was not supported by sufficient facts and data. Exhibit 1053 points out references he relied upon in his earlier declaration and confirms his opinion. It does not provide supplemental evidence.

In consideration of the above, we deny Patent Owner's Motion to Exclude in its entirety.

CONCLUSION

This is a final written decision of the Board under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. We hold that Petitioner has shown by a preponderance of the evidence that claims 30, 31, 40, 41, 43, 52, 55, 59, 72, and 75 unpatentable under 35 U.S.C. §103(a). Specifically, the claims are unpatentable as obvious over the combination of Zaurus, Pad++, and SVF. We further hold that Petitioner has shown by a preponderance of the evidence that claims 30, 31, 40, 41, 43, 52, 55, 59, 72, and 75 are unpatentable under 35 U.S.C. § 103(a) over the combination of Zaurus, Hara, Tsutsumitake and SVG.

35

Case IPR2013-00004, IPR2013-00257
Patent 7,831,926 B2

ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 30, 31, 40, 41, 43, 52, 55, 59, 72, and 75 of the '926 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is DENIED; and

FURTHER ORDERED that because this is a final decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.


PETITIONER KYOCERA: (via electronic transmission)
Richard P. Bauer (richard.bauer@kattenlaw.com)
Michael Tomsa (michael.tomsa@kattenlaw.com)
Eric C. Cohen (eric.cohen@kattenlaw.com)

PETITIONER MOTOROLA MOBILITY LLC
John C. Alemanni (jalemanni@kilpatricktownsend.com)
Candice C. Decaire (CDecaire@kilpatricktownsend.com)
David A. Reed (DaReed@kilpatricktownsend.com)


PATENT OWNER: (via electronic transmission)
Ben Yorks (byorks@irell.com)
Babak Redjaian (bredjaian@irell.com)

36



US007831926B2

(12) **United States Patent**
    Rohrabaugh et al.

(10) **Patent No.:**      **US 7,831,926 B2**
(45) **Date of Patent:**      *Nov. 9, 2010

(54) **SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES**

(75) Inventors: **Gary B. Rohrabaugh**, Bellingham, WA (US); **Scott A. Sherman**, Seattle, WA (US)

(73) Assignee: **SoftView LLC**, Bellingham, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 799 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/738,486**

(22) Filed: **Apr. 21, 2007**

(65) **Prior Publication Data**

US 2007/0288841 A1      Dec. 13, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 09/878,097, filed on Jun. 8, 2001, now Pat. No. 7,210,099, which is a continuation-in-part of application No. 09/828,511, filed on Apr. 7, 2001, now abandoned.

(60) Provisional application No. 60/211,019, filed on Jun. 12, 2000, provisional application No. 60/217,345, filed on Jul. 11, 2000.

(51) Int. Cl.
    *G06F 17/00*      (2006.01)
(52) U.S. Cl. ...................... **715/800**; 715/234; 715/243; 715/853
(58) Field of Classification Search ................. 715/800, 715/238, 249, 204, 234
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,615,384 A      3/1997  Allard et al.

| 5,897,644 | A | 4/1999 | Blumberg |
| 5,952,994 | A | 9/1999 | Ong et al. |
| 5,956,025 | A | 9/1999 | Goulden et al. |
| 5,966,135 | A | 10/1999 | Roy et al. |
| 6,011,905 | A | 1/2000 | Huttenlocher et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| GB | 0009129.8 | 4/2000 |
| GB | 2344197 A | 5/2000 |
| JP | 10-334082 A | 12/1998 |

OTHER PUBLICATIONS

Scalable Vector Graphics (SVG) Specification W3C Working Draft Feb. 11, 1999 http://www.w3.org/TR/1999/WD-SVG-19990211/--Pub Feb. 11, 1999 by W3C pp. 1-7.

Fisher, B., G. Agelidis, J. Dill, P. Tan, G. Collaud and C. Jones. "CZWeb: Fish-Eye Views for Visualiziang the World-Wide Web", Proc. Seventh Int. Conf. on Human-Computer Interaction (HCI International '97), pp. 719-722, 1997.

(Continued)

*Primary Examiner*—Doug Hutton
*Assistant Examiner*—Quoc A Tran
(74) *Attorney, Agent, or Firm*—Law Office of R. Alan Burnett

(57)      **ABSTRACT**

Mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes. The mobile devices employ software-based processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Display lists may also be employed to provide further enhancements in rendering speed.

**88 Claims, 22 Drawing Sheets**



US 7,831,926 B2

Page 2

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,057,854 | A | 5/2000 | Davis, Jr. et al. |
| 6,076,166 | A | 6/2000 | Moshfeghi et al. |
| 6,211,856 | B1 | 4/2001 | Choi et al. |
| 6,300,947 | B1 | 10/2001 | Kanevsky |
| 6,337,693 | B1 | 1/2002 | Roy et al. |
| 6,421,733 | B1 | 7/2002 | Tso et al. |
| 6,449,639 | B1 | 9/2002 | Blumberg |
| 6,456,305 | B1 | 9/2002 | Qureshi et al. |
| 6,456,308 | B1 | 9/2002 | Agranet et al. |
| 6,457,030 | B1 | 9/2002 | Adams et al. |
| 6,466,203 | B2 | 10/2002 | Van Ee |
| 6,546,397 | B1 | 4/2003 | Rempell |
| 6,553,410 | B2 | 4/2003 | Kikinis |
| 6,556,217 | B1 | 4/2003 | Mäkipää |
| 6,615,212 | B1 | 9/2003 | Dutta et al. |
| 6,674,445 | B1 | 1/2004 | Chithambaram et al. |
| 6,704,024 | B2 | 3/2004 | Robotham et al. |
| 6,781,600 | B2 | 8/2004 | Anwar |
| 6,829,746 | B1 | 12/2004 | Schwerdtfeger et al. |
| 6,857,102 | B1 | 2/2005 | Bickmore et al. |
| 6,886,034 | B2 | 4/2005 | Blumberg |
| 6,925,595 | B1 | 8/2005 | Whitledge et al. |
| 6,978,418 | B1 | 12/2005 | Bain et al. |
| 6,996,533 | B2 | 2/2006 | Ikeda et al. |
| 7,023,572 | B2 | 4/2006 | Tuli |
| 7,055,095 | B1 | 5/2006 | Anwar |
| 7,072,984 | B1 | 7/2006 | Polonsky et al. |
| 7,219,309 | B2 | 5/2007 | Kaasila et al. |
| 7,308,649 | B2 | 12/2007 | Ehrich et al. |
| 7,450,114 | B2 | 11/2008 | Anwar |
| 2001/0015719 | A1 | 8/2001 | Van Ee et al. |
| 2001/0047428 | A1 | 11/2001 | Hunter |
| 2002/0023110 | A1 | 2/2002 | Fortin et al. |
| 2002/0030699 | A1 | 3/2002 | Van Ee |
| 2002/0112237 | A1 | 8/2002 | Ketts |
| 2002/0158908 | A1 | 10/2002 | Vaajala et al. |
| 2004/0049598 | A1 | 3/2004 | Tucker et al. |
| 2005/0144256 | A1 | 6/2005 | Blumberg |

#### OTHER PUBLICATIONS

Benjamin B. Bederson et al., Pad++: A Zoomable Graphical Sketchpad For Exploring Alternate Interface Physics, Sep. 19, 1995, pp. 1-30, http://www.cs.unm.edu/pad++.

Benjamin B. Bederson et al., A Zooming Web Browser, SPIE 1996, http://www.cs.umd.edu/hcil/jazz/learn/papers/spie-96-webbrowser. pdf, entirety (pages not numbered) .

Specification for Simple Vector Format (SVF) v1.1 Jan. 16, 1995, pp. 1-9.

Specification for Simple Vector Format (SVF) v2.0 Dec. 6, 2000, http://www.svf.org/ spec.html, pp. 1-20.

SVF XML http://www.svf.org/svfxml.html, pp. 1-18.

Changes to SVF (Date unknown), pp. 1-2.

Scalable Vector Graphics (SVG) 1.0 Specification, W3C Candidate Recommendation Nov. 2, 2000, pp. 1-513.

Introduction to SVG, part of WD-SVG-19990211, http://www.w3.orgfTR/1999/ WD-SVG-19990211/intro.html#Document . . ., pp. 1-3.

W3C Scalable Vector Graphics (SVG)—History, http://www.w3.org/Graphics/SVG/History, pp. 1-18.

Janus Boye, SVG Brings Fast Vector Graphics to Web, Jul. 29, 1999 http://www.irt.org/articles/js176/, pp. 1-5.

Vector Markup Language (VML), World Wide Web Consortium Note May 13, 1998, Note-VML-19980513, http://www.w3.org/TR/1998/Note-VML_19980513, pp. 1-47.

Vector Markup Language, http://en.wikipedia.org/wiki/Vector_Markup_Language, pp. 1-2.

Precision Graphics Markup Language (PGML), World Wide Web Consortium Note Apr. 10, 1998, NOTE-PGML-19980410, http://www.w3.org/TR/1998/NOTE-PGML-19980410, pp. 1-31.

PCT International Search Report for International Application No. PCT/US01/40920, International Searching Authority, European Patent Office, Dec. 27, 2001, pp. 1-8.

PCT International Preliminary Exam Report for International Application No. PCT/US01/40920, International Preliminary Examining Authority, European Patent Office, Jun. 20, 2002, pp. 1-5.

Dennis, "Webraska Joins W3C for Next Generation Internet Graphics," Newsbytes, May 8, 2000, entirety (pages not numbered).

Fox et al. "Experience With Top Gun Wingman: A Proxy-Based Graphical Web Browser for the 3Com PalmPilot" Proceedings of Middleware '98, 1998, entirety (pages not numbered).

"Tadpole Technology: ILOG technology within Tadpole's Cartesia Redline system making repairs simpler," M2 Presswire, Jan. 1999, entirety (pages not numbered).

Thryft, "Wireless link ramped for 'always on' Internet," EETimes, Mar. 23, 1999, pp. 1-4.

Bharadvaj et al., "An Active Transcoding Proxy to Support Mobile Web Access," Proc. Of the IEEE Symposium on Reliable Distributed Systems, 1998, entirety (pages not numbered).

Björk, et al., "WEST: A Web Browser for Small Terminals," Proceedings of the 12 ACM symposium on User Interface Software and Technology (1999), entirety (pages not numbered).

Holmquist, "The Zoom Browser," Human IT Tridskrift för studier av IT ur ett humanvetenskapligt perspektive, Mar., 1998, pp. 1-18.

Chapple, "Rethinking the role of an embedded Internet client in digital set-top boxes," WebTV Workshop Submission Paper, Jun. 1998, http://www.w3.org/Architecture/1998/06/Workshop/paper11/, pp. 1-4.

Graham, "Mobile SVG at BitFlash Inc", May 2001, http://www.w3.org/Talks/2002/1007-Di-Helsinki/bitflash/index.html, pp. 1-4.

Koncz, "Working with Autodesk Mapguide," Nov. 2000, http://www.directionsmag.com/article.php? article_id=77&trv=1, pp. 1-6.

Schaffer et al. "Navigating Hierarchically Cluster Networks through Fisheye and Full-Zoom Methods," Mar. 24, 1988—pp. 1-20.

Holmquist "Flip Zooming: Focus+Context Visualization of Linearly Ordered Discrete Visual Structures,"Published 2000, pp. 27-53.

Scalable Vector Graphics (SVG) Specification, W3C Working Draft Feb. 11, 1999 WD-SVG-19990211, http://www.w3.org/TR/1999/WD-SVG-19990211/ (HTML format—initial page).

Scalable Vector Graphics (SVG) Specification, W3C Working Draft Apr. 12, 1999 WD-SVG-19990412, http://www.w3.org/TR/1999/WD-SVG-19990412/ (HTML format—initial page).

Jones et al. "From the large screen to the small screen—retaining the designer's design for effective user interaction,"IEEE Colloquium on Issues for Networked Interpersonal Communicators, May 1997, pp. 3/1-3/4.

Pacchiano, "Adobe's New View," Computer Shopper, vol. 19, No. 4, Apr. 1999, p. 346.

Official USPTO Actions for U.S. Appl. No. 09/878,097. (Entirety—pages not numbered).

Official USPTO Actions for U.S. Appl. No. 11/045,649. (Entirety—pages not numbered).

Official USPTO Actions for U.S. Appl. No. 11/045,757. (Entirety—pages not numbered).

Official USPTO Actions for U.S. Appl. No. 11/738,932. (Entirety—pages not numbered).

Official USPTO Action for U.S. Appl. No. 11/868,124 Mailed Aug. 24, 2010 pp.1-15.



FIG. 1A



*FIG. 1B*



*FIG. 1C*



*FIG. 2A*

*FIG. 2B*





FIG. 2C

CLIENT SENDS CONTENT REQUEST
TO NETWORK SITE (E.G., WEB URL) TO
RETRIEVE CONTENT — 113

NETWORK SITE SENDS
PARENT HTML DOCUMENT — 115

CLIENT PARSES HTML SEARCHING FOR
REFERENCES TO EXTERNAL OBJECTS — 117

REFERENCED
OBJECT: HTML
DOC OR
IMAGE FILE — 44, 46, 48, 50

ANY
REFS? — 119

YES

CLIENT RETRIEVES REFERENCED OBJECT
FROM AN APPROPRIATE SERVER — 121   NO

HTML, XML, CSS CONTENT IS TRANSLATED
INTO SCALABLE VECTOR REPRESENTATION — 114

IMAGE CONTENT TRANSLATED INTO
COMPRESSED BITMAP FORMAT — 116

VECTORIZED CONTENT AND BITMAP CONTENT
PROCESSED AND SCALED USING THIN CLIENT
TO RENDER CONTENT ON CLIENT DEVICE — 120



*FIG. 3*

*FIG. 10*



**FIG. 4A**



**FIG. 4B**



FIG. 4C



**FIG. 4D**



210E          **FIG. 4E**



**FIG. 4F**



**FIG. 4G**



**FIG. 5**

Case: 14-1599    Document: 32    Page: 153    Filed: 09/08/2014



*FIG. 6*



*FIG. 7A*



**FIG. 7B**



*FIG. 8A*



**FIG. 8B**



*FIG. 9A*



**FIG. 9B**

US 7,831,926 B2

1

## SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES

### RELATED APPLICATIONS

This application is a Continuation of U.S. Non-provisional application Ser. No. 09/878,097, filed Jun. 8, 2001, (issued as U.S. Pat. No. 7,210,099) entitled "RESOLUTION INDEPENDENT VECTOR DISPLAY OF INTERNET CONTENT," which is a Continuation-in-Part of U.S. Non-provisional application Ser. No. 09/825,511, filed Apr. 7, 2001, (Abandoned) entitled "RESOLUTION INDEPENDENT VECTOR DISPLAY OF INTERNET CONTENT," the benefit of the filing dates of which is claimed under 35 U.S.C. §120. U.S. Non-provisional application Ser. No. 09/878,097 further claims the benefit of the filing dates of U.S. Provisional Application No. 60/211,019, filed Jun. 12, 2000, entitled "METHOD AND SYSTEM FOR RESOLUTION INDEPENDENT DISPLAY OF HTML AND XML CONTENT" and U.S. Provisional Application No. 60/217,345, filed Jul. 11, 2000, entitled "METHOD AND SYSTEM FOR SELECTION, RETRIEVAL, AND CONVERSION OF COMPUTER CONTENT TO VECTOR FORMAT FOR RESOLUTION INDEPENDENT DISPLAY," under 35 U.S.C. §119(e). The disclosure of each of the foregoing applications is incorporated by reference in its entirety herein for all purposes.

This application also contains subject matter related to Divisionals (of Ser. No. 09/878,097) U.S. Non-provisional application Ser. Nos. 11/045,649 (issued as U.S. Pat. No. 7,584,423) entitled METHOD, PROXY AND SYSTEM TO SUPPORT FULL-PAGE WEB BROWSING ON HANDHELD DEVICES, and 11/045,757 (issued as U.S. Pat. No. 7,461,353) entitled SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES, both filed Jan. 28, 2005. This application also contains subject matter related to U.S. Non-provisional application Ser. Nos. 11/735,477 and 11/735,482, both filed on Apr. 15, 2007, 11/738,932 filed on Apr. 23, 2007, 11/868,124 filed on Oct. 5, 2007, and 12/326,092 filed on Dec. 1, 2008.

### COPYRIGHT NOTICE

Contained herein is material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by any person as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all rights to the copyright whatsoever.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates generally to viewing of Internet content on mobile devices, and more particularly concerns to novel processing of Internet and World Wide Web content to scalable forms for resolution-independent rendering and zoom- and pan-enabling the display of content on mobile devices.

2. Description of the Related Art

Text only Internet information browsers began as a project at the CERN, European Organization for Nuclear Research, facility in Geneva Switzerland. From its inception the intent was to provide a mesh or web of access to data with a common user interface. Browsers moved from the academic environment when NCSA, the National Center for Supercomputing

2

Applications at the University of Illinois in Urbana-Champaign developed Mosaic, an Internet information browser and World Wide Web client.

Internet content is stored in multiple file formats. These formats include HTML (Hyper Text Markup Language) and XML (eXtended Markup Language) as well as graphic file format GIF (Graphics Interchange Format) and JPEG (Joint Photographic Experts Group). These four file formats constitute the majority of Internet content. Font size and resizing display area for content can alter the size of the display of Internet content in existing browsers. The majority of Internet content displays as a flat single resolution with no browser support for zoom.

Much of the Internet content has been designed for display on desktop computers with a single target resolution. Even though HTML has the ability to adapt to changes in screen resolution, major Internet content providers have chosen to create their Web pages using fixed resolution structures, such as tables. This gives them the ability to control the look and feel of their Web sites. This fixed resolution approach has evolved to the point that the fixed resolution layout of Web pages has become the most common method to brand or uniquely identify Web sites. While this fixed resolution approach is good for site branding and product differentiation it does present a daunting technical problem for display of Internet content (designed for desktop computers) on small screen, low resolution, or different aspect ratio devices, such as cell phones and hand held computers.

### BRIEF SUMMARY OF THE INVENTION

In accordance with aspects of the invention, mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes are disclosed. The mobile devices employ novel processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Display lists may also be employed to provide further enhancements in rendering speed.

According to further aspects, the mobile devices employ touch-sensitive display screens that enable users to provide various inputs to control display of content within Web pages. Exemplary user inputs include tap-based inputs to selectively zoom in on columns, images, and paragraphs. Users can also define a window to zoom in on via the touch-sensitive display.

Other features of the present invention will be apparent from the accompanying drawings and from the detailed description that follows.

### BRIEF DESCRIPTION OF THE DRAWINGS

The appended claims set forth the features of the invention with particularity. The invention, together with its advantages, may be best understood from the following detailed description taken in conjunction with the accompanying drawings of which:

FIG. 1A is a block schematic diagram illustrating a first exemplary system infrastructure in accordance with the present invention in which content translation services are performed by a third-party proxy service that translates content requested from a client that is retrieved from one or more network resources into a scalable vector representation and delivers the translated content to the client;

US 7,831,926 B2

3

FIG. 1B is a block schematic diagram illustrating a second exemplary system infrastructure in which the translation of content is performed at a content provider's web site and delivered directly to the requesting client;

FIG. 1C is a block schematic diagram illustrating a third exemplary system infrastructure in which content received from one or more network sources is translated into a scalable vector representation at the client;

FIG. 2A is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. 1A;

FIG. 2B is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. 1B;

FIG. 2C is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. 1C;

FIG. 3 is a block schematic diagram illustrating an exemplary architecture corresponding to the proxy server of FIG. 1A;

FIG. 4A is a representation of an exemplary web page has displayed on a conventional browser;

FIG. 4B is a schematic diagram illustrates various objects that are generated based on the HTML code of the web page of FIG. 4A;

FIG. 4C is a schematic diagram illustrating a set of vectors and bounding boxes corresponding to the objects generated in FIG. 4B;

FIG. 4D is a schematic diagram illustrating how various vectors and bounding boxes may be defined in accordance with the invention;

FIG. 4E is a representation of the web page of FIG. 4A after it has been offset and scaled in accordance with the invention;

FIG. 4F is a schematic diagram illustrating new datum points and bounding boxes corresponding to the scaled and offset web page;

FIG. 4G is a schematic diagram illustrating new vectors and bounding box parameters for a pair of objects in the scaled and offset web page;

FIG. 5 is a flowchart illustrating the logic used by the invention when translating content into a scalable vector representation of that content;

FIG. 6 is a flowchart illustrating client-side operations that are performed to create a rendered display page based on the translated content the client receives and user-input;

FIGS. 7A and 7B are representations of a nominal and a zoomed in column view of an exemplary web page as they might appear on a Palm device;

FIGS. 8A and 8B are representation of nominal and zoomed in view of an exemplary graphic image as they might appear on the Palm device;

FIGS. 9A and 9B are representations of a nominal and zoomed in view of a text portion of a web page as they might appear on the Palm device; and

FIG. 10 illustrates an exemplary computer system that may be used for implementing various aspects of embodiments of the invention.

DETAILED DESCRIPTION OF THE INVENTION

Apparatus and methods are described for creating resolution independent vector display of Internet content to allow it to be scaled (zoomed) larger and smaller for better viewing or to fit any resolution or screen size. In addition, infrastructure and methods are provided for delivering such content to clients.

4

In the following description, for the purposes of explanation, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent, however, to one skilled in the art that the present invention may be practiced without some of these specific details. In other instances, well-known structures and devices are shown in block diagram form.

The present invention includes various operations, which will be described below. The operations of the present invention may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor or logic circuits programmed with the instructions to perform the operations. Alternatively, the operations may be performed by a combination of hardware and software.

The present invention may be provided as a computer program product that may include one or more machine-readable mediums having stored thereon instructions, which may be used to program a computer (or other electronic devices) to perform a process according to the present invention. The machine-readable medium may include, but is not limited to, floppy diskettes, optical disks, CD-ROMs, and magneto-optical disks, ROMs, RAMs, EPROMs, EEPROMs, magnetic or optical cards, flash memory, or other type of media/machine-readable medium suitable for storing electronic instructions. Moreover, the present invention may also be downloaded as a computer program product, wherein the program may be transferred from a remote computer (e.g., a server) to a requesting computer (e.g., a client) by way of data signals embodied in a carrier wave or other propagation medium via a communication link (e.g., a modem or network connection). Accordingly, herein, a carrier wave shall be regarded as comprising a machine-readable medium.

Client Overview

According to one embodiment, an ultra-thin client-side viewer provides the graphics, linking, caching, and function handling capabilities necessary for extending the web to almost any platform. It is designed as a lightweight browser (micro-browser) running directly on device operating systems. In alternative embodiments, the client-side viewer may be deployed as a standard browser plug-in, or Java applet for extending browser functionality. In one embodiment, the client-side viewer attains its small size and efficiency by taking advantage of the power of SVF (Simple Vector Format) to describe almost any current web content. SVF files can be handled with a tiny fraction of the client code required by normal web browsers because current browsers must interpret a large and growing number of file types and their idiosyncrasies. SVF was originally designed to handle a superset of the most commonly used file formats in the complex world of CAD. It can accommodate not only new graphical functions, but the storage and transfer of almost any foreseeable new functional capability. SVF has been under consideration by the W3C (World Wide Web Consortium) for adoption as a standard for vector content on the World Wide Web.

By working tightly with a server-side content translator, web content and functionality can be passed seamlessly to the end user platform without any degradation in the look or feel of the output. In addition, because the resulting file graphics are handled as vectors, the end user can control real time changes in the size of text and graphics as well as what portion of the file is viewable in the display. This "zoom and pan" capability, familiar to CAD and other vector content software users, adds dramatically to the usability of non-standard display sizes. For very small displays, real time zooming and panning allows the user to see graphics and text at sizes that make them easily readable, and then "back up" to view an

- 151 -

US 7,831,926 B2

| 5 | 6 |

entire page for context or pan in any direction for navigation. Because the client-side viewer manipulates vectors, there is no loss in quality as the display is zoomed. The graphics rendering engine within the client is so efficient that file manipulation happens in a fraction of a second. There is no perceptible wait for the user as the file is resized, or the window is repositioned. Content created for one display resolution now can be sized, real time, for any other display without degradation. Besides making small displays eminently usable, this technology extends web content into some surprising new arenas. For example, it enables normal desktop displays to be effective for individuals with visual impairment, or for content designed for 640x480 standard PC monitors to be shown without degradation on web billboards now appearing in cities like Seattle and San Francisco.

With a client of such extraordinary power packed in a tiny footprint, end user device manufacturers can free up valuable memory space for pre-fetching, caching and pre-loading content, dramatically improving performance for use in low bandwidth and portable applications. In the example of a wireless handheld device where expensive flash memory must be used instead of more cost effective bulk storage technology, the difference between consuming 10's of megabytes of flash memory with a standard browser versus running the client-side viewer described herein is dramatic.

Those "saved" megabytes of memory are now available for impressive interfaces, caching of often used content, and pre-fetching of intelligently selected linked files or pre-loading of content for targeted applications. For example, in a mapping application, the map tiles surrounding the viewed map could be downloaded and stored while the user was working with the initial tile, enabling an experience remarkably free from the current frustrations of waiting for a new map to be transferred for even the smallest change in magnification or coverage. If the user knows ahead of time what city they will visit on a business trip, maps and additional travel information in great detail could also be pre-loaded using a high bandwidth connection at home or in the office before heading out to shop or conduct business in the city. Additionally, SVF is a more efficient way to store web content. Resulting content files are reduced in size by anywhere from 20 to 80 percent over their source. SVF is also very compressible. With target file size reduction in the range of 90%, SVF files can take up as little as $\frac{1}{16}$th the space of the web files in current use. This means that pre-translated content can be moved up to 10 times the rate of current web pages, and as much as 10 times as many pages, maps, stock charts, etc. can be stored for instant retrieval on the hand held platform as can be handled with current web technology.

When used on content created natively in SVF, additional capability can be extended to the client-side viewer.

Graphing the performance of stocks over time is only one use of SVF's ability to handle streams of data. Handling the output from financial systems, transactional systems, ERP packages, and CRM systems becomes easier and more flexible. Of course, systems integrators don't have to use these powerful capabilities to start with. If the target system provides web interfaces, these can be viewed, as designed, with no additional software to write, and no changes to the design or layout of the interface.

Server Overview

Enabling the client-side viewer to be so small and powerful is the server-side content translator. The server-side content translator rapidly translates Web content to SVF, compresses and encrypts the SVF results if desired, and transfers the vector formatted results to the client-side viewer. Alternatively, SVF files can be cached or stored in a file system for

fetching and transfer at a later time. Pre-translated or cached content transfers are significantly faster as no conversion overhead is incurred, and file sizes are reduced using the more efficient SVF. Combine that with standard compression algorithms selectable for use with the client-side viewer for additional performance improvements.

During the translation process, and in the process of serving cached, pre-translated, or native SVF content, output files are "streamed" to the client-side viewer. Although this does not decrease the total time for file transfer, it can significantly improve the effective system performance for the end user. Content can be selectively streamed, with text and links coming through first, followed by graphic images and other content, for example. Should the user be accessing a link, rather than having interest in the entire file served, links can be selected early in the transfer and the next file download started immediately. In addition to streaming, the server-side content converter may also layer the content by type. This means that text can be put in one layer, links in another, GIF images in another, Javascript in another and so on. Layers can be turned on or off depending upon client capabilities, making files for less capable clients, or for users interested in a reduced functionality, higher transfer performance mode to be handled automatically.

All operational modes may be controlled through an administrative interface or accessible through a straightforward API (Application Program Interface). Furthermore, the system works with existing firewalls and within standard security protocols. In more secure modes, the server-side content converter and the client-side viewer may operate using Public/Private key authentication and encryption.

Exemplary System Infrastructures

In the following paragraphs, a description of three exemplary system infrastructures is provided. Schematic illustrations of these system infrastructures are shown in FIGS. 1A, 1B, and 1C. It is noted that like-numbered components in these Figures perform substantially the same function. Therefore, any discussion of the functions of a component with reference to one or more of the infrastructures generally may apply to the other infrastructures as well, unless specifically noted otherwise.

A first of exemplary system infrastructure 10A for implementing the invention is shown in FIG. 1A. Infrastructure 10A enables various clients, including wireless devices such as a cellular phone 12, a wireless-enabled PDA 14, and a wireless-enabled laptop computer 16, as well as landline computers 18, 20, and 22, to request content that is accessible via a network such as the Internet 24 to be retrieved from selected network resources, including web servers 26 and 28 and an FTP site 30, wherein the content is translated into a scalable vector representation (e.g., SVF, also referred to herein as "vectorized content") through use of a proxy server 32 and sent to the requesting client. Upon being received by the client, the vectorized content is processed and rendered using a thin client to enable a user to view the content on the client device.

With reference to the flowchart of FIG. 2A, the foregoing process is initiated by a client in a block 100, wherein the client submits a request to proxy server 32 to retrieve and convert selected content. As depicted by a transfer path 34, this comprises sending data 36, which includes content network location indicia from which the content can be retrieved and proxy server network location information by which the content request may be delivered to over Internet 24 to proxy server 32. Typically, it will be desired to retrieve a particular web page. Accordingly, the content network location indicia will comprise a URL (uniform resource locator) for the web

US 7,831,926 B2

7

page. Similarly, the proxy server network location information may also comprise a URL corresponding to a network access point for the proxy server. Optionally, the location information may comprise a network IP address for one or both of the content location and the proxy server location. If the content is to be retrieved from an Internet resource, the request will typically be sent using the HyperText Transfer Protocol (HTTP) over the TCP/IP transport.

Next, in a block 102, the request is received by the proxy server and the proxy server checks its cache to see if it already has the request content in its cache. If it does, it sends this cached content back to the client. If it does not have the requested content cached, the proxy server sends out a request to retrieve the content from the network resource. For illustrative purposes, it will be assumed for the present example that the desired content comprises a web page that is stored on web server 26. Typically, when the requested content comprises a web page, the content may be retrieved using conventional web content retrieval techniques, such as that employed by various modern browser clients, including Netscape Navigator and Internet Explorer. This generally comprises providing routing information, such as the URL for the web page (URL 38) to routing services provided by Internet 24, which routes the request to an appropriate network resource (e.g., web server 26), as depicted by a transfer path 40.

Typically, the URL will correspond to a web page whose content is stored by the web server in an HTML (HyperText Markup Language) document comprising HTML code and embedded text content, in addition to other optional content languages, that may contain references to other objects (e.g., HTML documents and graphic image files) stored locally to the server or stored on a remote server. For example, the HTML content corresponding to a single-frame web page is often stored in a single file, while multiple-frame web pages may comprise content that is stored in a single file or in multiple files. These files may be stored locally on the web server (e.g., on one of the server's hard disks), or on a local storage device connected to the web server via a local area network (LAN), such as a network attached storage (NAS) filer. Optionally, some of the web page's content may comprise one or more documents that are stored at remote locations that may be accessed via a WAN (wide area network) or the Internet.

HTML is a standardized language that describes the layout of content on a web page, and attributes of that content. This layout and attribute information is defined by sets of tags contained in HTML code corresponding to the page. The tags define various HTML layout and display information, including tables, paragraph boundaries, graphic image positions and bounding box sizes, typeface styles, sizes, and colors, borders, and other presentation attributes. A portion or all of a web page's text content may be contained in the parent HTML document corresponding to the URL. In addition to basic HTML, web page documents may contain XML (eXtensible markup language) code, as well as scripting language code, such as javascript. However, for simplicity, any documents containing web page content other than only graphic content that are discussed herein will be referred to as HTML documents.

In addition to HTML and other markup and scripting language content, it is very common for web pages to include graphical content. In general, graphical content is usually stored in an image file or files that are external from the parent HTML document for the web page. For example, the parent HTML document may contain one or more embedded image tags that reference the location where those images are stored.

8

As before, the graphic images may be stored locally, or may be stored on remote servers that are accessed by the web server via a WAN, or the Internet. These files will typically comprise data stored in one of several well-known graphic formats, including bitmap files (BMP), GIF (Graphics Interchange Format) files, and JPEG (Joint Photographic Experts Group) files.

In response to receiving the request for content, web server 26 begins sending a parent HTML document 42 back to proxy server 32 in a block 104. In a block 106, the HTML content of the parent HTML document is parsed to search for references to external objects such as HTML frames and graphics. In a decision block 108, a determination is made as to whether any references are found. For each reference to an external object that is found, proxy server 32 requests to have the object retrieved from an appropriate network resource (e.g., a web server) in a block 110, and data corresponding to the object is transmitted back to the proxy server, as depicted by locally accessible HTML documents 44 and graphic images 46, as well as remotely accessible HTML documents 48 and graphic images 50, which may be accessed via web server 28. If the external object is a graphic image, there is no further processing of the object at this point. If the object is an HTML document, the functions provided by blocks 106 and 108 are repeated. Generally, this set of processing functions is repeated iteratively until all of the external objects are retrieved. However, as described below, there will be some instances in which certain objects will be retrieved at a later point in time. In addition to content stored on web servers that are accessed using HTTP, content may also be retrieved from various network sites using the File Transfer Protocol (FTP), such as FTP documents 51, which are accessed via FTP server 30.

In general, HTML documents and graphic files will be sent as packetized data streams using HTTP over one or more TCP/IP network connections, wherein the data streams will usually be asynchronous. Retrieval of HTML documents and graphic files corresponding to the embedded references will usually require additional transfer time. Furthermore, graphic content oftentimes comprises significantly larger file sizes than HTML content, leading to significant transfer times in some instances. For simplicity, the transfer of the various HTML documents and graphic files for the content request are depicted by HTML documents 52 and graphic documents 54, which are transferred over a transfer path 56.

When the HTML documents and graphic content are received by proxy server 32, a scalable vector representation of the web page is generated in a block 114 by an HTML translator 58. In brief, HTML translator 58 translates HTML, XML, and cascaded style sheet (CSS) layout content into a scalable vector representation, such as SVF. Details of the HTML translation process are contained below. In addition, the graphic images are converted into a compressed bitmap format in a block 116 by a graphics translator 60. The vectorized content 62 and compressed bitmaps 64 are then streamed back to the client (i.e., computer 18) in a block 118, as depicted by a transfer path 66. In one embodiment, the content portions are sent in separate streams using multiple connections. In another embodiment, the content portions are sent via a multiplexed stream using a single connection. As the vectorized content and compressed bitmap data are received by the client device, they are processed by a thin client 68 running on the client device, whereby a representation of the original web page content may be rendered on the client device's display screen at various user-selectable scaled resolutions and pan offsets in a block 120, thereby

US 7,831,926 B2

9                                          10

enabling a user to more clearly see an overview or details in the web page. Further details of the client side processing are provided below.

As discussed above, wireless clients may also access the vectorized network (e.g., web site) content provided via proxy server **24**. The majority of this process is identical to that described above for land-line clients (e.g., computers **18**, **20**, and **22**), except for provisions required for sending data to and receiving data from wireless devices. In general, most wireless devices will access the Internet via a wireless service provider (i.e., a wireless telecommunications carrier) that is particular to that wireless device. Accordingly, a portion of the transmission path to and from proxy server **24** will comprise infrastructure provided by that service provider and/or shared with other service providers. For simplicity, this infrastructure is shown as a cellular tower **70** and a service provider data center **72**, although it will be understood by those skilled in the art that the connection path may comprise additional infrastructure components, including appropriate gateways and routers, that enable wireless devices to access proxy server **24**.

In some implementations, there will be no special formatting/protocol services that need to be performed by proxy service **24**—from the viewpoint of the proxy service, it will be immaterial whether the client is a land-based or wireless client; the special handling provisions for wireless devices will be handled entirely by the service providers infrastructure transparently at both ends of the communications path. In other instances, it may be desired or necessary to reformat the data content delivered to the wireless device at the proxy service. This will generally be dependent on the particular wireless protocol used, and what services are provided by the service provider for the wireless client.

Currently, in the United States, wireless clients generally access Internet **24** by using the Wireless Application Protocol (WAP). In Japan, the most popular access means is NTT DoCoMo's i-Mode wireless protocol. In addition to these wireless standards, new standards are anticipated to be in force in the near future, including NTT DoCoMo's FOMA (Freedom of Mobile Multimedia Access), which is transported over W-CDMA (Wideband Code Division Multiple Access), and CDMA-2000. For the purposes of the invention herein, it will be understood that those skilled in the mobile telecommunications arts will be knowledgeable about any particular format and/or transport protocol requirements that pertain to the particular protocol that is to be used.

A second exemplary system infrastructure **10**B for implementing the invention is shown in FIG. **1**B. As will be readily recognized, much of infrastructure **10**B is similar to infrastructure **10**A; however, rather than have a separate proxy server perform the proxy functions (retrieve and translate content), these functions are performed on machines operated by the web site in infrastructure **10**B.

The logic implemented by the invention when providing content to a client using infrastructure **10**B is illustrated in the flowchart of FIG. **2**B, wherein the process begins in a block **101** in which the client sends a content request **39** directly to the network site (e.g., web server **26**), as depicted by a transfer path **41**. In a block **103**, HTTP negotiations are performed to determine the format the content is to be delivered in. For example, the request may contain indicia identifying the type of content requested, such as an SVF MIME type (e.g., image/vnd.svf). This is to inform the web server that the request is for specially-formatted content rather than conventional content. The server first checks to see if it already has cached the requested content. If it has, it sends the content to the requesting client; otherwise, it retrieves the parent HTML document

in a block **107**. It then performs processing steps in blocks **107**, **109**, and **111** to retrieve content referenced through embedded tags in a manner substantially similar to that discussed above with reference to respective blocks **106**, **108**, and **110**. The primary difference in this instance is that the web server does not receive requests from or send documents to a proxy server—rather, the content is retrieved and processed at the web server, wherein the retrieved content may be stored local to the web server or retrieved from a remote server in a manner similar to that described above.

As before, the retrieved HTML documents are translated into scalable vector representations by HTML translator **58** in a block **114**, while the graphic images are translated into a compressed bitmap format by image translator **60** in a block **116**, as depicted by vectorized content **62** and bitmap content **64**. The vectorized content and bitmap content are then streamed from the web server to the client in a block **119**, as depicted by a transfer path **67**. Upon arriving at the client, the vectorized content and bitmap content are processed, scaled, and rendered on the client in a block **120**.

A third exemplary system infrastructure **10**C for implementing the invention is shown in FIG. **1**C. In this configuration, the proxy functions are performed at the client. As shown by a block **113** in FIG. **2**C, the process for providing vectorized content to a client in accordance with infrastructure **10**C begins in a block **113**, in which the client sends a content request **37** to a network site, such as web server **26**, via Internet **24**. In response, the network site retrieves the parent HTML document and sends it to the requesting client in a block **115**. In a manner similar to that discussed above with reference to blocks **106**, **108**, and **110** of FIG. **1**A, the client first parses the parent HTML document searching for embedded references to external objects and retrieves these objects, whereupon the embedded reference search is performed on the newly retrieved document until all of the content corresponding to the original content request has been retrieved. This content is depicted by HTML documents **52** and image files **54**, which are sent from the network site to the client via a transfer path **69**. At this point, the client performs translations on the HTML content and the graphic image content that are substantially similar to that performed by the proxy server in FIG. **1**A or at the web site in FIG. **1**B, as provided by blocks **114** and **116**. The vectorized and image content is then processed and scaled by thin client **68** in a block **120**, as depicted by device output **71**.

Attention now is focused on the functionality provided by proxy server **24** in system infrastructure **10**A of FIG. **1**. Fundamentally, the proxy server functions as a proxy. It accepts requests for content from client devices as full URLs using standard HTTP mechanisms carried over a multiplexed TCP connection. Standard HTTP content negotiations features specify the formats in which content is to be delivered (SVF, bitmap, and possibly others), which can be handed off to cooperating client-side display software). As described in further details below, in some embodiments the proxy server appears for the client as a normal proxy (that is, the client knows it is retrieving content via the proxy), while in other embodiments the proxy is transparent to the client.

The proxy server responds to content requests by delivering content in one of the requested formats, by retrieving the content in an appropriate format from its cache, or from an upstream content source (again using standard HTTP content negotiation features), or by translating upstream content from a supported original format to SVF or the client bitmap format.

Requests from the server installation to its cache and from the cache to upstream content sources are made in HTTP

US 7,831,926 B2

11

carried over TCP using simple straightforward Web content requests. For example, requests from clients to the proxy server comprise HTTP proxy requests (e.g., "GET http://www/xyz.com/some_page.html HTTP/1.0 . . .") carried over TCP or over a lightweight multiplexing protocol over TCP. The multiplexing protocol allows the server to push image thumbnails to the client before the SVF stream is available, as well as offering a channel for control and status information, more simultaneous channels than the client operating system may support, and a mechanism for prioritizing information flow from server to client under loose client control. In addition to HTTP requests, the proxy server architecture supports other user-level protocols, such as FTP and Gopher.

Details of some of the primary components of the proxy server architecture are shown in FIG. 3. Internally, the proxy server comprises a suite of coordinated processes connecting to upstream content through an HTTP cache 74. In one embodiment all functions except caching are performed in a single process, wherein multiple threads are used to effect asynchronous I/O. Separate processes communicated via persistent multiplexed connections carried over the most efficient reliable transport available (e.g., Unix sockets over single processor and symmetric multiprocessor (SMP) computers; TCP sockets between separate computers). All processes are capable of servicing multiple requests simultaneously. No process maintains client state outside the context of a single request, so all components can be repeated and load balanced across multiple CPU's of an SMP computer or across separate computers on a LAN.

The various content translators used by the proxy server accept (via HTTP PUT) or request (driven by HTTP proxy GET/POST) content in supported, but client-unsupported, formats; and return (via HTTP PUT or GET/POST response) one or more representations of that content in a client-supported format. In the embodiments illustrated in FIGS. 1A-C, two translators are used: HTML translator 58 and image translator 60. Future content types may be accommodated by new translators, by extending existing translators to cover the new content types, or by extending the client's capabilities. Standard HTTP content negotiation mechanisms are used to inform the proxy server of the client's capabilities and expectations on each request.

Managers at the proxy server coordinate the operations of other components. Two managers are presently defined; a client manager 73 that handles client proxy requests, and a request manager 75 that handles unproxied HTTP requests from other services. The managers accept requests, attempt to service them from HTTP cache 74, and drive HTML translator 58 and image translator 60 when content does not match

12

the clients' requirements. Managers also handle translator requests for inline content (e.g., image dimensions for page layout), and push translated content into HTTP cache 74. Additionally, the client manager coordinates delivery of primary and inlined content, and provides process and status information to the clients.

As discussed above, HTML translator 58 creates a scalable vector representation of the original HTML content of a requested web page. In order to better explain how translation of HTML content is performed, one embodiment of a translation process is described below as applied to an exemplary web page. In addition, details of conventional web page client and server-side processing are provided so as to clarify how web content is laid out during a pre-rendering process on the client.

FIG. 4 shows a representation of a web page 210 served from an exemplary stock brokerage Internet web site as it would appear when rendered on a modern Internet browser, such as Microsoft's Internet Explorer or Netscape's Navigator. Web page 210 is exemplary of many web pages that implement frames, and includes two adjacent frames 212 and 214. A logo graphic object 216A is displayed at the top of frame 212, which additionally includes a "MARKETS" text header 218A, an "INVESTMENTS" text header 220A, and a plurality of links with overlaying graphic objects, including a "DOW" link 222A, a "NASDAQ" link 224A, an "OPTIONS" link 226A, a "CHARTS" link 228A, a "MUTUAL FUNDS" link 230A, a "IRA, 401K OPTIONS" link 232A, and a "TAX INFORMATION" link 234.

A horizontal group of links 236 is disposed at the top of frame 214, and includes a "QUOTES" link 238A, a "HOT PICKS" link 240A, a "CALENDARS" link 242A, and a "NEWS" link 244A. An advertisement banner 246A is displayed just below the horizontal group of links and just above a "NEWS SPARKS MARKET" headline 248A. Frame 214 also includes a pair of graphic image objects, including a DOW chart 250A and a NASDAQ chart 252A. A set of user input objects is disposed adjacent to DOW chart 250A within a graphic object 254A, including an "ACCOUNT #" input box 255A, an "ACCESS CODE" input box 256A, and a "LOGIN" button 257A. In addition to the foregoing objects, frame 214 also includes text objects 258A and 260A.

An HTML listing corresponding to web page 210 is presented below as LISTING 1. Note that LISTING 1 sometimes refers to object descriptions and link paths rather than the text or path location of actual objects for simplicity, and that other elements commonly found in HTML pages, such as META entries, are omitted for clarity.

| | LISTING 1 |
|---|---|
| 1. | <html> |
| 2. | <head><title>"MARKET HOME"</title></head> |
| 3. | |
| 4. | <body bgcolor="#FFFFFF" link="0033CC" vlink="0033CC"> |
| 5. | |
| 6. | <frameset cols="25%,75% frameborder=0 border=0> |
| 7. | <frame> |
| 8. | <align=left><align=top> |
| 9. | <img src="/directory path/logo.gif" align = left border="0" height="80" width="100"> |
| 10. | <br><br> |
| 11. | <t3>TEXT HEADER #1 align=left</t3><br> |
| 12. | |
| 13. | <table width="90%" border=0 cellspacing=0 cellpadding=0 bgcolor="#000000" |
| 14. | align=center> |
| 15. | <tr> |

US 7,831,926 B2

13                                    14

-continued

LISTING 1

```
16.                <a href="URL or path for LINK #5" <img src="/directory
17.                path/GRAPHIC#2" height="50" width ="150"></a>
18.      <tr>
19.                <a href="URL or path for LINK #6" <img src="/directory
20.                path/GRAPHIC#3" height="50" width ="150"></a>
21.      <tr>
22.                <a href="URL or path for LINK #7" <img src="/directory
23.                path/GRAPHIC#4" height="50" width ="150"></a>
24.      <tr>
25.                <a href="URL or path for LINK #8" <img src="/directory
26.                path/GRAPHIC#5" height="50" width ="150"></a>
27.   </table>
28.        <br>
29.                <t3>TEXT HEADER #1 align=left</t3>
30.        <br>
31.   <table width="90%" border=0 cellspacing=10 cellpadding=0 bgcolor="#000000"
32.      align=center>
33.      <tr>
34.                <a href="URL or path for LINK #9" <img src="/directory
35.                path/GRAPHIC#6" height="50" width ="150"></a>
36.      <tr>
37.                <a href="URL or path for LINK #10" <img src="/directory
38.                path/GRAPHIC#7" height="50" width ="150"></a>
39.      <tr>
40.                <a href="URL or path for LINK #11" <img src="/directory
41.                path/GRAPHIC#8" height="50" width ="150"></a>
42.
43.   </table>
44.   </frame>
45.
46.   <frame>
47.
48.   <table>
49.      <tr>
50.                <table width="100%" border=0 cellspacing=15 cellpadding=0
51.                bgcolor="#000000" align=center>
52.           <tr>
53.                <td><a href="URL or path for link#1"> alt="QUOTES"</a>
54.                <td><a href="URL or path for link#2"> alt="HOT PICKS"</a>
55.                <td><a href="URL or path for link#3"> alt="CALENDERS"</a>
56.                <td><a href="URL or path for link#4>alt="NEWS"</a>
57.   </table><br>
58.        <br>
59.                <img src="URL for GRAPHIC #9" align=center
60.                border="0" height="80" width="325">
61.        <br><t1>HEADLINE TEXT></t1>
62.        <table>
63.                <Colgroup span="2">
64.                <Col width ="400" align="center">
65.                <Col width ="200" align="center">
66.                <tr><td>
67.                <img src="directory path/GRAPHIC #10" align = center
68.                border="0" height="180" width="350">
69.                <td>
70.   /* INPUT FOR ACCOUNT NUMBER AND ACCESS CODE */
71.        <SCRIPT LANGUAGE ="/Javascript">
72.   <!---
73.                [Javascript variable declarations]
74.                [Javascript functions to enable login] ---!>
75.   </SCRIPT>
76.        <table>
77.                <td>
78.                <img src="/directory path/GRAPHIC #11" align = center>
79.                <table width="150" height="25">
80.                <td>
81.                <font size=-2 face="arial,helvetica,verdana">Account #</font>
82.                <tr><input type=text name="USERID" maxlength=9 size=20>
83.                <tr><font size=-2 face="arial, helvetica">Access Code</font>
84.                <tr><input type=password name="PASSWORD" maxlength=10 size=20
85.                onKeyDown="SuppressEnterBell(event)"
86.                onKeyPress="SuppressEnterBell(event)"
87.                onKeyUp="SubmitOnEnter(event)">
88.                <br> 
89.                <br><input type="button" value="Login"
90.                OnClick="ProcessForm( )">  <input type="reset">
```

US 7,831,926 B2

15      16

-continued

LISTING 1

```
 91.                    <br> 
 92.                    </td>
 93.                  </table>
 94.          </table>
 95.    <tr>
 96.                    <img src="/directory path/GRAPHIC #12" border="0
 97.                    height="200" width="350">
 98.    <tr>
 99.                    <p>TEXT FOR TEXT OBJECT #1</p><br>
100.                    <p>TEXT FOR TEXT OBJECT #2</p>
101.          </table>
102.          </frame>
103.    </frameset>
104.  </html>
```

Web page documents comprise HTML code that is parsed, interpreted, and rendered by a browser. An HTML document comprises a plurality of HTML "markup" elements (tags) with corresponding attributes, that are used to describe the layout and formatting of various objects, including plain text and graphic objects, embedded between tag pairs. Exemplary elements include text tags (e.g., <b></b> for bolding text), links (e.g., <a href="URL"></a>), formatting (e.g., <p></p> for creating a new paragraph, graphical (e.g., <img src="name">), wherein "name" defines an absolute or relative location at where an image is stored, tables (e.g., <table></table>) creates a table, and forms (e.g., <form></form> creates all forms).

As of Netscape Navigator 3.0 (and other later browsers), web pages could include frames. When using frames, the display page is divided into multiple framed areas. Framing enables a single display page to include source code from several HTML documents (one for each frame) or optionally, enables a single document to include more complicated grouping of contents whereby different content groups are contained in separate frames. Frames are commonly found on the web pages at sites that display a great deal of text and graphical content, such as MSN.com, ESPN.com, and USA-Today.com.

With reference to the flowchart of FIG. 5, the process for translating the HTML content into a scalable vector representation proceeds as follows. The process is initiated when the proxy server receives the HTML corresponding to the parent document (and frame documents, if appropriate), whereupon a pre-rendering parsing of the HTML is performed to determine where to place the various objects on the display page in a block 150. For example, elements such as tables, column definitions, graphic images, paragraphs and line breaks are identified. If frames are included, each frame is examined in the sequential order it appears in the HTML document, or the order in which the HTML documents corresponding to the frames in a frameset are downloaded to the browser. During further processing, the actual objects are rendered in their respective locations. Some of these objects are rendered almost immediately, such as plain text, while other objects, such as graphic objects, must first be retrieved prior to being fully-rendered. With respect to tables, there are some instances in which all of the objects corresponding to the cells in the table must be retrieved prior to rendering any of the table, while a well-designed table can be rendered incrementally. For example, by using Column grouping, the format of the corresponding table can be quickly determined by the browser. In some instances, one or more bitmaps may actually need to be fetched before the page layout can be determined.

Next, in a block 152, the content is separated into objects based on logical groupings of content portions and a page layout is built using bounding boxes that are produced for each object. As the primary HTML document is parsed, logical groupings of content will emerge. For instance, text content contained within paragraph tags <p></p> forms a logical grouping of text content. In essence, a logical grouping means the content should appear together as a logical group, such as within a substantially rectangular outline, in the rendered page. Other logical groupings include frames, table content, row content, single line entries such as headlines and headers, and user-interface objects, as well as graphic layout objects, such as separator bars, and graphic images. In addition to logically grouping content into objects, a "bounding box" is defined for each object. In general, the bounding box defines an outlined shape within which the content (text or graphic image) will appear. In most instances, the bounding box will be substantially rectangular in shape. However, bounding boxes comprising more complex shapes may also be produced.

In further detail, the following explains how objects corresponding to graphic images are produced. In HTML, objects comprising graphic content are identified by an <img src="/local directory path/graphic image file" (for a local graphic image) or "URL" (for a remote graphic image)> or <object> or other tags. In the foregoing tag, local graphic images are typically stored on the same server as the web page, or another computer that is local to the site's server, and generally are located through a local directory path (absolute or relative to the location of the present page) that points to the graphic image file. Remote images are those images that are stored on servers at sites that are remote to the web server. For example, with reference to LISTING 1, when the parser encounters line 9, the browser identifies that data comprising a graphic image corresponding to logo graphic object 1 will be arriving (or may have already been received), and the displayed image is to have a height of 80 pixels and a width of 100 pixels. The location of each object on a display page will be dependent on previous HTML layout elements, such as tables, paragraphs, line breaks, and other graphic objects. The size and location of the other graphic objects (i.e., graphic objects #2-12) on the page are determined in a similar manner. The HTML code for these objects are shown in lines 16, 19, 22, 25, 34, 37, 40, 59, 67, 78 and 96, respectively. As identified in the HTML code, data corresponding to graphic objects #9 (advertisement banner 46A) is forwarded to the browser from an external site (as indicated by the URL to GRAPHIC #9), while graphic objects 1-8 and 10-12 are sent from the web site the parent HTML document is sent from.

US 7,831,926 B2

17

In a similar manner, the foregoing technique is applied to the HTML code in the primary document to identify other types of objects as well. In addition to parsing the primary HTML document, similar processing is performed on referenced documents, such as documents that include frame content that is defined and stored separate from the primary HTML document.

A representation of the results of the functions performed in block **152** are shown in FIG. **4**B. In the Figure, objects corresponding to the original content of FIG. **4**A are shown with an appended "B" that is added to each object's root reference number, wherein the root reference number for an object is that same as the logically grouped content in FIG. **4**A that it corresponds to, e.g., an object **248**B is generated for "NEWS SPARKS MARKET" headline **248**A, etc.

Next, in a block **154**, the page layout is defined based on the bounding boxes. In actuality, generation of the page layout information is performed in conjunction with defining the boundary boxes for the objects, wherein the location of a given object is based on the location of other related (e.g., if within a table) or non-related objects corresponding to HTML content that have been previously parsed. For example, the location of a given paragraph will depend on the other content for the page that are listed prior to the definition for the paragraph in the primary HTML document or referenced document, if applicable. As the HTML content of the primary and any referenced HTML documents are parsed, the page layout is generated based on the various HTML tags and the content embedded between tag pairs and/or referenced by a tag pair statement (e.g., graphic images).

As will be recognized by those skilled in the art, the functions performed in blocks **150**, **152**, and **154** are commonly performed by conventional browsers during a pre-rendering process. In some browsers, these functions are performed by the Mozilla rendering engine, which comprises open source software that is readily available for use by developers. At present, the software for the Mozilla rendering engine may be accessed via the Internet at www.mozilla.org. Accordingly, in one embodiment, the present invention uses core functionality provided by the Mozilla rendering engine source code to perform the functions of block **150**, **152**, and **154**.

At this point, the present invention deviates substantially from the prior art by using the various object layout data generated during the pre-rendering process to generate a scalable vector representation of the original page content. First, in a block **156**, a datum point is defined for the page and the bounding box for each object. For example, as shown in FIG. **4**C, a rendered page datum **262** is defined to coincide with the upper left hand corner of the display frame of the rendered page for the web page. Generally, any point on the page may be used as the page datum—the only requirement is that the page datum that is selected is used consistently throughout the process. The use of the upper left hand corner of the display frame is advantageous since the location of the first object encountered in the HTML code for a page is located relative to this corner.

In general, the datum points for each object may also be located any place on the object, as long as the object datum points are used in a predictable manner. For example, as depicted in FIG. **4**C, various datum points for corresponding objects are defined to be coincident with the upper left hand corner of the bounding box for that object, wherein the object's datum point shares the root reference number of the object with an appended "C".

Once the page's datum point and an object's datum point are known, a vector between these points is generated for each object in a block **158**. With reference to FIG. **4**D, in one

18

embodiment, wherein the page datum point corresponds to the upper left and corner of the display frame and is assigned an XY value **266** of 0,0, the vector for a given object may be stored as the XY value of the datum point of that object relative to 0,0, such as a value of 150, 225 (ref. num. **268**) for a vector **250**D pointing to an object datum **250**C, and a value of 150, 425 (ref. num. **270**) for a vector **252**D pointing to an object datum **252**C. In another embodiment, each vector may be stored as XY data relative to a 0,0 datum point corresponding to the upper left hand corner of the frame the object belongs to. For example, a vector **250**D' from a frame datum **214**D to object datum **250**C is stored as 20, 200 (ref. num. **268'**), while a vector **252**D from frame datum **214**D to object datum **252**C is stored as 20, 425. In this embodiment, offset information for each frame relative to a known datum will also be stored, as depicted by a vector **214**D.

The scalable vector representation is completed in a block **160**, wherein a reference is created for each object that includes or links an object's content and attributes, such as object type (e.g., text, image), object typeface, and boundary box parameters, to the object's vector. For example, object **250**B is a graphic image having a vector **250**D and a bounding box that is 180 pixels high and 350 pixels wide, while object **252**B is a graphic image having a vector **252**D and a bounding box that includes a height of 200 pixels and a width of 350 pixels. This enables client-side operations to be performed that only initially consider the vectors, wherein if it is determined that a vector's endpoint (and/or the bounding box corresponding to the object the vector points to) would appear off of a display, there is no need to retrieve the content and attribute data linked to the vector. This concept is explained in further detail in the following section.

It is noted that a portion of the display content produced on a client device will never contain any rendered content, as this portion is reserved for the browser's user interface. In WINDOWS™ environments, this portion will include the browser's window frame, as well as the pulldown and icon menus provided in the browser's user interface, which are depicted by a box **264** in the Figures herein.

Client-Side Software and Processing

As discussed above, the present invention supports a wide variety of clients, including land-based clients and wireless clients. Each client requires some client-side software that enables the scalable vector content data provided to it to be rendered at a user-selectable scale factor and offset on the client's display, such as a monitor or built-in LCD screen.

By enabling original content from a web site to be displayed in such a resolution-independent manner, users will be able to view content in a manner that did not previously exist, greatly enhancing the user experience. For example, in some implementations the client may be a personal computer (PC). Using a least-common denominator approach, many web pages are designed for a smaller resolution (for example 640×480 pixels, a minimum resolution commonly supported by nearly all PC's, including legacy PC's) than the resolution provided by the video output capabilities available with many of today's PC's, such as 1024×768 pixels, 1280×1024 pixels, and even 1600×1200 pixels. As a result, when these web pages are displayed on a high-resolution display, they occupy only a portion of the display, making portions of the pages, especially those portions containing small text, difficult to read. By enabling users to selectively magnify the entire page, these design flaws are easily overcome. Alternatively, the client may be a small device, such as a hand held computer or a cell phone, which has a smaller display resolution than common Web pages are designed for. As explained below, through use of the invention's scalable vector representation

US 7,831,926 B2

<table>
<tr><td>19</td><td>20</td></tr>
</table>

and client-side processing, users are enabled to view the entire content of billions of existing Web pages using handheld devices in a simple and reasonable way.

In one embodiment, the client software may be a plug-in to a Web browser, such as Netscape Navigator or Microsoft Internet Explorer. Such a plug-in might have the browser download the data and display it in a sub-window of the browser. Alternatively, the client software may be a Java applet running in a browser. As another option, the client software may be a stand-alone program that interfaces with the proxy server or proxy software directly. The client software may bypass the proxy when requesting information that won't be translated to vectors, such as bitmaps.

With reference to FIG. **6**, client-side processing proceeds in the following manner. In a block **160**, the vector representation data (i.e., vectorized HTML content and compressed bitmap content) for the web page is gathered at the client. Typically, this data will be stored in a cache at the client as it is being received, and the client simply retrieved the data from the cache. In a block **162**, a display list of vectors is built. This process is well known in the CAD arts, and is enabling rapid zooming of vector-based objects. In a block **164**, user selectable scale and offset (pan) values are determined. Based on various user interactions with the user-interface of the client, the user is enabled to control the zoom (size) and offset of the rendered page. For example, suppose the user provides zoom and offset inputs to produce a rendered page **210**E, as shown in FIG. **4**E. In this rendered page, the original origin is now off of the screen (the page image is shifted upward and toward the left—see FIG. **4**F), and the view has been scaled approximately 1.3 times.

Next, in a block **166**, the vectors and boundary boxes are processed based on the scale and offset, and a bounding box defining the limits of the display content is determined. The results of this step are shown in FIG. **4**F, while FIG. **4**G shows specific details on how the vectors and bounding boxes corresponding to image objects **250**B and **252**B (now **250**B′ and **252**B′, respectively) are processed. Logically, there are generally two ways to scale and offset the rendered content. In one embodiment, vectors and bounding boxes are mapped to a virtual display area in memory that has much greater resolution (e.g., 100,000×100,000 pixels) than any real display, and a virtual display limit bounding box is scaled and moved around over the virtual display area. Accordingly, during subsequent processing described below, objects falling within the display bounding box are rendered by reducing the scaling of those objects in the virtual display to how the objects will appear on the client device display relative to the virtual display bounding box. In the alternate, a fixed reference frame corresponding to the display resolution of the client device screen is maintained, wherein all vectors and bounding boxes are scaled and offset relative to the fixed reference frame. Each scheme has its advantages and disadvantages. One advantage of the second method is that the display bounding box is always maintained to have a size that matches the resolution of the content display area on the client device.

As shown in FIG. **4**G, respective offsets in X and Y, (−ΔX and −ΔY in the Figure) are applied to the starting point of each of the vectors. The vectors are then scaled by a scale factor "SF." The results of the new vectors are depicted by vectors **250**D″ and **252**D″. This produces a new datum for each object's bounding box that is relative to rendered page datum **262**, which remains fixed. As discussed above, only a portion of the display screen will actually be used to display content (as defined by a display limit bounding box **266** in this embodiment), while other portions of the screen, including

box **264**, will comprise a generally fixed-size user interface. Accordingly, rendered page datum **262** is not located at the upper left hand corner of the display area, although it possibly could be located at this point when either the current user interface is inactive (i.e., the display portion of the user interface is temporary disabled) or the user interface is contained in other portions of the display.

This foregoing process establishes a starting point (the new datum) for where the content in each object's bounding box will be rendered. At this point, each object's bounding box is then drawn from its new datum using the scaling factor. For example, in the original web page **210**O (FIG. **4**D), bounding box **250**B had an X-axis datum of 150 pixels, a Y-axis datum of 225 pixels, and a height and width of 180×350 pixels. In contrast, after being offset and scaled, bounding box **250**B′ has an X-axis datum of 150*SF−ΔX, a Y-axis datum of 225*SF−ΔY, and a height and width of 180*SF×350*SF.

Returning to the flowchart of FIG. **6**, once the vectors and bounding boxes are offset and scaled, content corresponding to objects having at least a portion of their bounding boxes falling within the display limit bounding box is retrieved from the client device's display list in a block **168**. For examples, as shown in FIG. **4**F, content corresponding to all of the objects except for those falling entirely outside of display limit bounding box **266** (objects **216**, **238**, **240**, **242** and **244**) is retrieved from the display list. That content is then scaled in a block **170**. For image content, this comprises decompressing and scaling the compressed bitmaps corresponding to those images. For text content, this comprises scaling the font (i.e., typeface) that the text content portions of the web page are written in the parent HTML document and any referenced documents. There are various techniques for typeface scaling that may be implemented here, depending on the available resources provided by the operating system of the client device. For example, for WINDOWS™ operating systems, many TRUETYPE™ fonts are available, which use a common scalable definition for each font, enabling those fonts to be scaled to just about any size. In other cases, such as current PDA (e.g., Palm Pilots) operating systems, there is no existing feature that supports scaling fonts. As a result, bitmapped fonts of different font sizes and styles may be used. In addition to scaling image and text content, other types of content, such as separator lines and borders may also be scaled by block **170**.

The process is completed in a block **172**, wherein those portions of the scaled content falling within the display limit bounding box are rendered on the client device's display.

As discussed above, it is foreseen that the invention will be used with client devices having small, low resolution displays, such as PDAs and pocket PCs. Examples of various views of an exemplary web pages obtained from the YAHOO™ web site are shown in FIGS. **7**A-B, **8**A-B and **9**A-B. For instance, FIG. **7**A represents how the YAHOO™ home page might appear on a Palm IIIc color PDA.

In addition to directly scaling and offsetting content, the client user-interface software for PDA's provides additional functionality. For instance, a user may select to view a column (results represented in FIG. **7**B by tapping that column with a stylus, a shown in FIG. **7**A. Similarly, the user may select to zoom in on an image by tapping the image with the stylus, as shown in FIGS. **8**A and **8**B, or select to view a paragraph in an article by tapping on the paragraph, as shown in FIGS. **9**A and **9**B. It is noted that in some instances, the display of the paragraph may be reformatted to fit the characteristics of the display, rather than following the original format in the zoom-out view.

US 7,831,926 B2

21

It is further noted that that different scaling factors can be applied to the X and Y axis so as to change the aspect ratio of the display. For example, a Web page may be designed to be displayed on a computer having a resolution of 800×600 pixels, or a 4X to 3Y aspect ratio. In this case, the display corresponds to a "landscape" layout, wherein there are more pixels along the X axis than along the Y axis. Conversely, many handheld devices display images having a "portrait" layout, wherein there are more pixels along the Y axis than the X axis. By enabling different scaling factors to be applied to the X and Y axes, the present invention enables the aspect ratio of a rendered display image to be adjusted to better fit the aspect ratio of the client device.

An Exemplary Computer Architecture

An exemplary machine in the form of a computer system **500** in which features of the present invention may be implemented will now be described with reference to FIG. **10**. Computer system **500** may represent a workstation, host, server, print server, or printer controller. Computer system **500** comprises a bus or other communication means **501** for communicating information, and a processing means such as processor **502** coupled with bus **501** for processing information. Computer system **500** further comprises a random access memory (RAM) or other dynamic storage device **504** (referred to as main memory), coupled to bus **501** for storing information and instructions to be executed by processor **502**. Main memory **504** also may be used for storing temporary variables or other intermediate information during execution of instructions by processor **502**. Computer system **500** also comprises a read only memory (ROM) and/or other static storage device **506** coupled to bus **501** for storing static information and instructions for processor **502**.

A data storage device **507** such as a magnetic disk or optical disc and its corresponding drive may also be coupled to bus **501** for storing information and instructions. Computer system **500** can also be coupled via bus **501** to a display device **521**, such as a cathode ray tube (CRT) or Liquid Crystal Display (LCD), for displaying information to an end user. Typically, an alphanumeric input device **522**, including alphanumeric and other keys, may be coupled to bus **501** for communicating information and/or command selections to processor **502**. Another type of user input device is cursor control **523**, such as a mouse, a trackball, or cursor direction keys for communicating direction information and command selections to processor **502** and for controlling cursor movement on display **521**.

A communication device **525** is also coupled to bus **501**. Depending upon the particular presentation environment implementation, the communication device **525** may include a modem, a network interface card, or other well-known interface devices, such as those used for coupling to Ethernet, token ring, or other types of physical attachment for purposes of providing a communication link to support a local or wide area network, for example. In any event, in this manner, the computer system **500** may be coupled to a number of clients and/or servers via a conventional network infrastructure, such as a company's Intranet and/or the Internet, for example.

Importantly, the present invention is not limited to having all of the routines located on the same computer system. Rather, individual objects, program elements, or portions thereof may be spread over a distributed network of computer systems. Additionally, it is appreciated that a lesser or more equipped computer system than the example described above may be desirable for certain implementations. Therefore, the configuration of computer system **500** will vary from imple-

22

mentation to implementation depending upon numerous factors, such as price constraints, performance requirements, and/or other circumstances. For example, according to one embodiment of the present invention, a cell phone or a hand held computer may comprise only a processor or a micro controller and a memory, such as a micro code ROM or RAM, for storing static or dynamically loaded instructions and/or data.

In the foregoing specification, the invention has been described with reference to specific embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense.

What is claimed is:

**1**. A mobile device, comprising:

a processor,

a wireless communications device operatively coupled to the processor, to facilitate communication with a network via which Web content may be accessed;

a touch-sensitive display;

a memory, operatively coupled to the processor; and

storage means, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile phone to perform operations including,

enabling a user to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving HTML-based Web content associated with the Web page;

translating the HTML-based Web content to produce scalable vector-based page layout information;

employing the scalable vector-based page layout information and/or data derived therefrom to,

render a view of at least a portion of the Web page on the touch-sensitive display using a first scale factor; and

re-render the Web page in response to associated user inputs to enable a user to iteratively zoom in and out views of the Web page on the display while preserving the original page layout, functionality, and design of the content on the Web page defined by the HTML-based Web content,

wherein preservation of the functionality defined by the HTML-based content includes preservation of hyperlink functionality.

**2**. The mobile device of claim **1**, wherein the device comprises a mobile phone.

**3**. The mobile device of claim **1**, wherein the device comprises one of a hand-held device or a palm-held device.

**4**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

**5**. The mobile device of claim **1**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**6**. The mobile device of claim **1**, wherein the Web content includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink via the touch-sensitive display; and, in response thereto,

US 7,831,926 B2

23

retrieving and translating HMTL-based Web content associated with the hyperlink to produce additional scalable vector-based page layout information; and

employing the additional scalable vector-based page layout information and/or data derived therefrom to render the Web content associated with the hyperlink on the touch-sensitive display.

**7**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling the Web content to be displayed at different resolutions by scaling the scalable vector-based page layout information to resize a view of the Web page on the display in response to associated user inputs.

**8**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising returning the display of the Web content to a previous view in response to a corresponding user input made via the touch-sensitive display.

**9**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

**10**. The mobile device of claim **9**, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

**11**. The mobile device of claim **1**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable vector-based page layout information and/or data derived therefrom is scaled to render a display having a different aspect ratio.

**12**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is displayed to fit across the touch-sensitive display.

**13**. The mobile device of claim **1**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit across a width of a display area of the touch-sensitive display.

**14**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is displayed to fit across a width of a display area of the touch-sensitive display.

**15**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising:

generating a display list derived, at least in part, use of the vector-based page layout information; and

employing the display list to re-render the display of the Web page.

**16**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising:

parsing HTML-based code corresponding to the received Web content to logically group content into objects, the objects including a plurality of display objects;

24

defining a primary datum corresponding to a page layout; and,

for each display object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**17**. The mobile device of claim **16**, wherein execution of the instructions performs further operations comprising:

mapping the object vectors to a virtual display area in memory.

**18**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising:

parsing the HTML-based content to logically group content into objects;

generating page layout information including a bounding box for each object, the bounding box defining width and height dimensions for the object; and

storing information that links each object with its corresponding page layout information;

wherein the page layout information further includes information from which a page layout location of each of the bounding boxes can be determined.

**19**. The mobile device of claim **1**, wherein the scalable vector-based content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**20**. The mobile device of claim **1**, wherein at least a portion of the instructions comprise Java-based instructions configured to be executed on a Java virtual machine.

**21**. The mobile device of claim **1**, wherein translating the HTML-based Web content to produce scalable vector-based page layout information comprises:

processing the HTML-based Web content with a rendering engine to generate page layout information corresponding to the original page layout as interpreted by the rendering engine; and

employing the page layout information to produce scalable vector-based page layout information.

**22**. The mobile device of claim **21**, wherein the page layout information defines a layout location for a plurality of objects, including text objects, graphic layout objects, and/or image objects included on the Web page, and wherein producing vector-based page layout information comprises:

defining a primary datum corresponding to a page layout; and,

for each object,

defining an object datum corresponding to the layout location for the object on the page layout;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**23**. The mobile device of claim **22**, wherein execution of the instructions performs further operations comprising effecting a zoom operation combined with a pan operation by, for each of the plurality of display objects to be included in a panned view of the Web page to be rendered on the display,

scaling page layout information associated with the display object using a scale factor corresponding to a zoom level associated with the zoom operation to determine a scaled datum;

US 7,831,926 B2

25

determining an offset corresponding to the pan operation and combining the scaled datum with the offset to produce a scaled and offset datum that defines a location where the display object is to be rendered on the panned view of the Web page;

scaling content associated with the display object using the scale factor; and

rendering the scaled content at the location defined by the scaled and offset datum to render the display object on the panned view of the Web page.

24. The mobile device of claim 23, wherein rendering scaled content associated with a text object comprises:

retrieving presentation attributes for the text object, the presentation attributes including a font typeface, size and color;

employing a scalable font associated with the font typeface to render text associated with the text object in a color associated with the color attribute, wherein the text is rendered relative to a location associated with the scaled and offset datum for the text object, and wherein the scale applied to the scalable font is a function of the scale factor and the font size.

25. The mobile device of claim 21, wherein the original format of the Web page defines a width for the Web page, as interpreted by the rendering engine, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to fit the width of the Web page across a display area of the touch-sensitive display; and

employing the scale factor that is determined as the first scale factor.

26. The mobile device of claim 1, wherein zooming operations are effected by applying a mathematical transformation to a plurality of points in a two-dimensional coordinate system comprising X and Y axes, including points comprising datum points having corresponding vectors included in the scalable vector-based page layout information defining page layout locations of corresponding text and image objects mapped to the two-dimensional coordinate system, wherein the mathematical transformation comprises:

$$X'=X*SF;$$

$$Y'=Y*SF;$$

wherein X, Y is the location of a point prior to transformation, X', Y' is the location of the point after transformation, and SF is the scale factor.

27. The mobile device of claim 26, wherein the mathematical transformation is applied to points in a first coordinate system comprising a virtual coordinate system associated with a virtual display area onto which page layout information is mapped to a second coordinate system comprising a device coordinate system corresponding to a pixel resolution of the display of the mobile device, wherein points are mapped from the first coordinate system to the second coordinate system using the mathematical transformation.

28. The mobile device of claim 1, wherein execution of the instructions performs further operations comprising maintaining at least one instance of the page layout information in a manner that is independent of the zoom levels used to view the web page on the display.

29. The mobile device of claim 1, wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page.

26

30. A mobile phone, comprising:

a processor,

wireless communications means operatively coupled to the processor, to facilitate communication with a mobile service provider network via which Web content may be accessed;

a touch-sensitive display;

a memory, operatively coupled to the processor; and

storage means, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile phone to perform operations including,

rendering a browser interface via which a user is enabled to request to access to a Web page having an original format comprising HTML-based content defining an original page layout, functionality, and design of content on the Web page;

retrieving HTML-based content associated with the Web page;

translating at least a portion of the HTML-based content from its original format to a scaled translated content including scalable vector-based content that supports a scalable resolution-independent representation of the HTML-based content that preserves an original page layout, functionality and design of the at least a portion of the HTML-based content when scaled and rendered; and

employing the scalable vector-based content to render a view of at least a portion of the Web page on the display using a first scale factor,

wherein preservation of the functionality defined by the HTML-based content includes preservation of hyper-link functionality.

31. The mobile phone of claim 30, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

32. The mobile phone of claim 31, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

33. The mobile phone of claim 30, wherein the Web content includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink via the touch-sensitive display; and, in response thereto,

retrieving and translating the Web content associated with the hyperlink to produce additional scalable vector-based content; and

employing the additional scalable vector-based content to render the Web content associated with the hyper-link on the touch-sensitive display.

34. The mobile phone of claim 30, wherein execution of the instructions performs further operations comprising:

parsing and processing markup language code associated with the Web page to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout location for a plurality of objects, including text objects, graphic layout objects, and/or graphic image objects included in the Web page;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to the layout location for the object;

US 7,831,926 B2

27

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**35.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling the Web content to be displayed at different resolutions by scaling the scalable vector-based content to re-render the display in response to associated user inputs.

**36.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising returning the display of the Web content to a previous view in response to a corresponding user input made via the touch-sensitive display.

**37.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

**38.** The mobile phone of claim **37**, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

**39.** The mobile phone of claim **30**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable vector-based content is scaled when rendered so as to produce a display having a different aspect ratio.

**40.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is displayed to fit across the touch-sensitive display.

**41.** The mobile phone of claim **30**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit across at least one of a width and height of a display area of the touch-sensitive display.

**42.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.

**43.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising:

generating a display list associated with the scalable vector-based content; and

employing the display list to re-render the display at different scale factors to enable rapid zooming of the Web page.

**44.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising:

parsing and processing markup language code corresponding to the received Web content to determine page layout information corresponding to a page layout of the content on the Web page;

28

logically grouping selected content into objects;

defining a primary datum corresponding to the page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**45.** The mobile phone of claim **44**, wherein execution of the instructions performs further operations comprising:

mapping the object vectors to a virtual display area in memory.

**46.** The mobile phone of claim **45**, wherein execution of the instructions performs further operations comprising:

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and pan corresponding to a rendered view of the Web content desired by a user;

determining a virtual display limit bounding box for the virtual display area associated with the first scale factor and offset;

identifying objects having at least a portion of their content falling within the virtual display limit bounding box; and,

for each of such objects,

retrieving content associated with that object; and

applying an appropriate scale factor and offset to the content to render the view of the Web content.

**47.** The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising:

parsing markup language code corresponding to the received Web content to logically group selected content into objects;

generating page layout information including a bounding box for each object, the bounding box defining width and height dimensions for the object; and

storing information that links each object with its corresponding page layout information;

wherein the page layout information further includes information from which a page layout location of each of the bounding boxes can be determined.

**48.** The mobile phone of claim **30**, wherein the scalable vector-based content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**49.** The mobile phone of claim **30**, wherein the original format of the Web page defines a width for the Web page, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to fit the width of the Web page across a display area of the touch-sensitive display; and

employing the scale factor that is determined as the first scale factor.

**50.** The mobile phone of claim **30**, wherein at least a portion of the instructions comprise Java-based instructions configured to be executed on a Java virtual machine.

**51.** The mobile device of claim **30**, wherein the original format of the Web page comprises HTML-based Web content and the vector-based scalable content comprises scalable vector-based page layout information, and wherein execution of the instructions performs further operations comprising:

US 7,831,926 B2

29

30

processing the HTML-based Web content with a rendering engine to generate page layout information corresponding to the original page layout as interpreted by the rendering engine;

employing the page layout information to generate the scalable vector-based page layout information.

52. A mobile device, comprising:

a processor,

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

a touch-sensitive display;

flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile device to perform operations including,

rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving and processing the HTML-based Web content to produce scalable content; and

employing the scalable content and/or data derived therefrom to,

render a view of the Web page on the touch-sensitive display; and

re-render the Web page in response to associated user inputs to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality.

53. The mobile device of claim 52, wherein the device comprises a mobile phone.

54. The mobile device of claim 52, wherein the device comprises one of a Personal Digital Assistant (PDA) or pocket PC.

55. The mobile device of claim 52, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

56. The mobile device of claim 55, wherein the user interface input enables the user to define a window of a current view of the Web page on which to zoom in on.

57. The mobile device of claim 52, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

58. The mobile device of claim 52, wherein the Web page includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink via the touch-sensitive display; and, in response thereto,

retrieving and processing HMTL-based Web content associated with the hyperlink to produce additional scalable content; and

employing the additional scalable content and/or data derived therefrom to render the Web content associated with the hyperlink on the touch-sensitive display.

59. The mobile device of claim 52, wherein at least a portion of the scalable content comprises scalable vector-based content.

60. The mobile device of claim 52, wherein execution of the instructions performs further operations comprising

returning the display of the Web page to a previous view in response to a corresponding user input made via the touch-sensitive display.

61. The mobile device of claim 52, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

62. The mobile device of claim 61, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

63. The mobile device of claim 52, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable content and/or data derived therefrom is scaled to render a display having a different aspect ratio.

64. The mobile device of claim 52, wherein execution of the instructions performs further operations comprising enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is displayed across the touch-sensitive display.

65. The mobile device of claim 52, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit a width of a display area of the touch-sensitive display.

66. The mobile device of claim 52, wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.

67. The mobile device of claim 66, wherein the content of the paragraph is reformatted to fit characteristics of the display area when the display is re-rendered.

68. The mobile device of claim 52, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

69. The mobile device of claim 68, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

mapping the object vectors and associated bounding boxes to a virtual display area in the dynamic memory.

70. The mobile device of claim 69, wherein execution of the instructions performs further operations comprising:

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and pan corresponding to a rendered display of the Web page desired by a user;

determining a virtual display limit bounding box for the virtual display associated with the first scale factor and offset;

US 7,831,926 B2

31

identifying object bounding boxes having at least a portion falling within the virtual display limit bounding box; and,

for each of such object bounding boxes,

retrieving content associated with that object bounding box; and

applying an appropriate scale factor to the content to render the display.

**71**. The mobile device of claim **52**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

building a display list via use of the scalable content and rendering the display list on a virtual display area in the dynamic memory; and

scaling the display list to re-render the display of the Web page.

**72**. The mobile device of claim **52**, wherein execution of the instructions performs further operations comprising:

parsing HTML-based code corresponding to the received Web content to identify content on the Web page;

logically grouping selected content into objects;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**73**. The mobile device of claim **72**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**74**. The mobile device of claim **52**, wherein the scalable content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**75**. The mobile device of claim **52**, wherein the original format of the Web page defines a width for the Web page, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to fit the width of the Web page across a display area of the touch-sensitive display; and

employing the scale factor to render the display area.

**76**. The mobile device of claim **52**, wherein at least a portion of the instructions comprise Java-based instructions configured to be executed on a Java virtual machine.

**77**. The mobile device of claim **52**, wherein a portion of the HTML-based Web content comprises XML-based content.

**78**. The mobile device of claim **52**, wherein a portion of the HTML-based Web content comprises cascading style sheet data.

**79**. A mobile device, comprising:

processing means;

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

touch-sensitive display means, to facilitate user input and display rendered content;

programmed circuit means; and

storage means, in which a plurality of instructions are stored,

32

wherein, upon execution of the instructions by at least one of the processing means and programmed circuit means, the mobile device is enabled to perform operations, including,

rendering a browser interface via which a user is enabled to request to access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving and processing the HTML-based Web content to produce scalable content; and

employing the scalable content and/or data derived therefrom to,

render a view of the Web page on the touch-sensitive display; and

re-render the Web page in response to associated user inputs made via the touch-sensitive display means to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality.

**80**. The mobile device of claim **79**, wherein the processing means includes a general-purpose processor.

**81**. The mobile device of claim **79**, wherein at least a portion of the programmed circuit means is embodied as a special-purpose processor.

**82**. The mobile device of claim **79**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

**83**. The mobile device of claim **82**, wherein the user interface input enables the user to define a window of a current view of the Web page on which to zoom in on.

**84**. The mobile device of claim **79**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**85**. The mobile device of claim **79**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

**86**. The mobile device of claim **85**, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

**87**. The mobile device of claim **79**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit across a width of a display area of the touch-sensitive display.

**88**. The mobile device of claim **79**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

building a display list of scalable content via use of the scalable content and rendering the display list on a virtual display area in the dynamic memory; and

scaling the scalable content in the display list to re-render the display of the Web page.

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on <u>September 8, 2014</u> by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

| Alan Heinrich | /s/ Alan Heinrich |
|---|---|

Name of Counsel

Law Firm:    <u>Irell & Manella LLP</u>

Address:    <u>1800 Avenue of the Stars, Suite 900</u>

City, State, ZIP:    <u>Los Angeles, CA  90067</u>

Telephone Number:
    <u>310-277-1010</u>

FAX:    <u>310-203-7199</u>

E-mail Address    <u>aheinrich@irell.com</u>

# CERTIFICATE OF COMPLIANCE

Form 19

FORM 19.  Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [        13,922        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑    The brief has been prepared in a proportionally spaced typeface using [ *Microsoft Word 2010* ] in [ *Times New Roman, 14 point* ], or

☐    The brief has been prepared in a monospaced typeface using [ *state name and version of word processing program* ] with [ *state number of characters per inch and name of type style* ].

/s/ Samuel K. Lu
_____
(Signature of Attorney)

Samuel K. Lu
_____
(Name of Attorney)

Attorney for Appellant SoftView LLC
_____
(State whether representing appellant, appellee, etc.)

September 8, 2014
_____
(Date)

Reset Fields

142